1  JOHN-PATRICK M. FRITZ (SBN 245240)
   DANIEL H. REISS (SBN 150573)
2  JEFFREY S. KWONG (SBN 288239)
   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
4  Los Angeles, California 90034
   Telephone:  (310) 229-1234;
5  Facsimile:  (310) 229-1244
   Email: JPF@LNBYG.COM; DHR@LNBYG.COM; JSK@LNBYG.COM
6
7  Counsel for Chapter 11 Debtors
   and Debtors in Possession

8
                **UNITED STATES BANKRUPTCY COURT**
9                **CENTRAL DISTRICT OF CALIFORNIA**
                   **LOS ANGELES DIVISION**
10

| | |
|---|---|
| In re: | Lead Case No.: 2:24-bk-19127-BB |
| UNRIVALED BRANDS, INC., et al. | Jointly administered with: Halladay Holding, LLC (2:24-bk-19128-BB) |
| Debtors and Debtors in Possession. | Chapter 11 Cases |
| | Adversary Case No. _____ |
| UNRIVALED BRANDS, INC.; HALLADAY HOLDING, LLC | **COMPLAINT FOR:** |
| Plaintiffs, | **(1)  AVOIDANCE OF VOIDABLE TRANSFERS;** |
| v. | **(2)  RECOVERY OF AVOIDED TRANSFERS;** |
| PEOPLE'S CALIFORNIA, LLC, a California Limited Liability Company, | **(3)  DISALLOWANCE OF CLAIM;** |
| | **(4)  RELATED RELIEF** |
| Defendant. | **[11 U.S.C. §§ 502, 544, 547, 548 and 550; Fed. R. Bankr. P. 7070]** |
| | Date:  [TO BE SET BY SUMMONS] Time: Place: Courtroom 1539 U.S. Bankruptcy Court 255 E. Temple Street Los Angeles, CA 90012 |

Plaintiffs Unrivaled Brands, Inc. ("<u>Plaintiff Unrivaled</u>") and Halladay Holding, LLC ("<u>Plaintiff Halladay</u>," and together with Plaintiff Unrivaled, "<u>Plaintiffs</u>" or "<u>Debtors</u>"), debtors in possession in the above-captioned jointly administered chapter 11 cases, hereby respectfully allege as follows:

### **REQUIRED PLEADING DISCLOSURE**

1.      In accordance with the requirements of Local Bankruptcy Rule 7008-1, Plaintiffs hereby allege that the claims for relief in this complaint constitute core proceedings under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), (K), and (O), and are related to the Plaintiffs' above-captioned jointly administered bankruptcy cases because, among other reasons, the outcome of such claims for relief could have a significant effect on their bankruptcy estates as each such claims for relief will impact property of the estates and the amount of money available for distribution to the Plaintiffs' creditors.  Regardless of the core or non-core nature of the claims for relief asserted herein, Plaintiffs consent to the entry of final orders and judgment by the bankruptcy court (the "<u>Court</u>") to the maximum extent permitted by applicable law.  Defendant People's California, LLC is hereby notified that Federal Rules of Bankruptcy Procedure ("<u>FRBP</u>") 7008 and 7012(b) require each defendant to plead whether each claim for relief asserted against such defendant is core or non-core and, if non-core, whether consent is given to the entry of final orders and judgment by the Court.

### **JURISDICTION AND VENUE**

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157, and 1334. This adversary proceeding is brought pursuant to Rules 7001, *et seq*., and 7070 of the FRBP; and Sections 502, 544, 547, 548, 550, and 551 of title 11 of the United States Code, sections 101, *et seq.* (the "<u>Bankruptcy Code</u>"). Venue in this Court is proper pursuant to 28 U.S.C. § 1409 as this adversary proceeding arises under, arises in, and/or relates to a case under title 11 of the United States Code that is pending in this District.

/ / /

/ / /

**PARTIES**

3.    On November 6, 2024 (the "Petition Date"), the Plaintiffs commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.[1]

4.    Plaintiff Unrivaled is a Nevada corporation, and is a holding company for multiple businesses based on certain acquisitions that occurred during 2018 to 2021.

5.    Plaintiff Halladay is a California limited liability company that is wholly-owned by Plaintiff Unrivaled.  Plaintiff Halladay's sole asset is certain real property located at 3242 Halladay Street, Santa Ana, CA 92705 (the "Halladay Property").

6.    Defendant People's California, LLC ("Defendant") is a California limited liability company located in Irvine, California.  Defendant is a creditor and insider of the Debtors and, as described more fully below, obtained certain transfers from the Plaintiffs during the relevant ninety-day ("90 Day Preference Period") and one-year period (the "1 Year Preference Period," and together with the 90 Day Preference Period, the "Preference Periods") and obtained certain transfers from the Plaintiffs during the two-year period for constructively fraudulent transfer, which are the subject of this adversary proceeding.

**GENERAL ALLEGATIONS**

7.    On July 19, 2022, Defendant filed a lawsuit styled *People's California LLC v. Plaintiff Unrivaled Brands, Inc.*, Case No. 30-2022-01270747-CU-BC-CJC, in the Orange County Superior Court (the "State Court"), which related to Plaintiff Unrivaled's purchase of certain assets from Defendant (the "State Court Action").

8.    The State Court Action alleged that Plaintiff Unrivaled was unable to pay its debts.  Plaintiff Unrivaled's inability to pay its debts was attributable to a number of factors, both macroeconomic and due to Plaintiff Unrivaled's particular circumstances.  For example, due to increasing inflationary pressures, rising interest rates and significantly decreased consumer spending in 2022, Plaintiff Unrivaled's cash flows and assets plummeted.

---

[1] Unless otherwise stated, all Section references herein are to title 11 of the United States Code, §§ 101, et seq.

9.      Due to Plaintiff Unrivaled's financial troubles, in August 2022, new management was brought in by hiring Adnant LLC and installing Sabas Carillo as the company's new chief executive officer.

10.     New management's attempts to restructure and rehabilitate Plaintiff Unrivaled's failing business were hampered by aggressive litigation by Defendant, including the State Court Action commenced in July 2022 (*i.e.*, shortly before new management was employed). Defendant's relentless litigation strategy, which included, but was not limited to the State Court Action, drained Plaintiff Unrivaled's financial resources, distracted new management, and ultimately made it impossible to stabilize the business.[2]

**The Settlement Agreement.**

11.     On March 6, 2023, Plaintiff Unrivaled and Defendant (collectively, the "Settlement Parties") entered into that certain "*Binding Settlement Term Sheet*" (as amended, the "Settlement Agreement") to, among other things, resolve the State Court Action.  A true and correct copy of the Settlement Agreement is attached as **Exhibit 1** hereto.

12.     Among other things, the Settlement Agreement required Plaintiff Unrivaled to pay to Defendant a total of twenty-three million dollars ($23,000,000) (the "Aggregate Settlement Amount").  The Aggregate Settlement Amount would be paid pursuant to the terms of two promissory notes – one in the amount of $20 million (the "$20M Note"), and the other in the amount of $3 million (the "$3M Note," and together with the $20M Note, the "Notes").

13.     The Settlement Agreement also required an "Up-Front Settlement Amount" of eight million dollars ($8,000,000), of which five million dollars ($5,000,000) was to be paid within 90 days of the effective date of the Settlement, and the other remaining three million dollars ($3,000,000) was due within 180 days in accordance the terms of the $3M Note.

/ / /

/ / /

---

[2] In fact, this litigation, the onerous terms of the Settlement Agreement, drained financial and human resources, and resulting financial instability were major causes of Plaintiffs' insolvency and their bankruptcy filings in November 2024.

14.     On May 17, 2023, the parties executed "*Amendment No. 1*" to the Settlement Agreement (the "Settlement Amendment"), and Plaintiff Unrivaled paid Defendant $800,000 toward the Up-Front Settlement Amount (the "$800,000 Up-Front Payment").

15.     In accordance with the terms of the Settlement Amendment: (1) the deadline for Plaintiff Unrivaled to pay off the $3M Note was extended to December 6, 2023; (2) interest that is due on the $3M Note shall be paid monthly and in cash; and (3) once the $3M Note was paid off, the DOT (defined below) and any security interest in the Retail assets "shall be released."[3] The Settlement Amendment also extended the deadline for Plaintiff Unrivaled to pay off the remaining $5 million of the Up-Front Settlement Amount to September 6, 2023.[4]  A copy of the Settlement Amendment is attached hereto as **Exhibit 2** hereto.

**The DOT Transfer Related To The Halladay Property, And Plaintiff Halladay's Insolvency.**

16.     As security for Plaintiff Unrivaled's obligations under the $3M Note, Plaintiff Halladay transferred a deed of trust (the "DOT Transfer") to Defendant on or about March 6, 2023 (the "DOT") in the Halladay Property.

17.     At the time of the DOT Transfer and all times relevant herein, the Halladay Property was owned solely by Plaintiff Halladay.

18.     At the time of the DOT Transfer, Plaintiff Halladay had no monetary or other obligations owing to Defendant.

19.     At the time of the DOT Transfer, Plaintiff Halladay received no payment or other value or consideration from Defendant in exchange for the DOT Transfer.

20.     At or about the time of the DOT Transfer, the following liens and encumbrances already existed on the Halladay Property:  (1) an Orange County Property Tax lien in the amount of $239,795.98; and (2) a mortgage owing to Fidelity Mortgage Lenders, Inc. in the amount of $2,869,519.17 (the "Pre-Existing Liens").

---

[3] (Exhibit 2, Settlement Amendment § 1.a.).
[4] (Exhibit 2, Settlement Amendment § 1.b.).

21.     The Pre-Existing Liens, totaling $3,109,315.15, were senior in priority to the DOT at the time of the DOT transfer.

22.     The DOT Transfer caused Plaintiff Halladay to be insolvent.  As stated in Plaintiff Halladay's motion for authority to sell the Halladay Property (the "Sale Motion")[5], the Halladay Property was thoroughly marketed, and the terms of the purchase were extensively negotiated.  In the Sale Motion, Plaintiffs sought Court authority to sell the Halladay Property for a purchase price of $5,303,320.00 ("Halladay Property Value").

23.     As further stated in the Sale Motion, the broker expects to receive a 6% commission on the sale.  Therefore, based on the proposed purchase price, the sales commission regarding the proposed sale of the Halladay Property will be $318,199.20.  Additional sales costs will likely be at least an additional 1% of the purchase price.  Therefore, total sales costs are anticipated to be $371,232.40 ("Halladay Property Sales Costs").

24.     Based on the above, the DOT Transfer caused Plaintiff Halladay to be insolvent, as shown on the below table:

| Halladay Property Value | $5,303,320.00 |
|---|---|
| Less: | |
| Pre-Existing Liens | $3,109,315.15 |
| Halladay Property Sales Costs | $371,232.40 |
| DOT Transfer | $3,000,000.00 |
| **Net Insolvency/Negative Equity** | **$1,177,227.55** |

**Settlement Agreement Amendment, And $800,000 Payment.**

25.     At the time that the Settlement Agreement was entered into, Unrivaled held certain ownership interests in certain entities, including: (1) People's First Choice, LLC ("Retail

/ / /

---

[5]  (Case No. 2:24-bk-19127-BB, Dkt. No. 10).  The Court's order approving the Sale Motion (Case No. 2:24-bk-19127-BB, Dkt. No. 53, the "Sale Order") was entered on December 6, 2024.

26.    PFC"); (2) People's Riverside, LLC; and (3) People's Costa Mesa, LLC (collectively, the "Retail Assets").

27.    The principal amount under the $20M Note was due on the five-year anniversary date of the $20M Note, in or about March 2028.

28.    Plaintiff Unrivaled and Defendant were aware that Plaintiff Unrivaled may not be able to make the scheduled payments under the Settlement Agreement out of its operating cash flows.    Consequently, the Settlement Agreement provided for a mechanism to help ensure payment of the Up-Front Settlement Amount.

29.    Specifically, the Settlement Agreement provided that in the event Plaintiff Unrivaled was unable to make payment of the Up-Front Settlement Amount (an "Up-Front Payment Default"), the Retail Assets would be sold pursuant to the terms therein.

30.    On May 17, 2023, the parties executed the Settlement Agreement Amendment, and Plaintiff Unrivaled paid Defendant the $800,000 Up-Front Payment toward the Up-Front Settlement Amount pursuant to Section 1.b.i. of the Settlement Agreement Amendment.

**Decision to Sell Retail Assets.**

31.    Ultimately, as contemplated between the parties, Plaintiff Unrivaled was not able to pay the Up-Front Settlement Amount and the parties moved to sell the Retail Assets as contemplated by the Settlement Agreement.    In addition to its inability to pay amounts due under the Settlement Agreement, as described below, Plaintiff Unrivaled was unable to pay its debts as they were coming due to creditors other than Defendant.

32.    In or about September 2023, Plaintiff Unrivaled and Defendant concluded that the sale of certain of the Retail Assets was necessary.

33.    Pursuant to the Settlement Agreement, the sale of the Retail Assets was to be conducted with the approval of a "Sales Committee."    Specifically, the Settlement Agreement provides:

The sales price of the Retail Assets shall be subject to the approval majority of a 3-person committee (the "Sales Committee") that shall oversee the sales process and make a final decision on the sales price. The Sales Committee members shall

1    consist of an individual appointed by [Defendant] People's, [Plaintiff Unrivaled

2    representative] Sabas Carrillo, and the Trustee.[6]

3    34.    On March 12, 2024, the Sales Committee – including Defendant – voted

4    unanimously to accept a $9 million offer to purchase Retail PFC, and executed a Letter of Intent

5    to facilitate that purchase.

6    **Additional Payments Made By Plaintiff Unrivaled to Defendant.**

7    35.    Subsequent to when Plaintiff Unrivaled and Defendant concluded that the sale of

8    certain of the Retail Assets was necessary, Plaintiff Unrivaled made several other payments to

9    Defendant in connection with the Settlement Agreement, including three payments (the "Escrow

10    Transfer") totaling $569,571 (the "Escrow Payments").

11    36.    Specifically, Plaintiff Unrivaled wired funds to two escrow accounts maintained

12    by Shelton Edward Wicker ("Escrow") for Defendant's benefit on March 21, 2024 ($250,000);

13    May 30, 2024 ($253,151); and June 25, 2024 ($66,420.85) (the "Escrow Funds"), and the

14    Escrow Funds were received by Defendant's bank on or around October 22, 2024.

15    37.    With respect to the $250,000 payment (the "Extension Fee Transfer") sent to

16    Escrow on March 21, 2024, that was a payment made by Plaintiff Unrivaled to Defendant for

17    the $250,000 extension fee set forth in Section § A.1.c. of the Settlement Agreement (the

18    "Extension Fee").[7]

19    38.    Despite receiving a payment from Plaintiff Unrivaled in the exact amount of the

20    Extension Fee (*i.e.*, $250,000), Defendant has contended in the State Court Action – and most

21    recently in its "*Motion To Enforce The Parties' Settlement Agreement Pursuant To CCP §*

22    *664.6*" (the "Enforcement Motion") – that the Extension Fee was not timely and not "deposited

23    for the benefit of People's" and refused to apply the payment to the Extension Fee.[8]    A true and

24    correct copy of the Enforcement Motion is annexed hereto as **Exhibit 6**.

25

26    _____
     [6] (Exhibit 1, Settlement Agreement § A.1.c.i.).

27    [7] (Exhibit 1, Settlement Agreement § A.1.c.).

28    [8] (Exhibit 6, Enforcement Motion, pages 1-2).

39.     Similarly, despite receiving payments for interest and fees due on the $3M Note on May 30, 2024 and June 25, 2024, Defendant has contended in the State Court Action that those amounts remained due and owing as of October 13, 2024.[9]

40.     On or about October 21, 2024, Defendant requested that the Escrow Funds be released to Defendant.  On or about October 23, 2024, the Escrow Funds were transferred to Defendant.

**The Monetary Transfer.**

41.     On or around June 10, 2024, the Settlement Parties and an unrelated third party, Haven Nectar LLC (the "PFC Purchaser") entered into a "*Membership Interest Purchase Agreement*" (the "PFC MIPA"), which provided for a sale of the membership interests of the Settlement Parties in Retail PFC to the PFC Purchaser for $9 million (the "PFC Retail Sale"). The PFC MIPA is annexed hereto as **Exhibit 3.**

42.     After deductions for certain costs of the sale, Defendant received a wire transfer of the proceeds of the PFC Retail Sale from the sales escrow in the amount of $7,653,483 on or about June 11, 2024 (the "Monetary Transfer"), and the PFC Retail Sale was consummated.

43.     The Settlement Agreement provides that the net proceeds of the sale of the Retail Assets will be applied first to the Up-Front Settlement amount before being applied to the $20M Note.[10]

44.     As a result, even excluding interest and other payments, the Monetary Transfer (in the amount of $7,653,483) and the $800,000 Up-Front Payment collectively exceed, and paid in full the $8,000,000 Up-Front Settlement Amount.

45.     Despite receiving the Monetary Transfer in the amount of $7,653,483 – which included the principal amount owing on the $3M Note, and Plaintiff's May 30, 2024 and June 25, 2024 deposits of all interest and fees owing on the $3M Note – Defendant refused to comply

---

[9] (Exhibit 6, Settlement Agreement, pg. 5) ("[a]s of October 14, 2024 [Plaintiff] Unrivaled will owe $361,507.00 total interest on the $3M Note[.]").
[10] *See*  (Exhibit 1, Settlement Agreement § A.1.c.i. & iii.).  As discussed above, Defendants also received $800,000 previously to pay down the Up-Front Settlement Amount.

1  with California Civil Code Section 2941 and Section A.1.a.i. of the Settlement Agreement by

2  refusing to reconvey the DOT on the Halladay Property.[11]

3  **Defendant Had No Perfected Security Interest in the Retail Assets.**

4  46.    As of the Petition Date, at the time of the Monetary Transfer, and at all other

5  times relevant herein, based on the records of the Nevada Secretary of State's Office, Defendant

6  did not file a UCC-1 financing statement with respect to any alleged amounts owed by Plaintiff

7  Unrivaled to Defendant, including but not limited to, any amounts owed under the Settlement

8  Agreement.

9  47.    At the time of the Monetary Transfer, Defendant did not hold a properly

10  perfected lien in Plaintiff Unrivaled's membership interest in Retail PFC.

11  **Defendant was an Insider of Plaintiff Unrivaled.**

12  48.    At the time of the Monetary Transfer, Plaintiff Unrivaled and Defendant were co-

13  owners of multiple entities, including certain of the Retail Assets.

14  49.    People's Costa Mesa, LLC ("Retail Costa Mesa") is one of the aforementioned

15  Retail Assets.

16  50.    Pursuant to that certain "*Membership Interest Purchase Agreement*" dated

17  November 4, 2021, Plaintiff Unrivaled purchased a 50% ownership interest in Retail Costa

18  Mesa from Defendant.

19  51.    Pursuant to that certain "*Amended and Restated Operating Agreement of People's

20  Costa Mesa, LLC*" dated November 4, 2021, Plaintiff Unrivaled and Defendant each hold a 50%

21  membership interest in Retail Costa Mesa (the "Costa Mesa Amended Operating Agreement").

22  The Costa Mesa Amended Operating Agreement was in effect at the time of the Monetary

23  Transfer.  A true copy of the Costa Mesa Amended Operating Agreement is annexed hereto as

24  **Exhibit 4**.

25  / / /

26

27  [11] *See* (Exhibit 1, Settlement Agreement § A.1.a.i.) ("Upon payment in full of the $3M Note, the

28  Halladay Property DOT and the security interests in the Retail Assets shall be released.").

52.    Although Defendant was a non-voting member, Defendant has various rights and benefits under the Costa Mesa Amended Operating Agreement, including but not limited to:

    a.  Right to financial information (Section 2.1.b.ii.);

    b.  Right to distributions under certain circumstances (Section 2.1.b.iii.);

    c.  Consent rights regarding certain modifications to the Costa Mesa Amended Operating Agreement (Section 5.2.b.);

    d.  Right to indemnity (Article 10).

53.    Prior to, and at the time of the sale of Retail PFC and the Monetary Transfer, pursuant to that certain "*Amended and Restated Operating Agreement of People's First Choice, LLC*" dated November 21, 2021, Plaintiff Unrivaled owned an 80% membership interest, and Defendant owned a 20% membership interest in Retail PFC, a true copy of which is annexed hereto as **Exhibit 5**.

54.    Although Defendant was a 20% non-voting member of Retail PFC, Defendant had various rights and benefits under the Amended and Restated Operating Agreement of People's First Choice, LLC (similar to those under the Costa Mesa Amended Operating Agreement), including but not limited to:

    a.  Right to financial information (Section 2.1.b.ii.);

    b.  Right to distributions under certain circumstances (Section 2.1.b.iii.);

    c.  Consent rights regarding certain modifications to the Costa Mesa Amended Operating Agreement (Section 5.2.b.);

    d.  Right to indemnity (Article 10).

55.    Defendant's influence and control over Plaintiff Unrivaled's business operations and assets can be seen in the sale of Retail PFC, demonstrating its status as an insider of Plaintiff Unrivaled, as follows:

    a.  In its role as a co-owner of Retail PFC, Defendant was an indispensable party to the PFC Retail Sale.

    b.  The sale of Retail PFC could not be consummated without Defendant's participation and consent as co-owner.

c.    As a co-owner of Retail PFC, Defendant was a signatory to the PFC MIPA.

d.    Under Section 2.01 of the PFC MIPA, Defendant sold its 20% interest in Retail PFC to the purchaser;

e.    Under Section 2.01 of the PFC MIPA, the entire net cash proceeds from the Retail PFC Sale was to be paid to Defendant.

f.    Defendant executed a Guaranty and Security Agreement in favor of the purchaser to secure a portion of the purchase price (Section 2.04(v));

g.    As a member of the Sale Committee, the negotiation and approval of the sale of Plaintiff Unrivaled's membership interest in PFC Retail was under the control and influence of Defendant.

56.    Not only did Defendant have insider information about the Plaintiffs, it: (1) jointly owned the Retail Assets together with Plaintiff Unrivaled; and (2) asserted control over certain of Plaintiff Unrivaled's assets and business dealings (*e.g.*, the Retail Assets and sale of certain of the interests related thereto).

**FIRST CLAIM FOR RELIEF**

(Avoidance of DOT Transfer Pursuant to 11 U.S.C. §§ 544, 548)

(Plaintiff Halladay Against Defendant)

57.    Plaintiff Halladay realleges each and every allegation contained in paragraphs 1 through 55, inclusive, of this Complaint as if set forth fully herein.

58.    Section 548 of the Bankruptcy Code provides that a trustee or debtor may avoid a transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the petition date as constructively fraudulent if it can be shown that: (i) the transfer made or obligation incurred was for less than reasonably equivalent value; and (ii) the debtor (a) was insolvent on the date of the transaction or was rendered insolvent thereby, (b) had unreasonably small capital, or (c) intended to incur, or reasonably should have known it would incur, debts that it could not pay as they matured. 11 U.S.C. § 548(a)(1)(B).

/ / /

59.     Section 544(b) of the Bankruptcy Code operates similarly and permits a trustee or debtor to avoid a transfer or obligation of the debtor pursuant to state fraudulent conveyance law, which imposes similar or identical requirements as section 548 of the Bankruptcy Code. 11 U.S.C.§ 544(b). The fraudulent conveyance laws of the relevant state — California – are substantially similar to section 548 of the Bankruptcy Code. *See* California Civil Code §§ 3439 et seq.

60.     At the time of the DOT Transfer and at all relevant times, Plaintiff Halliday was indebted to, and had one or more unsecured creditor(s).

61.     Defendant received the DOT Transfer for less than reasonably equivalent value before the Petition Date because, among other reasons, Plaintiff Halladay received nothing in return for the DOT on the Halladay Property.

62.     Plaintiff Halladay became insolvent as a result of the DOT Transfer in that the sum of the Plaintiff Halladay's debts exceeded the value of Plaintiff Halladay's assets, as particularly shown in paragraphs 17-21, above.

63.     The DOT Transfer constitutes a fraudulent transfer under 11 U.S.C. §§ 544 and 548, and California Civil Code §§ 3439 et seq. and, therefore, is avoidable by Plaintiff Halladay.

## SECOND CLAIM FOR RELIEF

(Divestiture of Lien or Other Interests Re: Halladay Property or Sale Proceeds Thereof Pursuant to FRBP 7070)

(Plaintiff Halladay Against Defendant)

64.     Plaintiff Halladay realleges each and every allegation contained in paragraphs 1 through 62, inclusive, of this Complaint as if set forth fully herein.

65.     FRBP 7070 provides that "[w]hen real or personal property is within the court's jurisdiction, the court may enter a judgment divesting a party's title and vesting it in another person."

/ / /

/ / /

/ / /

66.    Section A.1.a.i. of the Settlement Agreement provides that "[u]pon payment in full of the $3M Note, the Halladay Property DOT and the security interests in the Retail Assets shall be released."[12]

67.    Upon receiving the Monetary Transfer in the amount of $7,653,483, the amounts owing under the $3M Note were paid in full, and Defendant was obligated to reconvey its DOT on the Halladay Property but failed and refused to do so.

68.    The Court's Sale Order approved the sale of the Halladay Property "free and clear" pursuant to Section 363(f) of the Bankruptcy Code, with Defendant's lien or other interests "transferred to the proceeds of the Sale with the same force, effect, validity, and priority that such liens and interests had against the Property."

69.    Because the $3M Note has been paid off, the Court should divest Defendant of any lien or other interests that it has or asserts against the Halladay Property and/or its sale proceeds.

## THIRD CLAIM FOR RELIEF

(To Avoid Unperfected Security Interest Transfer - 11 U.S.C. § 544(a)(1))

(Plaintiff Unrivaled Against Defendant)

70.    Plaintiff Unrivaled realleges and incorporates by reference paragraphs 1 through 68 of this Complaint as though set forth in full herein.

71.    As of the Petition Date, Plaintiff Unrivaled obtained the rights and powers of a hypothetical judicial lien creditor, pursuant to 11 U.S.C. § 544(a)(1).

/ / /

---

[12] In addition to this contractual requirement, California Civil Code Section 2903 provides that a debtor may redeem a deed of trust "at any time after the claim is due, and before [the trustor's] right of redemption is foreclosed."  Cal. Civ. Code § 2903.  California Civil Code Section 2905 provides that "Redemption from a lien is made by performing, or offering to perform, the act for the performance of which it is a security, and paying, or offering to pay, the damages, if any, to which the holder of the lien is entitled for delay."  Cal. Civ. Code § 2905.  And, California Civil Code Section 2941 provides that, upon satisfaction of the obligation secured by a deed of trust, "the beneficiary … shall execute and deliver to the trustee the original note, deed of trust, request for a full reconveyance, and other documents as may be necessary to reconvey, or cause to be reconveyed, the deed of trust."  Civ. Code § 2941(b)(1).

72.     Plaintiff Unrivaled is informed and believes that Defendant may assert that it had a security interest in the Retail Assets owned by Plaintiff Unrivaled on and after March 6, 2023.

73.     Defendant failed to perfect such security interest, if any, against the Retail Assets owned by Plaintiff Unrivaled.

74.     Defendant's security interest, if any, against the Retail Assets is avoidable under the powers of a perfected judicial lien creditor granted to Plaintiff Unrivaled under 11 U.S.C. §544(a)(1).

## FOURTH CLAIM FOR RELIEF

(To Avoid Preferential Monetary Transfer - 11 U.S.C. § 547)

(Plaintiff Unrivaled Against Defendant)

75.     Plaintiff Unrivaled re-alleges and incorporates by this reference each and every allegation set forth in paragraphs 1 through 73, inclusive, as though fully set forth herein.

76.     The Monetary Transfer was of property interests of Plaintiff Unrivaled.

77.     The Monetary Transfer was made to or for the benefit of Defendant at a time in which Defendant was creditor of Plaintiff Unrivaled.

78.     The Monetary Transfer was for or on account of antecedent debts owed by Plaintiff Unrivaled under the Settlement Agreement before such Monetary Transfer was made.

79.     The Monetary Transfer was made while Plaintiff Unrivaled was insolvent.

80.     The Monetary Transfer enabled Defendant to receive more than Defendant would otherwise receive if (a) Plaintiff Unrivaled's bankruptcy case was a case under chapter 7 of the Bankruptcy Code; (b) had the Monetary Transfer not been made; and (c) Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

81.     Defendant was an "insider" for purposes of 11 U.S.C. § 547(b)(4)(B) based on the allegations set forth in paragraphs 47-55, above, which are incorporated hereat.

82.     The Monetary Transfer was made within the 1-Year Preference Period 11 U.S.C. § 547(b)(4)(B).

83.     The Monetary Transfer is subject to avoidance pursuant to 11 U.S.C. § 547(b).

/ / /

84.     Plaintiff Unrivaled is entitled to an order and judgment under 11 U.S.C. § 547 that the Monetary Transfer are avoided and recovered for the benefit of Plaintiff Unrivaled's creditors.

## FIFTH CLAIM FOR RELIEF

(To Avoid Preferential Escrow Transfer - 11 U.S.C. § 547)

(Plaintiff Unrivaled Against Defendant)

85.     Plaintiff Unrivaled re-alleges and incorporates by this reference each and every allegation set forth in paragraphs 1 through 83, inclusive, as though fully set forth herein.

86.     The Escrow Transfer was of property interests of Plaintiff Unrivaled.

87.     The Escrow Transfer was made to or for the benefit of Defendant at a time in which Defendant was creditor of Plaintiff Unrivaled.

88.     The Escrow Transfer was for or on account of antecedent debts owed by Plaintiff Unrivaled arising from the Settlement Agreement before such transfer was made.

89.     The Escrow Transfer was made while Plaintiff Unrivaled was insolvent.

90.     The Escrow Transfer enabled Defendant to receive more than Defendant would otherwise receive if (a) Plaintiff Unrivaled's bankruptcy case was a case under chapter 7 of the Bankruptcy Code; (b) had the Escrow Transfer not been made; and (c) Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

91.     Defendant was an "insider" for purposes of 11 U.S.C. § 547(b)(4)(B) based on the allegations set forth in paragraphs 47-55, above, which are incorporated hereat.

92.     The Escrow Transfer was made within the Preference Periods (*i.e.*, the 90-Day Preference Period[13] and/or the 1-Year Preference Period[14]) established by 11 U.S.C. § 547(b)(4).

---

[13] Plaintiff Unrivaled wired a total of $361,507 to escrow on May 30, 2024 ($253,151) and June 25, 2024 ($66,420.85).  In the Enforcement Motion, Defendant contends that "[a]s of October 14, 2024 [Plaintiff] Unrivaled will owe $361,507.00 total interest on the $3M Note[.]" Defendant, therefore, contends that the $361,507 payment was made by Plaintiff Unrivaled to Defendant after October 14, 2024 – allegedly within the 90-Day Preference Period.

1    93.    The Escrow Transfer is subject to avoidance pursuant to 11 U.S.C. § 547(b).

2    94.    Plaintiff Unrivaled is entitled to an order and judgment under 11 U.S.C. § 547

3    that the Escrow Transfer is avoided and recovered for the benefit of Plaintiff Unrivaled's

4    creditors.

5    **SIXTH CLAIM FOR RELIEF**

6    (Avoidance of Extension Fee Transfer Pursuant to 11 U.S.C. §§ 544, 548)

7    (Plaintiff Unrivaled Against Defendant)

8    95.    Plaintiff Unrivaled realleges each and every allegation contained in paragraphs 1

9    through 93, inclusive, of this Complaint as if set forth fully herein.

10    96.    Section 548 of the Bankruptcy Code provides that a trustee or debtor may avoid a

11    transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that

12    was made or incurred on or within two years before the petition date as constructively

13    fraudulent if it can be shown that: (i) the transfer made or obligation incurred was for less than

14    reasonably equivalent value; and (ii) the debtor (a) was insolvent on the date of the transaction

15    or was rendered insolvent thereby, (b) had unreasonably small capital, or (c) intended to incur,

16    or reasonably should have known it would incur, debts that it could not pay as they matured. 11

17    U.S.C. § 548(a)(1)(B).

18    97.    Section 544(b) of the Bankruptcy Code operates similarly and permits a trustee

19    or debtor to avoid a transfer or obligation of the debtor pursuant to state fraudulent conveyance

20    law, which imposes similar or identical requirements as section 548 of the Bankruptcy Code. 11

21    U.S.C.§ 544(b). The fraudulent conveyance laws of the relevant state — California – are

22    substantially similar to section 548 of the Bankruptcy Code. *See* California Civil Code §§ 3439

23    *et* seq.

24    98.    At the time of the Extension Fee Transfer and at all relevant times, Plaintiff

25    Unrivaled was indebted to, and had one or more unsecured creditor(s).

26    _____

27    [14] The Escrow Funds were wired to Escrow for the benefit of Defendant on March 21, 2024

28    ($250,000); May 30, 2024 ($253,151); and June 25, 2024 ($66,420.85).

99.    Despite receiving the Extension Fee Transfer in the amount of $250,000 Defendant has contended in the State Court Action – and most recently in its Enforcement Motion – that the Extension Fee was not "deposited for the benefit of People's" and refused to apply the payment to the Extension Fee.  As a result and according to Defendant's own contentions, Plaintiff Unrivaled received nothing or less than reasonably equivalent value for the Extension Fee Transfer.

100.    The Extension Fee Transfer constitutes a fraudulent transfer under 11 U.S.C. §§ 544 and 548, and California Civil Code §§ 3439 et seq. and, therefore, is avoidable by Plaintiff Unrivaled.

## SEVENTH CLAIM FOR RELIEF

(To Recover Avoided Transfers - 11 U.S.C. §§ 550 and 551)

(Plaintiffs Against Defendant)

101.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 99, inclusive, of this Complaint as if set forth fully herein.

102.    Defendant was the initial transferee of the DOT Transfer, Monetary Transfer and Escrow Transfer (collectively, the "Transfers"), or that Defendant was the entity for whose benefit the Transfers were made, or that Defendant was the immediate or mediate transferee of the initial transferee receiving the Transfers

103.    Upon avoidance of the Transfers, Plaintiffs are entitled to recover from Defendant each of such Transfers or the value of the property transferred, for the benefit of Plaintiffs' bankruptcy estates pursuant to 11 U.S.C. § 550.

## EIGHTH CLAIM FOR RELIEF

(For Disallowance Of Claim - 11 U.S.C. § 502(d))

(Plaintiffs Against Defendant)

104.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 102, inclusive, of this Complaint as if set forth fully herein.

105.    Defendant is an entity from which property is recoverable under 11 U.S.C. §§ 542, 543, 550 or 553, or the Defendant received an avoidable transfer under 11 U.S.C. §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a).

/ / /

/ / /

106.    Defendant has not paid the amount, or turned over any such property for which the Defendant is liable under 11 U.S.C. §§ 522(i), 542, 543, 550, or 553 of the Bankruptcy Code.

107.    Pursuant to 11 U.S.C. § 502(d), the Defendant's claims, to the extent that the Defendant asserts a claim or claims, should be disallowed.

## NINTH CLAIM FOR RELIEF

(For Attorneys' Fees And Costs)

(Plaintiffs Against Defendant)

108.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 106, inclusive, of this Complaint as if set forth fully herein.

109.    Plaintiffs seek attorneys' fees and costs on the First through Seventh Claims for Relief in amounts to be proven at trial.

## RESERVATION OF RIGHTS

110.    Plaintiffs reserve their right to supplement and amend the allegations contained in this Complaint, including, but not limited to, the right to (i) allege further information regarding the all Claims for Relief, (ii) make modifications and/or revisions to Defendant's name(s), (iii) allege claims against additional defendants, and/or (iv) allege additional causes of action arising in connection with the law and facts set forth herein (collectively, the "Adv. Amendments"), that may become known to the Plaintiffs at any time during this adversary proceeding through formal discovery or otherwise, and for the Adv. Amendments to relate back to this original Complaint.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment as follows:

A.     For a judgment by the Court in favor of Plaintiff Halladay and against Defendant on the First and Seventh Causes of Action, avoiding the DOT Transfer and recovering the DOT Transfer or its value for the benefit of Plaintiff Halladay's bankruptcy estate.

/ / /

/ / /

B.     For a judgment by the Court in favor of Plaintiff Halladay and against Defendant on the Second Cause of Action, divesting any lien or other interests Defendant has, or asserts against the Halladay Property or its sale proceeds.

C.     For a judgment by the Court in favor of Plaintiff Unrivaled and against Defendant on the Third and Seventh Causes of Action, avoiding any security interest held or asserted by Defendant in the Retail Assets.

D.     For a judgment by the Court in favor of Plaintiff Unrivaled and against Defendant on the Fourth and Seventh Causes of Action, avoiding the Monetary Transfer and recovering the Monetary Transfer or its value for the benefit of Plaintiff Unrivaled's bankruptcy estate.

E.     For a judgment by the Court in favor of Plaintiff Unrivaled and against Defendant on the Fifth and Seventh Causes of Action, avoiding the Escrow Transfer and recovering the Escrow Transfer or its value for the benefit of Plaintiff Unrivaled's bankruptcy estate.

F.     For a judgment by the Court in favor of Plaintiff Unrivaled and against Defendant on the Sixth and Seventh Causes of Action, avoiding the Extension Fee Transfer and recovering the Extension Fee Transfer or its value for the benefit of Plaintiff Unrivaled's bankruptcy estate.

G.     On the Eighth Cause of Action, for disallowance of any and all claims held by Defendant against the Plaintiffs from which property is recoverable under 11 U.S.C. § 550 or transfer that is avoidable under 11 U.S.C. §§ 544, 547, or 548, unless Defendant has paid the amount, or turned over any such property.

H.     On the Ninth Cause of Action, recovery of interest, costs, attorneys' fees and

1  expenses, to the extent recoverable under applicable law and the evidence submitted to the

2  Court.

3  ///

4  ///

5  ///

6         I.      For such other and further relief as the Court deems just and proper.

7  Dated: December 16, 2024        PLAINTIFF UNRIVALED BRANDS, INC.
                              HALLADAY HOLDING, LLC

8

9

10                        By: *  /s/ John-Patrick Fritz*
                            JOHN-PATRICK M. FRITZ

11                              DANIEL H. REISS
                            JEFFREY S. KWONG

12                              LEVENE, NEALE, BENDER,
                            YOO & GOLUBCHIK L.L.P.

13                              Counsel for Plaintiffs and Chapter 11
                            Debtors and Debtors in Possession

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

**Unrivaled Brands, Inc. – People's California, LLC**
**Binding Settlement Term Sheet**

*This is a settlement communication made subject to California Evidence Code Sections 1152 and 1154 and is made without prejudice to the parties' claims and defenses.*

This binding settlement term sheet (this "<u>Term Sheet</u>") dated as of March 6, 2023 ("<u>Effective Date</u>"), sets forth the terms of a binding settlement (the "<u>Settlement</u>") between, among others, Unrivaled Brands, Inc. ("<u>Unrivaled</u>") and People's California, LLC ("<u>People's</u>," and collectively with Unrivaled, the "<u>Parties</u>"). The term "People's" as used herein shall include People's past, present and future employees, agents, representatives, shareholders, principals, affiliates, parents, subsidiaries, officers, directors, members, managers, equity holders, predecessors, successors, heirs, executors, assigns, insurers, consultants and attorneys. The term "Unrivaled" as used herein shall include Unrivaled's past, present and future employees, agents, representatives, shareholders, principals, affiliates, parents, subsidiaries, officers, directors, members, managers, equity holders, predecessors, successors, heirs, executors, assigns, insurers, consultants and attorneys. The Parties or their authorized representatives anticipate that they will enter into long form agreements relating to the Settlement and other documents or agreements to affect the Settlement (collectively, the "<u>Settlement Documents</u>"). Notwithstanding the foregoing, the absence of executed Settlement Documents does not invalidate or otherwise affect the enforceability of this binding Settlement. If prepared and executed, the Settlement Documents shall include (without limitation) the terms of this Term Sheet and such other representations, warranties, conditions, covenants, indemnities and other terms that are customary for settlements of this kind and not inconsistent with this binding Term Sheet.

| A. Settlement | As consideration for the satisfaction and discharge of all obligations, claims, and defenses related to the various litigation matters either threatened or pending including, but not limited to, the matters entitled (i) *People's California, LLC, v. Unrivaled Brands, Inc.*, et. al., Case No. 30-2022-01270747-CU-BC-CJC; and (ii) *People's California, LLC, v. Kovacevich, et al.*, Case No. 30-2022-01272843-CU-MC-CJC (collectively, the "<u>Litigation</u>") and all agreements between the Parties including, but not limited to, the Primary MIPA, the Secondary MIPA, that certain Secured Promissory Note between the Parties, dated November 22, 2021 (the "<u>Note</u>"), that certain Security Agreement between the Parties, dated November 22, 2021 (the "<u>Security Agreement</u>") and that certain Trademark License Agreement between the Parties, dated November 22, 2021 (the "<u>Trademark Agreement</u>") and that certain Guaranty and Security Agreement, dated November 22, 2021, by and among Unrivaled, People's, and the other parties that are signatories thereto (the "<u>Guaranty and Security Agreement</u>") together with the other agreements between the Parties referred to herein, collectively as the "<u>Unrivaled/People's Agreements</u>"), Unrivaled and People's agree that the following shall represent the Settlement:<br><br>1. <u>Consideration</u>. Unrivaled shall agree to pay People's $23,000,000 in the following manner:<br><br>  a. $8,000,000 (the "<u>Up-Front Settlement Amount</u>") which shall be represented by:<br><br>    i. A $3,000,000 Promissory Note ("$3M Note") which shall be secured by a second deed of trust ("DOT") on that certain real property located at 3242 Halladay Street, Santa Ana, CA 92705 (the "Halladay Property"), which shall be submitted for recording recorded in no fewer than ten (10) business days after the Effective Date, as well as $1,000,000 on People's First Choice, LLC ("PFC") People's Riverside, LLC and |

People's Costa Mesa, LLC. PFC, People's Riverside, LLC and People's Costa Mesa, LLC shall collectively be referred to herein as the "Retail Assets". Unrivaled shall not record any additional deeds of trust on the Halladay Property between the Effective Date and the date the DOT is submitted. The $3M Note shall be paid in cash no later than one hundred eighty (180) days from the Effective Date. The principal of the $3M Note shall accrue simple interest at an annual rate of 10% from the Effective Date. All interest payments shall be paid monthly, in cash. Upon payment in full of the $3M Note, the Halladay Property DOT and the security interest in the Retail Assets shall be released; and

    ii. $5,000,000 of the Settlement Note (described in Section 1e).

b. The $5,000,000 of the Up-Front Settlement Amount, which is included in the principal of the Settlement Note, shall be paid in cash within 90 days of the Effective Date (the "Raise Period").

c. In the event that Unrivaled fails to (i) pay the $5,000,000 cash portion of the Up-Front Settlement Amount within the Raise Period; (ii) pay the $3,000,000 of the Up-Front Settlement Amount within 180 days of the Effective Date or timely pay any interest due thereon; or (iii) pay interest on the Settlement Note within 30 days of the due date of any such interest payment, except that, pursuant to Section 1(e)(iii) below, during the first 180 days Unrivaled shall not pay any interest although interest shall accrue during this period (any failure of which shall be referred to herein as a "Payment Default"), then the Retail Assets shall be sold under the following conditions: People's shall propose a minimum of 3 and maximum of 5 brokers, from which Unrivaled shall choose one to market and sell the Retail Assets. Unrivaled shall propose a minimum of 3 and maximum of 5 trustees, from which People's shall choose one (the "Trustee") to oversee the sale of the Retail Assets. The parties will cooperate in all respects to ensure that any sale is conducted in accordance with all applicable laws and regulations including the acquiring both of a fairness opinion and asset valuation of assets by certified third party professionals. Notwithstanding anything herein to the contrary, the parties agree that in the event of a forced sale of the Retail Assets, any such sale shall close no later than six (6) months from a Payment Default, except that Unrivaled is permitted to extend this date by an additional three (3) months provided that it pays People's $250,000 cash within six (6) months of Payment Default.

    i. People's and Unrivaled agree that in the event of a sale of the Retail Assets, they will cooperate to achieve the highest price as Commercially Practical for the Retail Assets. The sales price of the Retail Assets shall be subject to the approval majority of a 3-person committee (the "Sales Committee") that shall oversee the sales process and make a final decision on the sales price. The Sales Committee members shall consist of an individual appointed by People's, Sabas Carrillo, and the Trustee. Commercially Practical shall be defined as the

difference between the average Revenue Multiple (EV/Sales) of the largest MSO's and Unrivaled. For example, if GTI trades at 3x revenue, then a commercially practical highest price will be as close as possible to 3x or 3 times PFC's annual revenue. The Sales Committee is not authorized to accept any offer to purchase the Retail Assets unless such offer includes a cash payment that is equal or greater than any portion of the Up-Front Settlement Amount that remains unpaid at the time of sale.

ii. With respect to the sale of the Halladay Property, People's and Unrivaled agree that the first $1,000,000 of the net proceeds from the sale shall be used to pay down principal amounts owed to certain lenders (the "NY Lenders"), with the balance of the net proceeds, approximately $3 million, shall be used to pay People's any portion of the Up-Front Settlement Amount that remains unpaid and the balance will go to Unrivaled. For the avoidance of doubt, the Halladay Property currently has an approximate $2.9 million first deed of trust, so upon sale for an example sales price of $7 million then net proceeds would equal $4.1 million ($7 million less $2.9 million) of which net proceeds $1,000,000 would be used to pay down principal balance on lender notes, $3 million would be used to pay the Up-Front Settlement Amount.

iii. With respect to the sale of the Retail Assets, People's and Unrivaled agree that the net proceeds from the sale shall first go to pay People's any remaining unpaid portion of the Up-Front Settlement Amount and the balance of the Settlement Note (as defined below) and subject to the Prepayment Discount Incentive, with the remaining portion of the proceeds of the sale going to Unrivaled. In the event the sale of the Retail Assets does not result in full satisfaction of the Up-Front Settlement Amount and the Settlement Note (a "Deficiency"), People's agrees that it will not pursue the Deficiency subject to the following conditions: (i) the Retail Assets are sold free and clear of any encumbrances or other obligations to creditors, all Retail Asset debts and liabilities are paid current, the Retail Assets are in full compliance with and current on all leases, licenses, licensing fees, all material contracts and similar obligations and are operating in the normal course of business; and (ii) PFC enters into an installment agreement with the IRS for the 2021 tax year as soon as it is able to do so (the "No Deficiency Requirement").

iv. Unrivaled agrees that prior to entering into this Term Sheet, Unrivaled shall provide People's with PFC's 2022 unaudited financial statements, including, but not limited to, PFC's 2022 unaudited balance sheet and statement of income and supporting detail (collectively, "PFC's Unaudited Financial Statements"). The PFC Unaudited Financial Statements are attached hereto as **Attachment "A."** Sabas Carrillo shall

execute a certification under penalty of perjury that, to the best of his knowledge, PFC's Financial Statements are (i) true and correct in all material respects as of the date of those financial statements, (ii) that there are no known material diminution since that date, and (iii) PFC's Unaudited Financial Statements were provided to Marcum, Unrivaled's financial reporting auditors and are subject to any audit adjustments as a result of Unrivaled's financial audit and such audit adjustments will be provided to People's after the audit opinion is issued by Marcum. Upon the execution of this Term Sheet, Unrivaled shall execute documents necessary to transfer ownership of PFC to a subsequent transferee to be held in escrow by People's counsel unless and until a transfer is required following an asset sale or default ("PFC Ownership Transfer Documents"). The PFC Ownership Transfer Documents are attached hereto as **Attachment "B."** Unrivaled agrees that during the Raise Period and, if necessary, prior to any sale of PFC under this Section 1b and except as otherwise reflected in PFC's Financial Statements, it will not commit or allow any act or omission that will result in material diminution of PFC's value, including, but not limited to, cause PFC to incur any additional liabilities and/or sell or otherwise encumber any of PFC's assets other than in the ordinary course of business.

d.  The balance shall be in the form of a Secured Promissory Note (the "Settlement Note") with the following terms and conditions:

e.  $20M Note:

    i.  Principal: $20,000,000

    ii.  Interest: 5% simple interest for 180 days and then 10% simple interest thereafter ("Interest")

    iii.  Payment of Interest: Monthly. During the first 180 days Unrivaled shall not pay any Interest although interest shall accrue during this period. Thereafter, Unrivaled shall make monthly Interest payments on the first of each month but shall have the option to pay the monthly Interest payments in cash or in the form of registered shares of Unrivaled's common stock (i.e., shares issued for payment of Interest shall be free-trading). The conversion price of the shares issued for Interest shall be the 10-day VWAP at the date of issuance. Unrivaled shall provide People's with no less than 3 days' written notice of its intent to convert under this Section 1c(iii) and the conversion shares shall be issued to People's no later than 5 business days thereafter or as soon as commercially practicable if more than 5 business days. People's and Unrivaled to agree on the 10-day VWAP calculation or on a third-party source for the 10-day VWAP.

iv.  Payment of Principal: On the 5-year anniversary of the Settlement Note ("Due Date").

v.  Prepayment Discount Incentive of Note Balance: After the first $5 million has been paid down, any cash pay down of the principal balance within the first 12 months from the effective date of the Settlement Note will reduce the principal balance by twice the amount of the cash pay down (the "Prepayment Discount Incentive"). For the avoidance of doubt, the Prepayment Discount Incentive shall apply even in the event of a forced sale of the Retail Assets as described herein.

vi.  Forced Conversion (Principal): Only upon the payment, in full, of the Up Front Settlement Amount, Unrivaled shall have the option to force People's to convert the then outstanding or a portion of the principal balance of the Settlement Note into shares of Unrivaled's common stock at a conversion price of $0.20 as long as at the time of forced conversion the 10 day VWAP for Unrivaled's common stock is $0.20 or greater. Notwithstanding the foregoing, People's shall not be obligated to convert greater than 50% of the 10 day average daily trading volume per week. Unrivaled shall provide People's with no less than 3 days' written notice of such forced conversion and the conversion shares shall be issued to People's no later than 5 business days thereafter or as soon as commercially practicable if more than 5 business days. All conversion shares shall be registered shares of Unrivaled's common stock (i.e., free-trading).

vii.  Voluntary Conversion (Principal). From the earlier of (i) the payment, in full, of the Up Front Settlement Amount or (ii) 180 days, People's shall have the option, but not the obligation, to convert the outstanding principal balance of the Settlement Note into shares of Unrivaled's common stock: (1) beginning 12 months before the Due Date; or (2) at any time after CEO Sabas Carrillo resigns, is terminated or otherwise ceases providing services to Unrivaled for any reason whatsoever. The conversion price shall be the lower of (1) $0.20 per share; or (2) the 10-day VWAP. Notwithstanding the foregoing, People's shall not be able to convert greater than 50% of the 10 day average daily trading volume per week. People's shall provide Unrivaled with no less than 3 days' written notice of such voluntary conversion and the conversion shares shall be issued to People's no later than 5 business days thereafter or as soon as commercially practicable if more than 5 business days. All conversion shares shall be registered shares of Unrivaled's common stock (i.e., free-trading).

viii.  Subordination. People's will agree to subordinate 150% of actual Up-Front Settlement Amount cash received by

People's to future Unrivaled debt financing. For purposes of clarity only, if actual Up-Front Settlement Amount cash received by People's is $5,000,000 then People's will agree to subordinate $7,500,000 of the Settlement Note to future Unrivaled debt financing. The terms of subordination to be negotiated between the Parties.

ix.   <u>Security</u>. The Settlement Note shall be secured by the Retail Assets.

x.    <u>Rule 144 Compliant</u>. During the term of Settlement Note Unrivaled shall ensure that its common stock is qualified to participate on the OTCQB or higher market, including, but not limited to, remaining compliant with Rule 144(c) under the Securities Act of 1933.

2.  <u>2729 S. Grand Sublease</u>. All amounts owed by PF-People's Grand TC, LLC ("<u>Sublessee</u>"), to People's First Choice, LLC ("<u>Sublessor</u>"), under the Amended and Restated Sublease dated March 31, 2020 (the "<u>Sublease</u>"), shall be deemed satisfied as of the Effective Date. Beginning on the Effective Date, Sublessee shall execute an amended sublease agreement for a per square foot rental rate that is equal to PFC's existing lease per square foot rental rate subject to 3% annual increases or equal to PFC's existing annual increases (currently $9,320.95 per month) and pay a security deposit totaling 2 month's rent. The amended Sublease shall be on standard AIR terms and without any right of People's to sublease or assign the Sublease. Unrivaled agrees that the Sublease shall have an initial term of 5 years and allow People's two consecutive options, at People's discretion, to extend the Sublease by 5-years. In the event of a sale of the Retail Assets pursuant to section 1(b), People's and Unrivaled agree to cooperate to execute a lease as needed to complete the sale of the Retail Assets.

3.  <u>PFC</u>. Upon payment of the Up-Front Settlement Amount or in the event of a sale of the Retail Assets pursuant to section 1(b) above, any and all actions required for the secondary closing of the Primary MIPA shall be completed, People's will cooperate in all regulatory requirements to maintain the Santa Ana license, and 100% of PFC shall be transferred to Unrivaled. As soon as reasonably practical after the entry of Conditional Settlement Notices as described in Section 18 below, People's (or its affiliate) shall be released from liability under the PFC lease and Bernard Steimann ("<u>Steimann</u>") and Brian Decker ("<u>Decker</u>") shall be released as personal guarantors of the PFC lease, all of which are subject to landlord consent. In the event that the PFC landlord does not agree to release People's (or its affiliate), Steimann and Decker from liability, Unrivaled shall indemnify and hold People's, Steimann and Decker harmless from any liability related to the PFC lease.

4.  <u>Riverside</u>. Upon payment of the Up-Front Settlement Amount, or in the event of a sale of the Retail Assets pursuant to 1(b) above, any and all actions required for the primary and secondary closings of the Secondary MIPA shall be completed with no additional consideration, People's will cooperate in all regulatory requirements to maintain the Riverside cannabis license including adding People's Riverside, LLC as a party to the Development Agreement, and 100% of People's Riverside, LLC shall be transferred to Unrivaled. People's

shall cooperate with Unrivaled in requesting that the landlord stay any and all eviction activities for 60 days pending resolution of all matters contemplated herein and in Unrivaled's attempts to renegotiate the lease to bring the lease rate to market. People's shall provide Unrivaled with copies of all permits, design drawings, architectural plans, renderings, service provider contact information, and any other information relevant to the planned completion and opening of the Riverside facility.

5. <u>Costa Mesa</u>. Upon payment the Upfront Settlement Amount, or in the event of a sale of Retail Assets pursuant to 1(b) above, any and all actions required for the Costa Mesa closing of the Secondary MIPA shall be completed with no additional consideration, People's will cooperate in all regulatory requirements to obtain the Costa Mesa cannabis license, and 100% of People's Costa Mesa, LLC shall be transferred to Unrivaled. People's will use commercially reasonable efforts in working with Unrivaled in its attempt to extend the existing lease by one year. People's shall provide Unrivaled with copies of all permits, design drawings, architectural plans, renderings, service provider contact information, and any other information relevant to the planned completion and opening of the Costa Mesa facility.

6. <u>Non-Compete</u>. For a period of 2 years from the Effective Date, People's shall not establish, purchase or own in whole or in part, and/or license, and/or cause the establishment or creation of an additional cannabis retail store, whether storefront or delivery or conduct or cause to conduct delivery into or within a 10 mile radius of each of any the Retail Assets. Notwithstanding the foregoing, People's shall be entitled to sell or otherwise deliver its branded products, but not third party products, directly to consumers through a "store in a store" model.

7. <u>America's Tire Lease.</u> Unrivaled and People's shall use commercially reasonable efforts to (i) substitute PFC (or a PFC non-plant touching entity as requested by landlord) as tenant under the commercial lease agreement with America's Tire landlord; and (ii) remove and replace Jay Yadon and Melissa Yadon as personal guarantors on the America's Tire Lease. In the event that the America's Tire landlord does not agree to replace New Patriot Holdings, Inc., Jay and Melissa Yadon from liability, Unrivaled shall indemnify and hold New Patriot Holdings, Inc., Jay and Melissa Yadon harmless from any liability related to the America's Tire Lease.

8. <u>Transfers of Ownership</u>. Upon payment of the Up-Front Settlement Amount or in the event of a sale of the Retail Assets pursuant to 1(b) above, People's shall cooperate with Unrivaled in removing People's (and all People's affiliates) from all licenses related to the retail assets sold by People's to Unrivaled.

9. <u>Payroll/EDD</u>. People's shall cooperate with Unrivaled on all open Payroll/EDD matters.

10. <u>Derivative Individual Defendants</u>. Individual defendants in the derivative action that are still on the board of or employed by Unrivaled shall enter into Separation and Release Agreements or a similarly situated document effecting their resignation from their role in Unrivaled. Such resignations shall be prerequisite to release from the derivative action.

DocuSign Envelope ID: C8A4AB0C-GCBE-49AA-BD26-2577A8C4E35B

11. <u>Corrective Letter</u>. Immediately upon execution of the Settlement Documents Unrivaled shall provide a letter of clarification to banks and other financial institutions as necessary or reasonably requested by People's or its affiliates in the form of "**Attachment C**."

12. <u>PFC Tax Return (2021)</u>. After consulting with Unrivaled's tax accountants, in the event that People's tax accountants deem it necessary, accurate, and legal, Unrivaled shall cooperate with People's in the preparation and filing of amended PFC tax returns by People's for the year ended 2021.

13. <u>Los Angeles Lease Obligations</u>. The Parties shall work cooperatively to settle any outstanding obligations related to the LA property. Unrivaled shall be responsible for up to $1,000,000 of liabilities related to the Los Angeles Lease Obligations, including, but not limited to those owed by People's and Steimann and any amounts or obligations over $1,000,000 related to the Los Angeles Lease Obligations shall be shared evenly between People's and Unrivaled. The term "Los Angeles Lease Obligations" shall include, but not be limited to, any liability and/or damages related to the action currently pending in the Central District of the County of Los Angeles and entitled *1149 South LA Street Fashion District, LLC, et al. v. People's Properties, LLC, et al.*, Case No. 23STCV01994 (the "<u>LA Lease Litigation</u>"). People's shall have the right, in its sole and absolute discretion, to pay for any such obligation in Unrivaled stock.

14. <u>Displayit Litigation</u>. Unrivaled shall be responsible and indemnify and hold People's harmless from any and all liabilities related to products and services provided by Displayit Incorporated, including, but not limited to, any liability and/or damages related to the action currently pending in the County of Orange entitled *Displayit Incorporated v. People's California, LLC, et al.*, Case No. 30-2023-01305909-CU-CL-CJC (the "<u>Displayit Litigation</u>").

15. <u>The People's Brand.</u> In recognition that the Trademark License Agreement dated November 22, 2021, between Unrivaled and People's is being terminated, Unrivaled shall take all steps necessary and as reasonably requested by People's, including, but not limited to those referenced in Section XIII of the Trademark License Agreement, to remove the People's brand, or any reference thereto, from all Unrivaled assets, websites, social media or any other medium owned or controlled by Unrivaled and to cease using the People's brand and/or trademarks in any manner whatsoever. In addition to the foregoing, Unrivaled shall return to People's the roots sculpture and the ceiling graffiti artwork currently located at the PFC store so long as the removal of such does not cause damage or harm to the PFC store. Unrivaled shall have until November 22, 2023, the expiration of the Trademark License Agreement, to complete the removal of the People's Brand as detailed above.

16. <u>Stipulated Judgment and Injunction.</u> Concurrent with the execution of the Settlement Documents, Unrivaled shall execute a stipulated judgment and injunction in favor of People's. The stipulated judgment shall be in the amount of $20,000,000 including any attorneys' fees and costs associated with the entry and enforcement of the stipulated judgment and injunction. The injunction and/or the judgment shall include Unrivaled's unconditional agreement to a sale of the Retail Assets pursuant to Section 1(c) above. The Stipulated Judgment and Injunction is to be held by People's and not entered

unless and until Unrivaled fails to comply with the provisions set forth in section 1(c) above and fails to cure any such default upon ten days' written notice.

17. Mutual Indemnification. People's and Unrivaled shall mutually indemnify and hold each other, its affiliates, officers, directors, managers, shareholders, unitholders and agents harmless from any and all claims of any kind, causes of action, or judgments related to the assets purchased by Unrivaled from People's, which mutual indemnification and hold harmless shall be as broad as legally enforceable and include, but not be limited to, the LA Lease Litigation and the Displayit Litigation.

18. Dismissal of Claims.

    a.   Notice of Conditional Settlement. Immediately upon the execution of this binding Settlement Term Sheet, appropriate Conditional Settlement Notices shall be submitted for all open Litigation matters including a request to stay or vacate all pending dates.

    b.   Dismissal of Breach of Contract Lawsuit (Case No. 30-2022-01270747-CU-BC-CJC). The Parties agree that upon execution of the Settlement Documents, the Parties shall file a request for dismissal, with prejudice of all claims and causes of action related to the Breach of Contract Lawsuit, with the Court to retain jurisdiction to enforce the terms of the Settlement (including the entry of the Stipulated Judgment and Injunction), pursuant to CCP § 664.6.

    c.   Dismissal of Shareholder Derivative Lawsuit. The Parties agree that upon (i) execution of the Settlement Documents; and (ii) execution of mutual general releases (1542 Releases) by and between People's, Nicholas Kovacevich, Eric Baum, Dallas Imbimbo, Jeffrey Batliner, Erika Rasch and Uri Kenig, People's shall file a request for dismissal, with prejudice, of the Shareholder Derivative Lawsuit currently pending in the Superior Court of California, County of Orange, entitled *People's California, LLC, v. Nicholas Kovacevich, et al.*, Case No. 30-2022-01272843-CU-MC-CJC, with the Court to retain jurisdiction to enforce the terms of the Settlement (including the entry of the Stipulated Judgment and Injunction), pursuant to CCP § 664.6, and take all steps necessary to effect the dismissal.

19. Termination of Unrivaled/People's Agreements. Except for the Trademark License Agreement, which shall be subject to Paragraph 15 above, upon the execution of the Settlement Documents, , the Unrivaled/People's Agreements, all obligations thereunder, and the liens and security interests of People's in any and all of the property of Unrivaled to secure the payment of such obligations, shall be deemed to be immediately, automatically, and irrevocably discharged, released, and terminated without further action needed, in each case, in a manner that is most efficient and advantageous to the Parties, to the extent practicable, and any such termination of the Unrivaled/People's Agreements, and any security interests granted thereby, shall be subject to the mutual agreement of the Parties. Notwithstanding the foregoing, (i) any security interests provided for herein shall not be affected or otherwise deemed terminated as a result of this Section 13; and (ii) to the extent possible, in order to secure the Settlement Note the Parties agree that the UCC's previously

<table>
<tr>
<td></td>
<td>recorded to secure Unrivaled's obligations under the Unrivaled/People's Agreements shall remain in place and shall be amended to reflect the Settlement Note obligations.</td>
</tr>
</table>

|  | 20. <u>Release</u>. Upon the execution of the Settlement Documents , People's and Unrivaled and their respective shareholders, principals, affiliates, parents, subsidiaries, officers, directors, members, managers, equity holders, predecessors, successors, representatives, agents, attorneys, insurers, consultants, attorneys, administrators, heirs, beneficiaries, executors and assigns, in accordance with Cal. Civil Code Section 1542, shall forever release and discharge each other, and their past, present and future employees, agents, representatives, shareholders, principals, affiliates, parents, subsidiaries, officers, directors, members, managers, equity holders, predecessors, successors, heirs, executors, assigns, insurers, consultants and attorneys (the foregoing collectively the "<u>Released Parties</u>"), from any and all legal, equitable, arbitration or other claims, whether such claims have been or could be brought directly, derivatively or as part of a class action, counterclaims, actions, demands, judgments, causes of action and damages of any kind, both known and unknown, from the beginning of time until the execution of the applicable Settlement Documents, that in any way arise from or relate to, directly or indirectly, any act or omission of and one or more of the Released Parties arising out of or relating to, directly or indirectly, the Unrivaled/People's Agreements or the claims and allegations asserted in the Litigation. |
|---|---|
| **B. Miscellaneous** | 1. <u>Binding Agreement</u>. This Term Sheet is a binding and enforceable obligation of the Parties. |
|  | 2. <u>Modifications</u>. This Term Sheet shall not be modified, altered or discharged, nor any term or condition waived, except by a writing signed by each of the Parties. |
|  | 3. <u>Third-Party Beneficiaries</u>. Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties and their successors or assigns, any rights or remedies under or by reason of this Term Sheet. |
|  | 4. <u>CCP 664.6</u>. This Term Sheet constitutes a stipulation in writing as defined in California Code of Civil Procedure section 664.6 which provides "[i]f parties to pending litigation stipulate, in writing or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement." |
|  | 5. <u>Authority.</u> The undersigned represent and warrant that they have the full right, power, and authority to enter into and execute this Settlement Term Sheet and that their respective signatories have the full right, power, and authority to enter into this Settlement Term Sheet on their behalf. |
|  | 6. <u>Additional Documents.</u>  The Parties agree to execute such additional documents and perform such further acts as may be reasonably necessary to effectuate the purposes of this Settlement Term Sheet. |

7. <u>Representations.</u>  The Parties represent and agree that they have been advised to discuss this Settlement Term Sheet with their counsel and have done so, that they have carefully read and fully understand all provisions of this Settlement Term Sheet, and that they are voluntarily entering into this Settlement Term Sheet.  Further, the Parties represent and acknowledge that, in executing this Settlement Term Sheet, they do not rely and have not relied upon any representations or statements not set forth herein made by any of the Parties or any of the Parties' agents, representatives, or attorneys with regard to the subject matter, basis or effect of this Settlement Term Sheet or otherwise. The Parties expressly acknowledge that they are not relying on the advice of any other Party or such Party's attorneys in negotiating or executing this Settlement Term Sheet.

8. <u>Liability Denied.</u>  Nothing contained in this Settlement Term Sheet should be construed as an admission by any Party of any wrongdoing toward any other Party.  This Settlement Term Sheet effects the settlement of claims and disputes that are denied and contested, and nothing contained herein shall be construed as an admission by any Party hereto of any liability of any kind whatsoever. All such wrongdoing or liability is expressly denied.

9. <u>Severability.</u>  If any provision of this Settlement Term Sheet is held invalid or unenforceable, the remainder of this Settlement Term Sheet shall nevertheless remain in full force and effect.  If any provision is held invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

10. <u>Integration.</u>  This Term Sheet constitutes the agreement of the parties with respect to the subject matter herein and supersedes any prior or contemporaneous oral agreements and any prior written agreements.

11. <u>Attorneys' Fees and Costs.</u> In any filed litigation regarding the terms and conditions of this Settlement Term Sheet, the prevailing party shall be entitled to recover attorneys' fees and costs.

**IN WITNESS WHEREOF**, the parties have executed this Binding Settlement Term Sheet to be effective as of the date first listed above.

**UNRIVALED BRANDS, INC.**

By: _Sabas Carrillo_
11D7B3141EC2472...
Name:  Sabas Carrillo
Its:    CEO

**PEOPLE'S CALIFORNIA, LLC**

Bernard Steimann

By: _Bernard Steimann_____
Name:  Bernard Steimann, an individual


Fort Ashford Funds, LLC

By: _____
Name:  Frank Kavanaugh,
Its:       Manager and Authorized Representative

DocuSign Envelope ID: CBA4AB0C-GCBE-49AA-BD26-2577A8C4E35B

## <u>ATTACHMENT A</u>

PFC Financial Statements

**People's First Choice**
**Balance Sheet**

**As of December 31, 2022**

| | |
|---|---:|
| **ASSETS** | |
| Current Assets: | |
| Cash | 956,000 |
| Accounts Receivable, Net | - |
| Short Term Investment | - |
| Inventory | 413,048 |
| Prepaid Expenses and other assets | (67,841) |
| Notes Receivable | - |
| Current assets of discontinued operations | |
| | |
| **Total Current Assets** | 1,301,207 |
| | |
| Property, Equipment and Leasehold Improvements, Net | 562,098 |
| Intangible Assets, Net | - |
| Goodwill | - |
| Other Assets | 1,403,898 |
| Other Investments | - |
| Investments in Subsidiaries | - |
| Assets of discontinued operations | - |
| Deferred Tax Asset | |
| Intercompany Accounts | 33,159,969 |
| | |
| **TOTAL ASSETS** | $   36,427,173 |
| | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | |
| Current Liabilities: | |
| Accounts Payable and Accrued Expenses | 5,626,916 |
| Deferred Gain on Sale of Assets | - |
| Derivative Liability | - |
| Short-Term Debt | - |
| Income Taxes Payable | 4,798,061 |
| Acquisition Payable | - |
| Contingent Consideration | - |
| Current liabilities of discontinued operations | - |
| | |
| **Total Current Liabilities** | 10,424,977 |
| | |
| Long-Term Liabilities: | |
| Long-Term Debt | - |
| Deferred Tax Liability, Net | - |
| Other Long Term Liabilities | 841,738 |
| Long term liabilities of discontinued operations | - |
| | |
| **Total Long-Term Liabilities** | 841,738 |
| | |
| **Total Liabilities** | 11,266,714 |
| | |
| Commitments and Contingencies | - |
| | |
| Stockholders' Equity: | - |
| Preferred Stock, Convertible Series A, Par Value $0.001 | - |
| Preferred Stock, Convertible Series B, Par Value $0.001 | - |
| Common Stock, Par Value $0.001 | - |
| Additional Paid-In Capital | 15,000,000 |
| Treasury Stock | - |
| Accumulated Deficit | 10,160,458 |
| | |
| Total Stockholders' Equity Attributable to | |
| Unrivaled Incoration Stockholders | 25,160,458 |
| | |
| Non-Controlling Interests in Consolidated Subsidiaries | - |
| | |
| **Total Stockholders' Equity** | 25,160,458 |
| | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $   36,427,173 |
| | - |

**People's First Choice**
**Income Statement**

**For the Twelve Months Ended December 31, 2022**

| | Full Year 2022 |
|---|---|
| Revenue | 25,780,232 |
| Cost of Goods Sold | 11,656,922 |
| | |
| Gross Profit $ | 14,123,310 |
| Gross Profit % | 54.8% |
| | |
| Advertising and Promotion | 535,187 |
| Allowance for Doubtful Accounts | 2,032 |
| Amortization Expense | - |
| Automobile Expense | 83,375 |
| Bank Service Charges | 55,416 |
| Charitable Contributions | - |
| Commission Expense | - |
| Computer and Internet Expenses | 29,483 |
| Conferences and training | - |
| Consultant Stock Compensation | - |
| Depreciation Expense | 105,422 |
| Director(s) Compensation | 108,533 |
| Directors Stock Compensation | - |
| Dues and Subscriptions | 22,850 |
| Employee Stock Compensation | - |
| Independent Contractors | - |
| Insurance Expense | 184,931 |
| Licenses, Permits & Fees | 266,191 |
| Management Fees | - |
| Marketing Expense | - |
| Meals and Entertainment | 9,150 |
| Miscellaneous expense | 823 |
| Moving expense | - |
| Office Supplies and Expenses | 1,593 |
| Option Expense | - |
| Payroll Tax Expense | 211,954 |
| Political Contributions | - |
| Postage and Delivery | - |
| Printing and Reproduction | - |
| Professional Fees - Accounting | - |
| Professional Fees - Legal Fees | 50,306 |
| Professional Fees - Other Professional Fees | 26,590 |
| Rent Expense | 784,846 |
| Rental equipment | 456 |
| Repairs and Maintenance | 97,714 |
| Research and development | - |
| Salaries & Wages and Processing Fees | 1,896,544 |
| Security Expense | 748,335 |
| Taxes - Business City Property | 53,635 |
| Telephone Expense | 3,573 |
| Travel Expense | 3,143 |
| Utilities | 105,548 |
| Warrant Expense (Option Expense) | - |
| Inventory Absorption | - |
| | |
| Total Selling, General and Administrative Expenses | 5,387,629 |
| | |
| Impairment of Property and Equipment | - |
| Impairment of Intangibles Assets | - |
| Impairment of Goodwill or Intangibles | - |
| (Gain) / Loss on Disposal and Sale of Assets | - |
| (Gain) / Loss on Interest in Joint Venture | - |
| | |
| Total Gain on Sale / Impairment of Assets & JV | - |
| | |
| Income (Loss) from Operations | 8,735,681 |
| | |
| Income (Loss) from Subsidiaries | - |
| | |
| Other Income (Expense): | |
| Loss on Extinguishment of Debt | - |
| Loss from Derivatives Issued with Debt Greater than Debt Carrying Value | - |
| Gain (Loss) on Investments | - |
| Interest Expense | - |
| Unrealized gain on investments | - |
| Change in Fair Market Value of Contingent Consideration | - |
| Gain on Settlement of Contingent Consideration | - |
| Other Income/Loss | (83,427) |
| | |
| Total Other Expense | (83,427) |
| | |
| Income (Loss) from continuing operations before tax | 8,652,254 |
| | |
| Income Tax Provision | - |
| | |
| Net Income (Loss) from continuing operations | 8,652,254 |
| Net Income (Loss) Attributable to Non-Controlling Interests from continuing operations | - |
| | |
| Net Income (Loss) Attributable to Unrivaled Inc. from continuing operations | 8,652,254 |
| | |
| Net Income (Loss) from discontinued operations | - |
| Net Income (Loss) Attributable to Non-Controlling Interests from discontinued operations | - |
| | |
| Net Income (Loss) Attributable to Unrivaled Inc. from discontinued operations | - |
| | |
| NET INCOME (LOSS) ATTRIBUTABLE TO UNRIVALED INC. | 8,652,254 |

DocuSign Envelope ID: CBA4AB0C-GCBE-49AA-BD26-257A8C4E35B1

**People's First Choice**
**Liability Detail**
**As of December 31, 2022**

| | | |
|---|---|---:|
| Accounts Payable & Accrued Liabilities | 20000 - Accounts Payable | $ (3,259,630.55) |
| | 21000 - Accrued Expenses | $ (91,326.36) |
| | 21002 - Accrued Payroll | $ (143,022.35) |
| | 21003 - Tips Payable | $ (122,856.33) |
| | 21016 - Excise Tax | $ (36,594.32) |
| | 21017 - Income Taxes Payable - FTB | $ (616,532.67) |
| | 21021 - City Tax | $ (1,000,410.87) |
| | 21024 - Sales Tax | $ 293,002.76 |
| | 21031 - Accrued Vacation | $ (23,145.75) |
| | 21033 - Current Lease Liability | $ (626,399.15) |
| | Subtotal | **$ (5,626,915.59)** |
| Income Taxes Payable | 25000 - IRS Federal Taxes | **$ (4,798,060.98)** |
| Other Long Term Liabilities | 27005 - Long Term Lease Liability | **$ (841,737.64)** |

## <u>DECLARATION OF SABAS CARRILLO</u>

I, Sabas Carrillo, hereby declare as follows:

1.  I am the Chief Executive Officer of Unrivaled Brands, Inc.  If called upon, I could and would testify to the facts contained herein from my personal knowledge.

2.  On or about March 6, 2023, Unrivaled Brands, Inc. and People's California, LLC entered into a Binding Settlement Term Sheet ("Term Sheet").

3.  Pursuant to paragraph 1(c)(iv) of that Term Sheet, Unrivaled provided to People's the 2022 unaudited financial statements of People's First Choice, LLC, including, but not limited to, People's First Choice, LLC's 2022 unaudited balance sheet and statement of income and supporting detail, attached as Attachment A to the Term Sheet ("PFC's Financial Statements").

4.  To the best of my knowledge, PFC's Financial Statements are (i) true and correct in all material respects as of the date of those financial statements, and (ii) there is no known material diminution since that date.

5.  PFC's Financial Statements were provided to Marcum, LLP, Unrivaled's financial reporting auditors, and are subject to any audit adjustments as a result of Unrivaled's financial audit.  Any such audit adjustments will be provided to People's after the audit opinion is issued by Marcum.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 6th day of March, 2023 at Los Angeles, California.

DocuSigned by:

*Sabas Carrillo*

11D7B3141BC2472...

Sabas Carrillo

DocuSign Envelope ID: CBA4AB0C-GCBE-49AA-BD26-2577A9C4E35B

## ATTACHMENT B

Ownership Transfer Documents



Planning and Building Agency
**Planning Division**
20 Civic Center Plaza
P.O. Box 1988 (M-20)
Santa Ana, CA 92702
**(714) 647-5804**
www.santa-ana.org

**2023**



## Commercial Cannabis Business
## Binder Checklist Requirements

| | |
|---|---|
| Circle all that apply: Retail, Distribution, Manufacturing, Cultivation, Testing Laboratory | |
| Circle all that apply: New/Renewal/Ownership Change | |

| **Business Name:** People's First Choice, LLC | **Business Address:** 2721 S. Grand Ave. Santa Ana, CA 92705 |
|---|---|
| *Document* | *Complete/Pending* |
| **Binder Section 1** | |
| Regulatory Safety Permit (RSP)* | |
| Approval Letter* | |
| Copy of State License(s) ** | |
| **Binder Section 2** | |
| RSP Application Checklist (Application Pages 1 to 3) | |
| RSP Application (Application  Pages 4 to 6) | |
| Fictitious Business Name (DBA), if applicable. | |
| Issued Certificate of Occupancy (COO) Copy* | |
| **Binder Section 3** | |
| Site and Floor Plans – New business unless changes on renewal | |
| Exterior and Interior Photos | |
| **Binder Section 4** | |
| Site Control Documentation (Lease or Title) | |
| Property Owner/Landlord Use Disclosure Affidavit and Notary Statement  (Application Pages 7 and 8) | |
| Commercial Cannabis Operating Standards Acknowledgement Form (Application Page 9) | |
| **Binder Section 5** | |
| Articles of Incorporation or Organization | |
| Bylaws/Operating Agreement | |
| California Statement of Information | |
| California Department of Tax and Fee Administration Seller's Permit | |
| **Binder Section 6** | |
| Live Scan for Owners | |
| Current Employee List and Contact Information | |
| **Binder Section 7** | |
| Security Guard Copy of Current Business License. | |
| Current Alarm Company Copy of Current Business License. | |
| Labor Peace Agreement (LPA) Copy- Not required on renewals | |
| Filtration Maintenance Schedule (when systems will be cleaned) | |
| Santa Ana Business License Copy | |
| **Binder 8** | |
| Community Benefits, Sustainable Business practices, and Social Equity Plan. | |
| *Provided by the City  ** Applies to renewal RSP applications | |

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued. All application materials are public record.



**Planning and Building Agency**
**Planning Division**
**20 Civic Center Plaza**
**P.O. Box 1988 (M-20)**
**Santa Ana, CA 92702**
**(714) 647-5804**
**www.santa-ana.org**

**2023**



### Commercial Cannabis **Phase 2**/ Regulatory Safety Permit (RSP) Application

*This application is a public record.*

## Submittal Checklist

Submittals require **one (1) USB flash drive and one (1) printed binder** with eight section tabs. Please email Cannabis@santa-ana.org to schedule an appointment to submit **in person** to 20 Civic Center Plaza (1st Floor, Ross Annex). All documents **must be formatted to letter size** (8.5 by 11-inch) sheets on the USB flash drive.

The following are the submittal items necessary for a Commercial Cannabis Business Phase 2/Regulatory Safety Permit (RSP) Application. The items are required for new or change of ownership applications. In order for your application to be deemed complete and entered into the permit database, all items referenced below must be submitted. Please e-mail the City at cannabis@santa-ana.org should you have any questions regarding the submittal requirements or need additional information.

| Item | Date Submitted |
|---|---|
| **Printed Binder of Application Components.** All applications and materials must be assembled into a three ring binder. The binder must have seven separate section tabs. See the Commercial Cannabis Business Binder Requirements table at the end of this packet. | |
| **USB Drive.** All of the documents below must be formatted to letter size (8.5 by 11-inch) sheets on the USB flash drive. The files must be organized in file folders labeled Section 1 through 8 and files labeled within each folder as listed in the title below in bold. | |
| **Regulatory Safety Permit Application.** The Regulatory Safety Permit (RSP) Application is included in this packet. | |
| **Preliminary Site and Floor Plans.** Plans should be prepared by an architect, engineer, or draftsperson and should show a basic site and floor plan with the proposed layout of the business. (Note: Detailed structural, electrical, mechanical, plumbing, and disabled access compliance pursuant to Title 24 of the State of California Code of Regulations and the Americans with Disabilities Act will be required for Building plan check.). | |
| **Site and Building Photographs.** Please submit *digital* color photographs of the property's exterior and interior, including entrances, exits, street frontages, parking, all sides of the property, and interior areas. | |
| **Site Control Documentation.** If the property is being rented or is owned by the commercial cannabis business applicant(s)/owner(s), documentation indicated lease or title must be submitted. | Not required until RSP approved. |

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.



**Planning and Building Agency**
Planning Division
20 Civic Center Plaza
P.O. Box 1988 (M-20)
Santa Ana, CA 92702
(714) 647-5804
www.santa-ana.org

**2023**



## Commercial Cannabis **Phase 2**/ Regulatory Safety Permit (RSP) Application

*This application is a public record.*

| Item | Date Submitted |
|---|---|
| **Business Structure.** If the Business is a corporation, submit a certified copy of the Business' Secretary of State Articles of Incorporation, Certificate(s) of Amendment, Statement(s) of Information and a copy of the Collective's Bylaws. If the Commercial Cannabis Business is an unincorporated association, submit a copy of the Articles of Association. | |
| **Commercial Cannabis Operating Standards Acknowledgement Form**. A copy of the Commercial Cannabis Business Operating Standards Acknowledgement Form with a signed statement by the responsible party on-site stating under penalty of perjury, that they read, understand and shall ensure compliance with the aforementioned operating standards. A copy of the form is included in this packet. | |
| **Submittal Fee.** The submittal fee is payable in cashier's check, money order, or personal checks. *Credit cards will not be accepted.* | |

| Additional Items Required After Submittal of the Above-Listed Items | |
|---|---|
| **Construction Drawings for Plan Check.** Detailed structural, electrical, mechanical, plumbing, and disabled access compliance pursuant to Title 24 of the State of California Code of Regulations and the Americans with Disabilities Act will be required for Building plan check. **A RSP will not be issued until all required plan check, tenant improvements, and inspections are complete.** *Not required for change of ownership applications, unless improvements are proposed.* | Preliminary final drawings required when tenant improvement completed. |
| **Odor Control and Ventilation.** Submit documentation of all odor control and ventilation equipment, mechanisms, devices, etc. including how often they will be changed/cleaned. | |
| **Business License, Seller's Permit, and County of Orange "Doing Business As" (DBA).** All commercial cannabis businesses must obtain any required business license(s) prior to opening. Business License forms and applications are available at City Hall. | |
| **Badge Requirement Retail sales**- Badges shall be worn by any individuals as required to do so pursuant to the California Code of Regulations, Title 4, Section 15043 and California Business and Professions Code Section 7582.28, as amended from time to time. SAMC I. iv.5 (o). | |

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.



**Planning and Building Agency**
**Planning Division**
**20 Civic Center Plaza**
**P.O. Box 1988 (M-20)**
**Santa Ana, CA 92702**
**(714) 647-5804**
**www.santa-ana.org**

**2023**



Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

| | |
|---|---|
| **Individual Information List - SAMC 40-8 3. I. (s)** The commercial cannabis business shall provide the name and phone number of an on -site staff person to the Code Enforcement Division of the Planning and Building Agency for notification if there are operational problems with the establishment. Submit a list of all owners, managers, employees, security personnel, and/or volunteers affiliated with the business. | Required prior to RSP issuance. |
| **Owner Information.** SAMC 40-2 (6)  "Business owner" means any of the following: (a) A person with an aggregate ownership interest of twenty (20) percent or more in the person applying for a license or a licensee, unless the interest is solely a security, lien, or encumbrance. (b) The chief executive officer of a nonprofit or other entity. (c) A member of the board of directors of a nonprofit. (d) An individual who will be participating in the direction, control, or management of the person applying for a license.<br><br>Submit: 1. A completed Cannabis Individual application 2. Proof of live scan request form(s). Please use the Request for Live Scan Service form included in this packet, and also available online at www.santa-ana.org/documents/commercial-cannabis-business-phase-2-regulatory-safety-permit/  3. A fully legible color copy of one valid government-issued form of photo identification.  Once all documents have been completed, please submit them to cannabislivescan@santa-ana.org. | |
| **Labor Peace Agreement.** For any commercial cannabis business with two (2) or more employees, the business owner shall attest that he/she has entered into a legally binding agreement with a bona fide labor organization and provide a copy of the agreement to the City. | |
| **Update/Finalize Printed Binder and USB of Application Components.** Prior to scheduling the required final Planning and Code Enforcement Division inspections, the *final* version of all documents, plans, finished site photos, and any other items that have been updated since the time of the initial submittal must be provided for the final binder and USB files. | |

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.

Page 3 of 9

**CITY OF SANTA ANA PLANNING & BUILDING AGENCY**

Planning and Building Agency
**Planning Division**
**20 Civic Center Plaza**
**P.O. Box 1988 (M-20)**
**Santa Ana, CA 92702**
**(714) 647-5804**
**www.santa-ana.org**

**2023**



Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

# Regulatory Safety Permit Application

I.  Type (new or change of ownership): <u>Change of Ownership</u>

II.  Business Information
    a.  Commercial Cannabis Business Name: <u>People's First Choice, LLC</u>
    b.  Commercial Cannabis Business DBA: <u>People's OC</u>
    c.  Entity name used on Phase 1 Application: <u>People's First Choice, LLC</u>
    d.  Type of business entity: <u>LLC</u>
    e.  Business Address: <u>2721 S. Grand Ave. Santa Ana, CA 92705</u>
    f.  Type(s) of commercial cannabis business activities proposed (as indicated
       on the Phase 1/Registration Application): <u>Retail Storefront</u>

III.  Mailing Information
    a.  If same as above, please indicate here: _____
    b.  Mailing Address Line 1: _____
    c.  Mailing Address Line 2: _____
    d.  Mailing City, State, Zip: _____

IV.  Contact Information
    a.  Name: _____
    b.  Email Address: _____
    c.  Phone Number: _____
    d.  Website: _____
    e.  Fax Number: _____

V.  Employee Information
    a.  Number of Employees, Managers, Volunteers, etc.: _____

VI.  Current Agent for Service Process
    a.  Name: <u>Sabas Carrillo</u>
    b.  Email Address: _____
    c.  Phone Number: _____
    d.  Agent Address Line 1: _____
    e.  Agent Address Line 2: _____
    f.  Agent City, State, Zip: _____

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT
OPERATE unless a valid Permit is issued.

DocuSign Envelope ID: CBA1AB0C-GCBE-49AA-BD26-2577A8C4E35B

**2023**



Planning and Building Agency
Planning Division
20 Civic Center Plaza
P.O. Box 1988 (M-20)
Santa Ana, CA 92702
(714) 647-5804
www.santa-ana.org

Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

## Regulatory Safety Permit Application

VII.    Ownership Information

*All individuals identified as controlling members of the Commercial Cannabis Business must complete the "Owner Information" section. Use additional copies of this form for additional controlling members, if necessary.*

a. Full Name: Sabas Carrillo, CEO, Unrivaled Brands, Inc.

b. Email Address: scarrillo@unrivaledbrands.com

c. Phone Number:

d. Agent's Address:

e. Date of Birth:

f. Driver's License Number and State:

g. Social Security Number:

VIII.    Other Information

a. Have you been denied or had revoked a regulatory safety permit or similar in the last five (5) years in the City of Santa Ana or any other city located in or out of California?

b. Have you ever been convicted of, or plead guilty/no-contest to a felony or misdemeanor drug charge within the past four (4) years?

c. Is the property at which you propose to operate associated with or controlled by an association or regulatory CC&R's? If the answer is 'yes', you are required to submit a letter from the association acknowledging your proposed use of the property as a Commercial Cannabis Business is authorized and consistent with the applicable CC&R's.

*Note: If answering 'yes' to any of the above questions, describe on a separate piece of paper the circumstances, date, city, or county, and nature of incidents or charges applicable. Use extra pages if necessary.*

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.



**2023**



**Planning and Building Agency**
**Planning Division**
**20 Civic Center Plaza**
**P.O. Box 1988 (M-20)**
**Santa Ana, CA 92702**
**(714) 647-5804**
**www.santa-ana.org**

Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

# Regulatory Safety Permit Application

I represent and warrant that by my signature below, I have, or will have, the power, authority, and right to bind and represent the applicant, business, non-profit or not for profit entity listed in this application and I certify under penalty of perjury that the foregoing information is true and correct. I understand that if any information in this application is deemed to be false or misleading, it will result in automatic rejection of the application without a refund of the application fee.

Signature:_____

Printed Name and Title: _Sabas Carrillo, CEO, Unrivaled Brands, Inc._ Date:_____

Executed on (date):_____ in (write

location):_____.

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.

**CITY OF SANTA ANA** PLANNING & BUILDING AGENCY

Planning and Building Agency
Planning Division
20 Civic Center Plaza
P.O. Box 1988 (M-20)
Santa Ana, CA 92702
(714) 647-5804
www.santa-ana.org

**2023** 

Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

## Regulatory Safety Permit Application

VII.    Ownership Information

*All individuals identified as controlling members of the Commercial Cannabis Business must complete the "Owner Information" section. Use additional copies of this form for additional controlling members, if necessary.*

      a. Full Name:_____

      b. Email Address:_____

      c. Phone Number:_____

      d. Agent's Address:_____

      e. Date of Birth:_____

      f. Driver's License Number and State:_____

      g. Social Security Number:_____

VIII.    Other Information

      a. Have you been denied or had revoked a regulatory safety permit or similar in the last five (5) years in the City of Santa Ana or any other city located in or out of California? _____

      b. Have you ever been convicted of, or plead guilty/no-contest to a felony or misdemeanor drug charge within the past four (4) years?_____

      c. Is the property at which you propose to operate associated with or controlled by an association or regulatory CC&R's? If the answer is 'yes', you are required to submit a letter from the association acknowledging your proposed use of the property as a Commercial Cannabis Business is authorized and consistent with the applicable CC&R's._____

*Note: If answering 'yes' to any of the above questions, describe on a separate piece of paper the circumstances, date, city, or county, and nature of incidents or charges applicable. Use extra pages if necessary.*

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.

DocuSign Envelope ID: CBA1AB0C-GCBE-49AA-BD26-2577A8C1E35B



**Planning and Building Agency
Planning Division
20 Civic Center Plaza
P.O. Box 1988 (M-20)
Santa Ana, CA 92702
(714) 647-5804
www.santa-ana.org**

**2023**



Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

# Regulatory Safety Permit Application

I represent and warrant that by my signature below, I have, or will have, the power, authority, and right to bind and represent the applicant, business, non-profit or not for profit entity listed in this application and I certify under penalty of perjury that the foregoing information is true and correct. I understand that if any information in this application is deemed to be false or misleading, it will result in automatic rejection of the application without a refund of the application fee.

Signature:_____

Printed Name and Title:_____ Date:_____

Executed on (date):_____ in (write
location):_____.

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT
OPERATE unless a valid Permit is issued.

DocuSign Envelope ID: CBA1AB0C-GCBE-49AA-BD26-2577A8C4E35B

**Planning and Building Agency**
**Planning Division**
**20 Civic Center Plaza**
**P.O. Box 1988 (M-20)**
**Santa Ana, CA 92702**
**(714) 647-5804**
**www.santa-ana.org**

**2023**



Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

## Regulatory Safety Permit Application

VII.    Ownership Information

*All individuals identified as controlling members of the Commercial Cannabis Business must complete the "Owner Information" section. Use additional copies of this form for additional controlling members, if necessary.*

   a.  Full Name:_____
   b.  Email Address:_____
   c.  Phone Number:_____
   d.  Agent's Address:_____
   e.  Date of Birth:_____
   f.   Driver's License Number and State:_____
   g.  Social Security Number:_____

VIII.    Other Information

   a.  Have you been denied or had revoked a regulatory safety permit or similar in the last five (5) years in the City of Santa Ana or any other city located in or out of California? _____

   b.  Have you ever been convicted of, or plead guilty/no-contest to a felony or misdemeanor drug charge within the past four (4) years?_____

   c.  Is the property at which you propose to operate associated with or controlled by an association or regulatory CC&R's? If the answer is 'yes', you are required to submit a letter from the association acknowledging your proposed use of the property as a Commercial Cannabis Business is authorized and consistent with the applicable CC&R's._____

*Note: If answering 'yes' to any of the above questions, describe on a separate piece of paper the circumstances, date, city, or county, and nature of incidents or charges applicable. Use extra pages if necessary.*



**Planning and Building Agency**
**Planning Division**
**20 Civic Center Plaza**
**P.O. Box 1988 (M-20)**
**Santa Ana, CA 92702**
**(714) 647-5804**
**www.santa-ana.org**

**2023**

 

Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

# Regulatory Safety Permit Application

I represent and warrant that by my signature below, I have, or will have, the power, authority, and right to bind and represent the applicant, business, non-profit or not for profit entity listed in this application and I certify under penalty of perjury that the foregoing information is true and correct. I understand that if any information in this application is deemed to be false or misleading, it will result in automatic rejection of the application without a refund of the application fee.

Signature:_____

Printed Name and Title:_____  Date:_____

Executed on (date):_____  in (write

location):_____.

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.

**Planning and Building Agency**
**Planning Division**
**20 Civic Center Plaza**
**P.O. Box 1988 (M-20)**
**Santa Ana, CA 92702**
**(714) 647-5804**
**www.santa-ana.org**

**2023** 

Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

## Cannabis Use Disclosure/Submittal Affidavit

Property Address: 2721 S. Grand Ave. Santa Ana, CA 92705

Assessor's Parcel Number(s) : 411-132-02

Total Square Footage of Leased Area: _____

Business Name: People's First Choice, LLC

I, as current legal owner, landlord, or lessor of the property identified above and in the attached application(s), acknowledge the submittal of the above application(s). I authorize the commercial cannabis business referenced above to use this property as a Commercial Cannabis Business, as those terms are defined in Chapters 18 and 40 of the Santa Ana Municipal Code, should this Commercial Cannabis Business be selected and approved by the City of Santa Ana for a Regulatory Safety Permit. I further understand that I am responsible for, and also subject to, enforcement actions regarding any violations and/or nuisance activity which may occur at this property. I certify that the information contained in the application package is true and correct to the best of my knowledge.

Recorded Property Owner Signature: _____

Printed Name and Title: Bharat Lodhia, Property Owner    Date: _____

Recorded Property Owner Signature: _____

Printed Name and Title: _____    Date: _____

Recorded Property Owner Signature: _____

Printed Name and Title: _____    Date: _____

I certify under penalty of perjury that the foregoing information is true and correct.

Executed on (date): _____ in (write

location): _____.

*Note: An original signature is required on this form as part of the application. An agent for the property owner may sign the application provided that a signed original letter of authorization from the property owner accompanies this affidavit.*

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.



**Planning and Building Agency**
Planning Division
20 Civic Center Plaza
P.O. Box 1988 (M-20)
Santa Ana, CA 92702
**(714) 647-5804**
www.santa-ana.org

**2023**  

## Commercial Cannabis **Phase 2**/ Regulatory Safety Permit (RSP) Application

*This application is a public record.*

## <u>Sample Notary Format</u>

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**          CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                )
County of _____ )

On _____ before me, _____,
        *Date*                                *Here Insert Name and Title of the Officer*

personally appeared _____
                                        *Name(s) of Signer(s)*

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                    *Signature of Notary Public*

*Place Notary Seal Above*

—————————————— **OPTIONAL** ——————————————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited  ☐ General | ☐ Partner — ☐ Limited  ☐ General |
| ☐ Individual        ☐ Attorney in Fact | ☐ Individual        ☐ Attorney in Fact |
| ☐ Trustee          ☐ Guardian or Conservator | ☐ Trustee          ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.



**Planning and Building Agency**
Planning Division
20 Civic Center Plaza
P.O. Box 1988 (M-20)
Santa Ana, CA 92702
(714) 647-5804
www.santa-ana.org

**2023**



Commercial Cannabis **Phase 2**/
Regulatory Safety Permit (RSP)
Application

*This application is a public record.*

## Commercial Cannabis Operating Standards Acknowledgement Form

We, the property owner and commercial cannabis business operator listed below, collectively acknowledge that we have read, understand, and agree to abide by all applicable commercial cannabis business operating standards listed the Santa Ana Municipal Code, as well as any other Code sections applicable to the construction and operation of a commercial cannabis business in the State of California, in the County of Orange, and in the City of Santa Ana.

Commercial Cannabis Business Name: People's First Choice, LLC

Commercial Cannabis Business DBA: People's OC

Entity name used on Phase 1 Application: People's First Choice, LLC

Business Address Line 1: 2721 S. Grand Ave.

Business Address Line 2: Santa Ana, CA 92705

Type(s) of commercial cannabis business activities proposed (as indicated on the

Phase 1/Registration Application): Retail

Total Square Footage of Leased Area: 7500

Property Owner Signature:

Printed Name and Title: Bharat Lodhi, Property Owner        Date:

Commercial Cannabis Business Owner Signature:

Printed Name and Title: Sabas Carrillo, CEO, Unrivaled Brands, Inc.   Date:

Executed on (date): _____ in (write

location): _____.

Note: This is not a Regulatory Safety Permit (RSP) to legally operate a Commercial Cannabis Business. DO NOT OPERATE unless a valid Permit is issued.

Page 9 of 9

State of California
BCIA 8016
(Rev. 04/2020)

DEPARTMENT OF JUSTICE
PAGE 1 of 4

# REQUEST FOR LIVE SCAN SERVICE

*Applicant Submission*

CA0301900
**ORI** (Code assigned by DOJ)

LICENSE CERT. OR PERMIT
Authorized Applicant Type

REGISTRATION APP. FOR RSP
Type of License/Certification/Permit **OR** Working Title (Maximum 30 characters - if assigned by DOJ, use exact title assigned)

**Contributing Agency Information:**

SANTA ANA POLICE DEPARTMENT
Agency Authorized to Receive Criminal Record Information

A09680
Mail Code (five-digit code assigned by DOJ)

60 CIVIC CENTER PLAZA
Street Address or P.O. Box

YVETTE PORTUGAL
Contact Name (mandatory for all school submissions)

SANTA ANA          CA          92702
City                State      ZIP Code

(714) 667-2701
Contact Telephone Number

**Applicant Information:**

Last Name

First Name          Middle Initial          Suffix

Other Name: (AKA or Alias)

Last Name

First Name          Suffix

Date of Birth          Sex ☐ Male   ☐ Female

Driver's License Number

Height      Weight      Eye Color      Hair Color

Billing Number
(Agency Billing Number)

Place of Birth (State or Country)      Social Security Number

Misc. Number
(Other Identification Number)

Home Address    Street Address or P.O. Box

City          State      ZIP Code

I have received and read the included Privacy Notice, Privacy Act Statement, and Applicant's Privacy Rights.

Applicant Signature                    Date

Your Number: _____
OCA Number (Agency Identifying Number)

Level of Service: ☒ DOJ    ☐ FBI
(If the Level of Service indicates FBI, the fingerprints will be used to check the criminal history record information of the FBI.)

If re-submission, list original ATI number: _____
(Must provide proof of rejection)          Original ATI Number

**Employer** (Additional response for agencies specified by statute):

Employer Name

Street Address or P.O. Box                    Telephone Number (optional)

City          State      ZIP Code          Mail Code (five digit code assigned by DOJ)

**Live Scan Transaction Completed By:**

Name of Operator                    Date

Transmitting Agency          LSID          ATI Number          Amount Collected/Billed

DocuSign Envelope ID: CBA3AB0C-GCBE-49AA-BD26-B577A9C4E35B

STATE OF CALIFORNIA
BCIA 8016
(Rev. 04/2020)

DEPARTMENT OF JUSTICE
PAGE 2 of 4

# REQUEST FOR LIVE SCAN SERVICE

## Privacy Notice

### As Required by Civil Code § 1798.17

**Collection and Use of Personal Information.** The California Justice Information Services (CJIS) Division in the Department of Justice (DOJ) collects the information requested on this form as authorized by Business and Professions Code sections 4600-4621, 7574-7574.16, 26050-26059, 11340-11346, and 22440-22449; Penal Code sections 11100-11112, and 11077.1; Health and Safety Code sections 1522, 1416.20-1416.50, 1569.10-1569.24, 1596.80-1596.879, 1725-1742, and 18050-18055; Family Code sections 8700-87200, 8800-8823, and 8900-8925; Financial Code sections 1300-1301, 22100-22112, 17200-17215, and 28122-28124; Education Code sections 44330-44355; Welfare and Institutions Code sections 9710-9719.5, 14043-14045, 4684-4689.8, and 16500-16523.1; and other various state statutes and regulations. The CJIS Division uses this information to process requests of authorized entities that want to obtain information as to the existence and content of a record of state or federal convictions to help determine suitability for employment, or volunteer work with children, elderly, or disabled; or for adoption or purposes of a license, certification, or permit. In addition, any personal information collected by state agencies is subject to the limitations in the Information Practices Act and state policy. The DOJ's general privacy policy is available at **http://oag.ca.gov/privacy-policy**.

**Providing Personal Information.** All the personal information requested in the form must be provided. Failure to provide all the necessary information will result in delays and/or the rejection of your request.

**Access to Your Information.** You may review the records maintained by the CJIS Division in the DOJ that contain your personal information, as permitted by the Information Practices Act. See below for contact information.

**Possible Disclosure of Personal Information.** In order to process applications pertaining to Live Scan service to help determine the suitability of a person applying for a license, employment, or a volunteer position working with children, the elderly, or the disabled, we may need to share the information you give us with authorized applicant agencies.

The information you provide may also be disclosed in the following circumstances:

- With other persons or agencies where necessary to perform their legal duties, and their use of your information is compatible and complies with state law, such as for investigations or for licensing, certification, or regulatory purposes.
- To another government agency as required by state or federal law.

**Contact Information.** For questions about this notice or access to your records, you may contact the Associate Governmental Program Analyst at the DOJ's Keeper of Records at (916) 210-3310, by email at **keeperofrecords@doj.ca.gov**, or by mail at:

Department of Justice
Bureau of Criminal Information & Analysis
Keeper of Records
P.O. Box 903417
Sacramento, CA 94203-4170



BCIA 8016
(Rev. 04/2020)

# REQUEST FOR LIVE SCAN SERVICE

### Privacy Act Statement

**Authority**. The FBI's acquisition, preservation, and exchange of fingerprints and associated information is generally authorized under 28 U.S.C. 534. Depending on the nature of your application, supplemental authorities include Federal statutes, State statutes pursuant to Pub. L. 92-544, Presidential Executive Orders, and federal regulations. Providing your fingerprints and associated information is voluntary; however, failure to do so may affect completion or approval of your application.

**Principal Purpose**. Certain determinations, such as employment, licensing, and security clearances, may be predicated on fingerprint-based background checks. Your fingerprints and associated information/biometrics may be provided to the employing, investigating, or otherwise responsible agency, and/or the FBI for the purpose of comparing your fingerprints to other fingerprints in the FBI's Next Generation Identification (NGI) system or its successor systems (including civil, criminal, and latent fingerprint repositories) or other available records of the employing, investigating, or otherwise responsible agency. The FBI may retain your fingerprints and associated information/biometrics in NGI after the completion of this application and, while retained, your fingerprints may continue to be compared against other fingerprints submitted to or retained by NGI.

**Routine Uses.** During the processing of this application and for as long thereafter as your fingerprints and associated information/biometrics are retained in NGI, your information may be disclosed pursuant to your consent, and may be disclosed without your consent as permitted by the Privacy Act of 1974 and all applicable Routine Uses as may be published at any time in the Federal Register, including the Routine Uses for the NGI system and the FBI's Blanket Routine Uses. Routine uses include, but are not limited to, disclosures to: employing, governmental, or authorized non-governmental agencies responsible for employment, contracting, licensing, security clearances, and other suitability determinations; local, state, tribal, or federal law enforcement agencies; criminal justice agencies; and agencies responsible for national security or public safety.

DocuSign Envelope ID: CBA1AB0C-GCBE-49AA-BD26-B577A8C1E35B

## REQUEST FOR LIVE SCAN SERVICE

### Noncriminal Justice Applicant's Privacy Rights

As an applicant who is the subject of a national fingerprint-based criminal history record check for a noncriminal justice purpose (such as an application for employment or a license, an immigration or naturalization matter, security clearance, or adoption), you have certain rights which are discussed below.

- You must be provided written notification[1] that your fingerprints will be used to check the criminal history records of the FBI.
- You must be provided, and acknowledge receipt of, an adequate Privacy Act Statement when you submit your fingerprints and associated personal information. This Privacy Act Statement should explain the authority for collecting your information and how your information will be used, retained, and shared. [2]
- If you have a criminal history record, the officials making a determination of your suitability for the employment, license, or other benefit must provide you the opportunity to complete or challenge the accuracy of the information in the record.
- The officials must advise you that the procedures for obtaining a change, correction, or update of your criminal history record are set forth at Title 28, Code of Federal Regulations (CFR), Section 16.34.
- If you have a criminal history record, you should be afforded a reasonable amount of time to correct or complete the record (or decline to do so) before the officials deny you the employment, license, or other benefit based on information in the criminal history record. [3]

You have the right to expect that officials receiving the results of the criminal history record check will use it only for authorized purposes and will not retain or disseminate it in violation of federal statute, regulation or executive order, or rule, procedure or standard established by the National Crime Prevention and Privacy Compact Council. [4]

If agency policy permits, the officials may provide you with a copy of your FBI criminal history record for review and possible challenge. If agency policy does not permit it to provide you a copy of the record, you may obtain a copy of the record by submitting fingerprints and a fee to the FBI. Information regarding this process may be obtained at https://www.fbi.gov/services/cjis/identity-history-summary-checks.

If you decide to challenge the accuracy or completeness of your FBI criminal history record, you should send your challenge to the agency that contributed the questioned information to the FBI. Alternatively, you may send your challenge directly to the FBI. The FBI will then forward your challenge to the agency that contributed the questioned information and request the agency to verify or correct the challenged entry. Upon receipt of an official communication from that agency, the FBI will make any necessary changes/corrections to your record in accordance with the information supplied by that agency. (See 28 CFR 16.30 through 16.34.) *You can find additional information on the FBI website at* https://www.fbi.gov/about-us/cjis/background-checks.

---

[1] Written notification includes electronic notification, but excludes oral notification
[2] https://www.fbi.gov/services/cjis/compact-council/privacy-act-statement
[3] See 28 CFR 50.12(b)
[4] See U.S.C. 552a(b); 28 U.S.C. 534(b); 34 U.S.C. § 40316 (formerly cited as 42 U.S.C. § 14616), Article IV(c)

## WRITTEN CONSENT AND RATIFICATION OF MANAGER
## TO COMPANY ACTION BY PEOPLE'S FIRST CHOICE, LLC,
### A California limited liability company

The undersigned, Unrivaled Brands, Inc., is the sole manager (the "Manager") of People's First Choice, LLC, a California limited liability company (the "Company"), and as of _____, 202__, (the "Effective Date"), hereby consents, by this writing, to take the following action, to adopt the following resolutions, and to transact the following business of this Company:

### Transfer of 80% of Membership Interest

**WHEREAS,** the Company and its Manager have determined that it's in the best interests of the Company that Manager transfer its 80% ownership (the "Unrivaled Interest") in the Company to _____ ("_____"); and

**RESOLVED**, that for good and valuable consideration _____ agrees to the transfer of the Unrivaled Interest as of the Effective Date and that after such transfer, -_____ shall own _____% of the Company and Manager shall not have any ownership interest in the Company.

### Resignation of Unrivaled Brands, Inc. as Manager

**WHEREAS,** the Company and its Manager have determined that it's in the best interests of the Company that Manager, including all officers, directors, employees, owners, affiliates and agents of Manager resign all their positions with the Company, including, but not limited to, as Manager and officers of the Company; and

**RESOLVED,** that as of the Effective Date the Company hereby accepts the foregoing resignations and that neither Manager nor any of its officers, directors, employees, owners, affiliates or agents shall hold any positions with the Company.

### Appointment of New Manager

**WHEREAS,** as its last act before resigning, the Manager has determined that it's in the Company's best interests to appoint _____ as Manager of the Company; and

**RESOLVED, FURTHER,** that _____ is hereby appointed as Manager of the Company to hold that position pursuant to the Company's Operating Agreement.

### Authorizing Resolution

**RESOLVED, FURTHER**, that the Manager or officers as designated by the Manager, of this Company, and each of them, be, and they hereby are, authorized, empowered, and instructed, in the name of and on behalf of this Company, and as the act of this Company, to take whatever action is necessary or appropriate to perform, carry out, and effectuate the intents and purposes of the foregoing resolutions.

The foregoing recitals and resolutions are approved by the undersigned to be effective as of the date indicated below.

**Unrivaled Brands, Inc.**

By: _____
Name: Sabas Carrillo
Title: Chief Executive Officer

Agreed and Accepted as to Resignations:

**Unrivaled Brands, Inc.**

By: _____
Name: Sabas Carrillo
Title: Chief Executive Officer

Agreed and Accepted as to Appointment:

_____

By: _____
Name: _____
Title: Managing Member

**ATTACHMENT C**

UNRIVALED

Re:    Orange County Superior Court Case No. 30-2022-01270747-CU-BC-CJC

To Whom It May Concern:

Regarding the above-referenced lawsuit, Unrivaled Brands, Inc. and its counsel made a diligent search and good faith review of available information regarding the substance of the claims asserted against Frank Kavanaugh, Jay Yadon, and Bernard Steimann based on Unrivaled's acquisition of certain retail assets from People's California, LLC, including People's First Choice, LLC.  These retail assets were acquired in a transaction while Unrivaled was directed by prior management.  The lawsuit was filed on information and belief.  Unrivaled acknowledges that these claims have not been proven and has agreed to dismiss these claims.

Respectfully submitted,

*Sabas Carrillo*

Sabas Carrillo

**<u>EXHIBIT 2</u>**

# AMENDMENT NO. 1
# TO BINDING SETTLEMENT TERM SHEET

This Amendment No. 1 ("Amendment No. 1") is made effective May 17, 2023 ("Effective Date"), and is in reference to the Binding Settlement Term dated March 6, 2023, by and between Unrivaled Brands, Inc. ("Unrivaled") and People's California, LLC ("People's," and collectively with Unrivaled, the "Parties").

For other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree to the following:

1.    <u>Amendments</u>. The Parties agree that the Settlement Agreement shall be amended as follows (amended language underlined):

a.    <u>Section 1(a)(i)</u> shall be amended to read: "A $3,000,000 Promissory Note ("$3M Note") which shall be secured by a second deed of trust ("DOT") on that certain real property located at 3242 Halladay Street, Santa Ana, CA 92705 (the "Halladay Property"), which shall be ~~submitted for recording~~ <u>recorded</u> in no fewer than ten (10) business days after the Effective Date, as well as $1,000,000 on People's First Choice, LLC ("PFC") and People's Costa Mesa, LLC. PFC and People's Costa Mesa, LLC, shall collectively be referred to herein as the "Retail Assets". Unrivaled shall not record any additional deeds of trust on the Halladay Property between the Effective Date and the date the DOT is submitted. The $3M Note shall be paid in cash <u>no later than December 6, 2023</u>. The principal of the $3M Note shall accrue simple interest at an annual rate of 10% from the Effective Date. All interest payments shall be paid monthly, in cash. Upon payment in full of the $3M Note, the Halladay Property DOT and the security interest in the Retail Assets shall be released; and"

b.    <u>Section 1(b)</u> shall be amended to read: "<u>The $5,000,000 of the Up-Front Settlement Amount, which is included in the principal of the Settlement Note, shall be paid in the following manner:</u>
    i.    <u>$800,000.00 shall be due and payable in cash via wire transfer on or before May 18, 2023.</u>
    ii.    <u>$2,200,000.00 shall be due and payable in cash via wire transfer on or before July 6, 2023. The payment shall be secured by the Employment Retention Credit ("ERC") that Unrivaled believes it will receive from the IRS.</u>
    iii.    <u>$2,000,000.00 shall be due and payable in cash via wire transfer on or before September 6, 2023.</u>
<u>The period of time between the Effective Date and September 6, 2023, shall be referred to herein as the 'Raise Period.'"</u>

c.    <u>Section 1(e)(iii)</u> shall be amended to read: "<u>Payment of Interest</u>: Monthly. During the first 180 days Unrivaled shall not pay any Interest although interest shall accrue during this period. Thereafter, Unrivaled shall make monthly

DocuSign Envelope ID: 9545541CE-08AB-452D-AE61-341667F43909

Interest payments on the first of each month but shall have the option to pay 50% of the monthly Interest payments in the form of registered shares of Unrivaled's common stock (i.e., shares issued for payment of Interest shall be free-trading). The remaining 50% of monthly Interest payments must be paid in cash via wire transfer. The conversion price of the shares issued for Interest shall be the 10-day VWAP at the date of issuance. Unrivaled shall provide People's with no less than 3 days' written notice of its intent to convert under this Section 1e(iii) and the conversion shares shall be issued to People's no later than 5 business days thereafter or as soon as commercially practicable if more than 5 business days. People's and Unrivaled to agree on the 10-day VWAP calculation or on a third-party source for the 10-day VWAP."

d.  Section 1(e)(iv) shall be amended to read: "Payment of Principal: In addition to the payment of the $5,000,000.00 portion of the Up-Front Settlement Amount which if paid in full shall reduce the principal of the Settlement Note to $15,000,000.00, Unrivaled shall pay $1,000,000.00 in principal on or before September 6, 2023, which, upon payment, shall reduce the Settlement Note by $2,000,000.00 ($1,000,000 payment plus $1,000,000 in prepayment discount per Section 1(e)(v) hereof) to $13,000,000.00. The remainder of all unpaid principal and accrued but unpaid interest shall be due on or before March 5, 2028 ("Due Date")."

e.   Section 4 shall be amended to read: Riverside. Upon payment of the first $800,000.00 of the Up-Front Settlement Amount, any and all actions required for the primary and secondary closings of the Secondary MIPA related to Unrivaled's acquisition of People's Riverside, LLC, shall be deemed completed with no additional consideration and People's will cooperate in all regulatory requirements to maintain the Riverside cannabis license including adding People's Riverside, LLC, as a party to the Development Agreement, and 100% of People's Riverside, LLC, shall be transferred to Unrivaled. People's shall provide Unrivaled with copies of all permits, design drawings, architectural plans, renderings, service provider contact information, and any other information relevant to the planned completion and opening of the Riverside facility. In the event that Unrivaled sells all or any portion of People's Riverside, LLC, or any of its equity interests, including the units or other equity interests held by Unrivaled or any of its affiliates, or any assets held by People's Riverside, LLC, including, but not limited to, People's Riverside, LLC's, license(s) to operate, the gross proceeds of any such sale shall be immediately paid to People's and applied to the Settlement Note, first to any unpaid interest and then to any remaining unpaid principal.

2.    Definitions. For purposes of the Settlement Agreement, the "effective date of Settlement Note" shall be the "Effective Date" of the Settlement Agreement which is March 6, 2023.

3. <u>No Other Changes</u>. Except as modified, amended or clarified in this Amendment No. 1, all of the terms, covenants, provisions, agreements, and conditions of the Settlement Agreement are hereby ratified and confirmed in every respect and shall remain unmodified and unchanged and shall continue in full force and effect.

4. <u>Miscellaneous</u>. For all purposes of this Amendment No. 1, except as otherwise expressly provided or unless the context otherwise requires, (a) unless otherwise defined herein, all capitalized terms used herein shall have the meanings attributed to them by the Settlement Agreement, and (b) the capitalized terms expressly defined in this Amendment No. 1 shall have the meanings assigned to them in this Amendment No. 1. In the event of any ambiguity between the Settlement Agreement and this Amendment No. 1, the terms and conditions of this Amendment No. 1 shall control. Copies of this Amendment No. 1 with signatures transmitted electronically (e.g., pdf) will be deemed original signed versions of this Amendment No. 1.

This Amendment No. 1 has been duly executed by the parties hereto as of the day and year first set forth above.

**UNRIVALED BRANDS, INC.**

By: *Sabas Carrillo*
Name: Sabas Carrillo
Title: CEO

**PEOPLE'S CALIFORNIA, LLC**

By: *Bernard Steimann*
Name: Bernard Steimann
Title: Managing Member

**<u>EXHIBIT 3</u>**

*Execution Version*

PEOPLE'S FIRST CHOICE, LLC

**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

Effective as of June 10, 2024

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND TERMS ................................................................1

    Section 1.01    Definitions..................................................................1
    Section 1.02    Interpretation ..............................................................6

ARTICLE II CLOSING ....................................................................................7

    Section 2.01    Purchase of Interests....................................................7
    Section 2.02    Closing ......................................................................8
    Section 2.03    Uncertificated Interests................................................8
    Section 2.04    Closing Deliverables ...................................................8

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS ......................9

    Section 3.01    Representations and Warranties of Unrivaled. ...................9
    Section 3.02    Representations and Warranties of People's.....................10

ARTICLE IV REPRESENTATIONS AND WARRANTIES REGARDING THE
COMPANY..................................................................................................12

    Section 4.01    Organization and Qualification ....................................12
    Section 4.02    Authority and Enforceability .......................................12
    Section 4.03    Capital Structure ........................................................12
    Section 4.04    Governmental Filings and Consents...............................13
    Section 4.05    No Violations .............................................................13
    Section 4.06    Compliance with Laws; Permits ...................................13
    Section 4.07    Litigation; Governmental Orders ..................................14
    Section 4.08    Taxes........................................................................14
    Section 4.09    Employee Benefits ......................................................15
    Section 4.10    Employee Matters.......................................................15
    Section 4.11    Intellectual Property ...................................................15
    Section 4.12    Material Contracts ......................................................15
    Section 4.13    Title to Assets; Sufficiency of Assets.............................15
    Section 4.14    Real Property.............................................................15
    Section 4.15    Fees to Brokers and Finders.........................................15
    Section 4.16    Bank Accounts ...........................................................15
    Section 4.17    FCPA .......................................................................15
    Section 4.18    No Other Representations or Warranties .........................16

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .............16

    Section 5.01    Organization and Qualification ....................................16
    Section 5.02    Authority and Enforceability .......................................16
    Section 5.03    Governmental Filings and Consents...............................16
    Section 5.04    No Violations .............................................................17
    Section 5.05    Litigation; Governmental Orders ..................................17

i

Section 5.06    Fees to Brokers and Finders ........................................................17
Section 5.07    Sufficiency of Funds..................................................................17
Section 5.08    No Other Representations or Warranties .................................17

ARTICLE VI COVENANTS ..............................................................................17

Section 6.01    Conduct of Business .................................................................17
Section 6.02    Access to Information; Confidentiality ...................................19
Section 6.03    Reasonable Best Efforts; Regulatory Matters .........................20
Section 6.04    Resignation ..............................................................................20
Section 6.05    Public Disclosure......................................................................21
Section 6.06    Transfer Taxes ..........................................................................21
Section 6.07    Release ......................................................................................21
Section 6.08    Further Assurances ...................................................................21
Section 6.09    Notice of Developments ...........................................................21

ARTICLE VII CONDITIONS TO CLOSING.....................................................22

Section 7.01    Conditions to the Obligations of the Purchaser ......................22
Section 7.02    Conditions to the Obligations of the Sellers ...........................23

ARTICLE VIII TERMINATION .........................................................................23

Section 8.01    Termination...............................................................................23
Section 8.02    Procedure Upon Termination....................................................24
Section 8.03    Effect of Termination ...............................................................24

ARTICLE IX INDEMNIFICATION.....................................................................25

Section 9.01    Survival.....................................................................................25
Section 9.02    Indemnification by the Sellers..................................................25
Section 9.03    Indemnification by the Purchaser.............................................25
Section 9.04    Limitations; Effect of Investigation ........................................26
Section 9.05    Third-Party Claims ...................................................................26
Section 9.06    Direct Claims ...........................................................................27
Section 9.07    Payment ....................................................................................28
Section 9.08    Tax Treatment of Indemnification Payments...........................28
Section 9.09    Exclusive Remedy ....................................................................28

ARTICLE X MISCELLANEOUS .......................................................................28

Section 10.01        Entire Agreement ..............................................................28
Section 10.02        Notices...............................................................................28
Section 10.03        Amendment; Modification and Waiver ............................30
Section 10.04        Successors and Assigns.....................................................30
Section 10.05        No Third-Party Beneficiaries ...........................................30
Section 10.06        Governing Law; Jurisdiction ............................................30
Section 10.07        Specific Performance ........................................................31
Section 10.08        Counterparts ......................................................................31
Section 10.09        Severability........................................................................31

BN 83011036v1

Section 10.10          Transaction Expenses..................................................................32

**EXHIBITS**

Exhibit A      Management Services Agreement
Exhibit B      Assignment of Membership Interests
Exhibit C      Promissory Note
Exhibit D      Pledge Agreement
Exhibit E      Security Agreement

BN 83011036v1

*Execution Version*

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement ("**Agreement**") is made effective as of June 10, 2024 (the "**Effective Date**"), by and among Haven Nectar LLC, a California Limited Liability Company ("**Purchaser**"), and Unrivaled Brands, Inc., a Nevada corporation ("**Unrivaled**"), and People's California, LLC, a California limited liability company ("**People's**"), the sole members of People's First Choice, LLC, a California limited liability company (the "**Company**"). Each of Unrivaled and People's are sometimes individually referred to as "**Seller**" and together as the "**Sellers**". Each Seller and Purchaser are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**."

A.  Company holds a Regulatory Safety Permit issued by the City of Santa Ana, California ("**RSP**"), to engage in commercial cannabis retail operations (Storefront and Non-Storefront Delivery) at the premises located at 2721 South Grand Avenue, Santa Ana, California 92121 ("**Premises**");

B.  Company holds a California commercial cannabis business license C10-0000212-LIC for cannabis retail and delivery ("**State Licenses**") issued to it by the California Department of Cannabis Control ("**DCC**");

C.  Sellers currently own One Hundred Percent (100%) of the membership interests in Company (the "**Interests**");

D.  Sellers wish to sell, and Purchaser wishes to purchase, the Interests, on the terms and subject to the conditions set forth herein;

E.  The Purchaser and the Company shall enter into that certain Management Services Agreement substantially in the form attached hereto as <u>Exhibit A</u> (the "**MSA**") simultaneously with the signing of this Agreement; and

F.  The Company shall receive a written Consent for Assignment of the Lease for the Premises (the "**Lease Consent**").

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND TERMS

<u>Section 1.01</u>   <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings set forth or as referenced below:

"**Action**" means any action, suit, arbitration, hearing, mediation or other proceeding, whether civil or criminal, at law or in equity, before or by any Governmental Authority.

*Execution Version*

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such specified Person.  Notwithstanding anything to the contrary contained herein, from and after the Closing, the Company shall not be deemed to be an Affiliate of the Seller.

"**Agreement**" has the meaning set forth in the Preamble.

"**Ancillary Agreements**" means the MSA, the Lease Consent, the Note, the Pledge Agreement, the Security Agreement and the Assignments.

"**Assignments**" has the meaning set forth in Section 2.04(a)(ii).

"**Business Day**" means any day other than a Saturday, a Sunday or any day on which banks in San Diego, California are authorized or required by applicable Law to be closed for business.

"**California Courts**" has the meaning set forth in Section 10.06(b).

"**Cap**" has the meaning set forth in Section 9.04(a).

"**Closing**" has the meaning set forth in Section 2.02.

"**Closing Date**" has the meaning set forth in Section 2.02.

"**Code**" means the Internal Revenue Code of 1986.

"**Collective Bargaining Agreement**" means any collective bargaining agreement or other labor contract (including any contract or agreement with any works council, labor or trade union or other employee representative body).

"**Company Material Contract**" has the meaning set forth in Section 4.12(a).

"**Confidential Information**" has the meaning set forth in Section 6.02(b).

"**Contract**" any written note, bond, mortgage, indenture, guarantee, license, franchise, permit, agreement, contract, lease, commitment, legally binding letter of intent or other similar instrument, and any amendments thereto.

"**Control**" means, with respect to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.  The terms "Controlled," "Controlled by" and "under common Control with" shall have correlative meanings.

"**Deposit**" has the meaning set forth in Section 2.01(c).

"**Direct Claim**" has the meaning set forth in Section 9.06.

"**Effective Date**" has the meaning set forth in the Preamble.

*Execution Version*

"**Encumbrance**" means any lien, encumbrance, charge, security interest, mortgage, pledge, indenture, deed of trust, right of way, encroachment, easement, covenant, option, right of first offer or refusal or transfer restriction, or any other similar restrictions or limitations on the ownership or use of real or personal property or similar irregularities in title thereto.

"**Enforceability Exceptions**" has the meaning set forth in <u>Section 3.01(b)</u>.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law) or any arbitrator, arbitration panel, court or tribunal.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Indemnified Party**" means the party making a claim under this Agreement.

"**Intellectual Property**" means any and all intellectual property rights throughout the world, including any and all of the following (a) patents, patent applications and patent disclosures, including any continuations, divisions, continuations-in-part, reexaminations, extensions, renewals, reissues and foreign counterparts of or for any of the foregoing, (b) Trademarks, (c) Internet domain names, and social media usernames, handles and similar identifiers, (d) works of authorship, content, copyrights and copyrightable subject matter, design rights and moral and economic rights therein, (e) rights in software, data and databases, (f) trade secrets and other confidential and proprietary information, including confidential and proprietary customer and supplier lists, pricing and cost information, and business and marketing plans and proposals (collectively, "Trade Secrets"), (g) rights in ideas, know-how, inventions (whether or not patentable or reduced to practice), processes, formulae and methodologies, compositions, technologies, techniques, specifications, protocols, schematics and research and development information, (h) any and all applications, registrations and recordings for the foregoing and (i) all rights in the foregoing (including pursuant to licenses, common-law rights, statutory rights and contractual rights), in each case to the extent protectable under applicable Law.

"**Interests**" has the meaning set forth in Recitals.

"**Knowledge**" means with respect to (a) the Company, the actual knowledge of any manager of the Company, after reasonable inquiry, and (b) Purchaser, the actual knowledge of any manager, officer or director of the Purchaser, after reasonable inquiry.

"**Law**" means any statute, law, ordinance, regulation, rule, code, Governmental Order, constitution, treaty, common law, other requirement or rule of law of any Governmental Authority.

"**Lease Consent**" has the meaning as set forth in Recital F above.

3

*Execution Version*

"**Liabilities**" means any liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Losses**" means any and all actual losses, damages, Liabilities, deficiencies, obligations, claims, costs, interest, awards, judgments, fines, charges, penalties, Taxes, settlement payments and expenses (including reasonable expenses of investigation, enforcement and collection and reasonable attorneys', actuaries', accountants' and other professionals' fees, disbursements and expenses) of any kind; provided, however, that "Losses" shall not include punitive damages, lost profits, diminution in value, or other special or compensatory damages except to the extent actually awarded to a Governmental Authority or other third party.

"**Material Adverse Effect**" means, (a) with respect to a Person, a material adverse effect on the business, financial condition, assets or Liabilities or results of operations of such Person and its Subsidiaries, taken as a whole; provided, however, that no event, change, circumstance, effect, development, condition or occurrence resulting from, arising out of or relating to any of the following shall constitute or be deemed to contribute to a Material Adverse Effect, or shall otherwise be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur (i) changes in applicable Laws or other applicable accounting rules, (ii) changes in general economic, political, business or regulatory conditions, (iii) changes in United States or global financial, credit, commodities, currency or capital markets or conditions, (iv) the outbreak or escalation of war, military action or acts of terrorism or changes due to natural disasters, (v) any action expressly required by this Agreement or (vi) the public announcement, pendency or completion of the transactions contemplated by this Agreement, except, in the case of clauses (i) through (iv) to the extent such event, change, circumstance, effect, development, condition or occurrence has or would reasonably be expected to have a disproportionate impact on such Person and its Subsidiaries as compared to other Persons in such Person's industry, or, (b) with respect to the Company, a material adverse effect on the ability of the Company or the Sellers to perform their respective obligations under this Agreement or to consummate the transactions contemplated hereby.

"**Operating Agreement**" means that certain Amended and Restated Operating Agreement of the Company made effective as of November 22, 2021, by and between Unrivaled and People's.

"**Outside Date**" has the meaning set forth in Section 8.01(b).

"**Payment Schedule**" means the payment schedule attached hereto as Schedule I.

"**People's Interest**" means 20 Class B Membership Interest Units in the Company.

"**Permits**" means all licenses, permits, franchises, waivers, orders, registrations, consents and other authorizations and approvals of or by a Governmental Authority.

"**Permitted Encumbrances**" means (a) Encumbrances for Taxes not yet due and payable and for which appropriate reserves have been established in accordance with the applicable Person's past accounting practices, consistently applied, (b) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business consistent with past practice or amounts which are not yet due and payable or the amount and validity of which

4

*Execution Version*

are being contested in good faith and for which appropriate reserves have been established in accordance with the applicable Person's past accounting practices, consistently applied, (c) any non-monetary minor imperfection in title or Encumbrances, encroachments or conditions, if any, that, individually or in the aggregate, do not materially interfere with the continued use or operation of any real property or tangible personal property, as currently used or operated and (d) non-exclusive licenses of Intellectual Property granted in the ordinary course of business consistent with past practice.

"**Person**" means an individual, a corporation, a partnership, an association, a limited liability company, a joint venture, a trust or other entity or organization, including a Governmental Authority.

"**Pledge Agreement**" has the meaning set forth in Section 2.04(v).

"**Purchase Price**" has the meaning set forth in Section 2.01.

"**Purchaser Indemnitees**" has the meaning set forth in Section 9.02.

"**Promissory Note**" has the meaning set forth in Section 2.01(d).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Resignation**" has the meaning set forth in Section 6.04.

"**Sellers**" has the meaning set forth in the Preamble.

"**Sellers' Indemnitees**" has the meaning set forth in Section 9.03.

"**Survival Period**" has the meaning set forth in Section 9.01.

"**Tax**" or "**Taxes**" means any and all federal, state, county, local, foreign and other taxes, charges, fees, imposts, and governmental levies and assessments including all income, gross receipts, member units, premium, franchise, profits, production, value added, occupancy, gains, personal property replacement, employment and other employee and payroll related taxes, withholding, foreign withholding, social security, welfare, unemployment, disability, real property, personal property, license, ad valorem, transfer, workers' compensation, windfall and net worth taxes, environmental, customs duty, severances, stamp, excise, occupations, sales, use, transfer, alternative minimum, estimated taxes, inventory, escheat, guaranty fund assessment, and other taxes, duties, fees, levies, customs, tariffs, imposts, obligations, charges and assessments of the same or a similar nature imposed, imposable or collected by any Governmental Authority, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions, whether disputed or not, and any transferee, successor or other liability in respect of any items described above payable by reason of contract, assumption, operation of law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under foreign, state or local law) or otherwise.

*Execution Version*

"**Tax Authority**" means any Governmental Authority responsible for the administration or the imposition of any Tax.

"**Tax Returns**" means any return, report, declaration, election, estimate, information statement, claim for refund and return or other document (including any related or supporting information and any amendment to any of the foregoing and any sales and use and resale certificates) filed or required to be filed with any Tax Authority with respect to Taxes.

"**Third-Party Claim**" has the meaning set forth in Section 9.05(a).

"**Threshold**" has the meaning set forth in Section 9.04(a).

"**Transaction Expenses**" means (a) all fees, costs and expenses incurred by or on behalf of a Party in connection with the negotiation, documentation and consummation of the transactions contemplated by this Agreement, including all of the fees, disbursements and expenses of attorneys, actuaries, accountants, financial advisors and other advisors, and (b) any severance, change of control, sale, retention or similar bonuses, compensation or payments (together with the employer portion of employment Taxes payable in connection with such amounts) payable to any current or former director, officer, employee or natural independent contractor of the party as a result of the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

"**Transfer Taxes**" means any and all transfer Taxes (excluding Taxes measured in whole or in part by net income), including sales, use, excise, value-added, gross receipts, registration, real estate, stamp, documentary, notarial, filing, recording, permit, license, authorization and similar Taxes, fees, duties, levies, customs, tariffs, imposts, assessments, obligations and charges.

"**Unrivaled Closing Interest**" means 60 Class A Membership Interest Units in the Company.

"**Unrivaled Remainder Interest**" means 20 Class A Membership Interest Units in the Company.

Section 1.02    Interpretation.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." The word "or" need not be disjunctive. Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(b)    Whenever the last day for the exercise of any right or the discharge of any duty under this Agreement falls on a day other than a Business Day, the party having such right or duty shall have until the next Business Day to exercise such right or discharge such duty. Unless otherwise indicated, the word "day" shall be interpreted as a calendar day. With respect to any

6

*Execution Version*

determination of any period of time, unless otherwise set forth herein, the word "from" means "from and including" and the word "to" means "to but excluding."

(c)    The table of contents and headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

(d)    References to a "party" hereto means Purchaser, the Company or the Sellers, and references to "parties" hereto means Purchaser, the Company and the Sellers, unless the context otherwise requires.

(e)    References to "**dollars**" or "**$**" mean United States dollars.

(f)    The parties have participated jointly in the negotiation and drafting of this Agreement. Consequently, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(g)    All capitalized terms used without definition in the Exhibits and Schedules to this Agreement shall have the meanings ascribed to such terms in this Agreement.

## ARTICLE II
## CLOSING

Section 2.01    Purchase of Interests.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, (a) People's shall sell, transfer, convey, assign and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from People's, all of the People's right, title and interest in and to the People's Interest, free and clear of all Encumbrances, (b) Unrivaled shall sell, transfer, convey, assign and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from Unrivaled, all of Unrivaled's right, title and interest in and to the Unrivaled Closing Interest, free and clear of all Encumbrances and (c) the Purchaser shall pay to People's an amount equal to the sum of Nine Million ($9,000,000.00) (the "**Purchase Price**"), payable to People's or its designee in accordance with this Section 2.01 and the Funds Flow executed by the Parties:

(a)    Seven Million One Hundred Thousand Dollars ($7,100,000.00) of the Purchase Price shall be deposited by Purchaser into escrow with Wicker Law Group, as the escrow agent, prior to the Closing Date, and shall be released and paid by wire transfer, subject to release as provided in this Agreement, to People's on the Closing Date;

(b)    The balance of the amounts held in the escrow with Wicker Law Group shall be distributed as provided pursuant to the Funds Flow executed by the Parties;

(c)    The remaining balance of the Purchase Price that is represented by Nine Hundred Thousand Dollars ($900,000.00) (the "**Deposit**") that was deposited into escrow with Wicker Law Group on or about March 14, 2024, is hereby deemed a non-refundable deposit and shall be paid by wire transfer to People's on or before the Closing Date; and

*Execution Version*

(d)    The balance of the Purchase Price, in the amount of One Million Dollars ($1,000,000.00), shall be payable to People's pursuant to a secured promissory note substantially in the form set forth in Exhibit C (the "**Promissory Note**") in equal monthly installments paid by wire or ACH (as requested by People's) from Purchaser to People's of Forty-One Thousand Six Hundred Sixty-Six and 67/100 ($41,666.67) commencing from the first day of the month following the month in which the Closing occurs.

(e)    At such time as the RSP and the State Licenses have been transferred to Purchaser such that Purchaser is a valid holder of the RSP and the State Licenses and Unrivaled's ownership of an Interest is no longer required for Purchaser's legal operation of the Company's business, Unrivaled shall transfer, convey, assign and deliver to the Purchaser, and the Purchaser shall acquire and accept from Unrivaled, for no additional consideration, all of Unrivaled's right, title and interest in and to the Unrivaled Remainder Interest, free and clear of all Encumbrances.

Section 2.02    Closing.    The closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place electronically by mutual exchange of portable document format (.PDF) signatures and electronic delivery of funds, or at such other place, time and date as the Sellers and the Purchaser may mutually agree in writing.    The date on which the Closing occurs is referred to herein as the "**Closing Date**."    The Closing Date shall be on or before June 10, 2024. The Closing shall be deemed to occur and be effective at 11:59 p.m., local time, in Santa Ana, California, on the Closing Date.

Section 2.03    Uncertificated Interests.    Neither the Sellers nor the Company shall be required to provide physical certificates representing the Interests to the Purchaser, and, instead, the Interests shall be recorded as held by the Purchaser in the book and records of the Company upon their transfer in accordance with this Article II.

Section 2.04    Closing Deliverables.

(a)    At the Closing, the Company and/or the Sellers, as applicable and as indicated, shall deliver or cause to be delivered to the Purchaser the following:

(i)    the Company shall deliver evidence reasonably satisfactory to the Purchaser that the transfer of the Interests has been appropriately entered on the equity transfer books of the Company;

(ii)    assignments transferring the Interests, duly executed by the applicable Sellers, substantially in the form set forth in Exhibit B (the "**Assignments**"); *provided, that* the Assignment for the Unrivaled Remainder Interest shall be endorsed by Unrivaled in blank, to be dated and effective as provided in Section 2.01(d);

(iii)    the Lease Consent, duly executed by the applicable parties thereto;

(iv)    the MSA, duly executed by the applicable parties thereto;

(v)    a Guaranty and Security Agreement substantially in the form set forth in Exhibit D securing the Promissory Note (the "**Pledge Agreement**"), duly executed by People's;

8

*Execution Version*

(vi)    a Security Agreement substantially in the form set forth in <u>Exhibit E</u> securing the Promissory Note, duly executed by People's;

(vii)    certified resolutions from the governing bodies of each of the Sellers authorizing this Agreement, the Ancillary Agreements to which it is a party, and the transactions contemplated hereby and thereby; and

(viii)    without limitation by specific enumeration of the foregoing, all other documents reasonably required by the Purchaser to consummate the transactions contemplated by this Agreement.

(b)    At the Closing, the Purchaser shall deliver or cause to be delivered to the Sellers the following:

(i)    the MSA, duly executed by the applicable parties thereto;

(ii)    the Purchase Price, in accordance with this <u>Section 2</u> and <u>Schedule I</u>;

(iii)    the Lease Consent, duly executed by the applicable parties thereto;

(iv)    the Promissory Note duly executed by the Purchaser;

(v)    the Pledge Agreement duly executed by the Purchaser;

(vi)    the Security Agreement duly executed by the Purchaser;

(vii)    certified resolutions from the governing body of Purchaser authorizing this Agreement, the Ancillary Agreements to which it is a party, and the transactions contemplated hereby and thereby; and

(viii)    without limitation by specific enumeration of the foregoing, all other documents reasonably required by the Sellers to consummate the transactions contemplated by this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

<u>Section 3.01</u>    <u>Representations and Warranties of Unrivaled</u>.  Unrivaled hereby represents and warrants to the Purchaser as follows as of the Effective Date:

(a)    Organization and Authority.  Unrivaled is a corporation duly organized and validly existing under the laws of the State of Nevada.

(b)    Authority and Enforceability.  Unrivaled has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  Unrivaled has taken all requisite corporate or other actions to authorize the execution and delivery of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.  This

9

*Execution Version*

Agreement has been duly executed and delivered by Unrivaled and, assuming the due authorization, execution and delivery by each of the other Parties, this Agreement constitutes the valid and binding obligation of Unrivaled enforceable against Unrivaled in accordance with its terms, subject to: applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer, preference and other similar laws affecting creditors' rights generally, and by general principles of equity (regardless of whether enforcement is sought in equity or at law) (the "**Enforceability Exceptions**").

(c)    No Violations. Assuming the consents, approvals, authorizations, waivers, notices and filings referred to in Section 4.04 are obtained or made, the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party by Unrivaled, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) conflict with or result in a violation or breach of, or default under any provision of its Articles of Incorporation or Bylaws; (b) conflict with or result in a violation or breach of any provision of Law or Permit applicable to either Seller or any of its Affiliates (other than the Company); (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which Unrivaled or any of its Affiliates (other than the Company) is a party or by which Unrivaled, or any of its Affiliates (other than the Company), are bound or to which any of its respective properties and assets are subject; or (d) result in the creation or imposition of any Encumbrance, other than Permitted Encumbrances, on any properties or assets of Unrivaled.

(d)    Ownership of Interests. Unrivaled owns 80 Class A Units of the Company, constituting all of the outstanding Class A Units of the Company and all of the Interest owned by Unrivaled, of record and beneficially, free and clear of all Encumbrances (other than restrictions on transfer imposed by federal and state securities Laws and those contained in the Operating Agreement). The Interests are not certificated. Unrivaled represents and warrants to Purchaser that (i) it has not made any agreement to sell, transfer or hypothecate its Interests other than as disclosed herein, and (ii) it has not made any agreement in the name or on behalf of, or regarding, the Company or Interests held by it that has not been disclosed to the Purchaser in writing.

(e)    Fees to Brokers and Finders. Unrivaled has no obligation to pay any fee or commission to any investment banker, broker, financial adviser, finder or other similar intermediary in connection with the transactions contemplated by this Agreement except for Unrivaled's portion of the Brokers Fee equal to $32,982.96 of $370,000 payable to Green Life Business Group, Inc. No Other Representations or Warranties. Except for the representations and warranties contained in this Section 3.01, neither Unrivaled nor any other Person has made or makes any express or implied representation or warranty, either written or oral, on behalf of Unrivaled, including any representation or warranty as to the accuracy or completeness of any information regarding Unrivaled furnished or made available to the Purchaser, or any representation or warranty arising from statute or otherwise in law.

Section 3.02    Representations and Warranties of People's. People's hereby represents and warrants to the Purchaser as of the Effective Date as follows:

10

*Execution Version*

(a)    Organization and Authority.  People's is a limited liability company duly organized and validly existing under the laws of the State of California.

(b)    Authority and Enforceability.  People's has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  People's has taken all requisite limited liability company or other actions to authorize the execution and delivery of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by People's and, assuming the due authorization, execution and delivery by each of the other Parties, this Agreement constitutes the valid and binding obligation of People's enforceable against People's in accordance with its terms, subject to the Enforceability Exceptions.

(c)    No Violations.  Assuming the consents, approvals, authorizations, waivers, notices and filings referred to in Section 4.04 are obtained or made, the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party by People's, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) conflict with or result in a violation or breach of, or default under any provision of its organizational documents; (b) conflict with or result in a violation or breach of any provision of Law or Permit applicable to the Sellers or any of their Affiliates (other than the Company); (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which People's or any of its Affiliates (other than the Company) is a party or by which People's, or any of its Affiliates (other than the Company), are bound or to which any of its respective properties and assets are subject; or (d) result in the creation or imposition of any Encumbrance, other than Permitted Encumbrances, on any properties or assets of People's.

(d)    Ownership of Interests.  People's owns 20 Class B Units of the Company, constituting all of the outstanding Class B Units of the Company and all of the Interest owned by People's, of record and beneficially, free and clear of all Encumbrances (other than restrictions on transfer imposed by federal and state securities Laws and those contained in the Operating Agreement).  The Interests are not certificated. People's represents and warrants to Purchaser that (i) it has not made any agreement to sell, transfer or hypothecate its Interests other than as disclosed herein, and (ii) it has not made any agreement in the name or on behalf of, or regarding, the Company or Interests held by it that has not been disclosed to the Purchaser in writing.

(e)    Fees to Brokers and Finders.  People's has no obligation to pay any fee or commission to any investment banker, broker, financial adviser, finder or other similar intermediary in connection with the transactions contemplated by this Agreement except for People's portion of the Brokers Fee equal to $337,017.04 of $370,000 payable to Green Life Business Group, Inc.

(f)    No Other Representations or Warranties.  Except for the representations and warranties contained in this Section 3.02, neither People's nor any other Person has made or makes any express or implied representation or warranty, either written or oral, on behalf of People's,

11

*Execution Version*

including any representation or warranty as to the accuracy or completeness of any information that People's furnished or made available to the Purchaser, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

Except as set forth in the Disclosure Schedules attached to this Agreement, the Company hereby represents and warrants to the Purchaser as of the Effective Date as follows:

Section 4.01    Organization and Qualification.    The Company is a limited liability company, validly existing and in good standing (or the equivalent thereof) under the laws of its jurisdiction of organization. The Company has all requisite power and authority to carry on its business as currently conducted by it and to own and make use of its assets as currently used. The Company is duly qualified to do business and is in good standing (or the equivalent thereof) in each jurisdiction where the ownership or operation of its assets or the operation or conduct of its business as currently conducted requires such qualification, except where the failure to be so qualified or in good standing, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. The Company has made available to the Purchaser prior to the date hereof correct and complete copies of the organizational documents of the Company in effect as of the date hereof. Each such organizational document is in full force and effect, and the Company is in compliance with its organizational documents.

Section 4.02    Authority and Enforceability.

(a)    The Company has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The Company has taken all requisite limited liability company or other actions to authorize the execution and delivery of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery by each of the other parties hereto, this Agreement constitutes the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to the Enforceability Exceptions.

Section 4.03    Capital Structure.

(a)    The Sellers are the sole owners of all of the Interests, which includes all membership units or other equity interests in the Company that are issued and outstanding. The Interests have been duly authorized, are validly issued and are non-assessable. Except for this Agreement and as contained in the Operating Agreement, there are no preemptive or other outstanding rights, options, warrants, subscriptions, puts, calls, conversion rights or agreements or commitments of any character relating to the Interests, and the Company is not committed to issue any of the foregoing. The Interests have not been issued in violation of any applicable Laws or the organizational documents of the Company. The Company does not have any debt securities outstanding that have voting rights or are exercisable or convertible into, or exchangeable or redeemable for, or that give any Person a right to subscribe for or acquire, member units or other

BN 83011036v1

*Execution Version*

equity interests of the Company. There are no obligations, contingent or otherwise, to repurchase, redeem or otherwise acquire any membership units or other equity interests of the Company. There are no membership units or other equity or voting interests of the Company reserved for issuance. There are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the equity interests of the Company.

(b)    The Company does not own, directly or indirectly, any membership units or other equity or voting interest of any Person. The Company has no direct or indirect equity or ownership interest in any business nor is it a member of or participant in any partnership, joint venture or other entity. There are no outstanding contractual obligations of the Company to provide funds to make any investment (in the form of a loan, capital contribution or otherwise) in any other entity. There are no irrevocable proxies, voting trusts or other agreements to which the Company is a party with respect to the Interests, or other equity or voting interests in, the Company. There are no restrictions that prevent or restrict the payment of distributions by the Company other than those imposed by applicable Law or contained in the Operating Agreement.

Section 4.04    Governmental Filings and Consents.    No consents, approvals, authorizations or waivers of, or notices or filings with, any Governmental Authority are required to be made or obtained by the Company in connection with the execution and delivery of this Agreement and the Ancillary Agreements by the Company, the performance of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby, except for consents, approvals, authorizations, waivers, notices and filings as related to the transfer of ownership of the RSP and State Licenses issued by the City of Santa Ana and DCC, respectively. Company agrees to add Purchaser as a co-owner at Purchaser's expense.

Section 4.05    No Violations.    The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party by the Company, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby do not and will not (a) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of the Company, (b) conflict with or result in a violation or breach of any provision of any Law or Permit applicable to the Company, (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Company Material Contract or (d) result in the creation or imposition of any Encumbrance, other than Permitted Encumbrances, on any properties or assets of the Company or the Interests.

Section 4.06    Compliance with Laws; Permits.    The Company is in compliance in all material respects with all applicable Laws. The Company has not received any written notice from any Governmental Authority that it is or is alleged to be in material violation of any applicable Law. The Company has obtained and maintained all Permits required by any Governmental Authority for the Company's operation and general course of business.

*Execution Version*

Section 4.07    Litigation; Governmental Orders.

(a)    There is no Action or claim pending or, to the Knowledge of the Company, threatened, or, to the Knowledge of the Company, governmental investigation threatened or pending by, against or involving the Company or any of its respective properties or assets.

(b)    The Company is not subject to any Governmental Order that restricts the operation of the business of the Company.

Section 4.08    Taxes. Except as set forth in Section 4.08 of the Disclosure Schedules:

(a)    (i) All income, premium and other material Tax Returns required to be filed by or on behalf of the Company have been timely filed (taking into account any extensions of time within which to file), (ii) all such Tax Returns are true, correct and complete in all material respects and (iii) all income, premium and other material Taxes (whether or not shown as due on such Tax Returns) have been fully and timely paid or are subject to payment plans pursuant to which such Taxes are being paid.

(b)    The Company has complied with all applicable Tax Laws with respect to the withholding of Taxes (including reporting and recordkeeping requirements related thereto) and has duly and timely withheld and paid over to the appropriate Tax Authority all material amounts required to be so withheld and paid over.

(c)    The Company does not have any liability for Taxes of any Person (other than the Company) (i) under any Tax indemnity, Tax sharing or Tax allocation agreement or any other contractual obligation (excluding for this purpose, agreements entered into in the ordinary course of business the primary purpose of which is not related to Taxes, such as leases, licenses or credit agreements), (ii) arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or non-U.S. Law, or (iii) as a transferee or successor.

(d)    No income, premium or other material Taxes with respect to the Company are under audit or examination by any Tax Authority, and there are no audits, claims, assessments, levies, administrative or judicial proceedings pending, threatened, proposed (tentatively or definitely) or contemplated against, or regarding, any income, premium or other material Taxes of the Company, and no Tax Authority has proposed, assessed or asserted in writing any material deficiency with respect to Taxes against the Company with respect to any Tax period for which the period of assessment or collection remains open.

(e)    No written waiver of or agreement to extend any statute of limitations relating to Taxes for which the Company is liable and that remains in effect has been granted or requested.

(f)    Taking into account any valid extensions of due dates, payment plans and other agreements with state and local Tax Authorities, the Company is current in the payment of all state and local Taxes of the Company as of the Effective Date and will be current in such payments as of the Closing.

*Execution Version*

Section 4.09    Employee Benefits.  The Company maintains the employee benefit plans as described in Section 4.09 of the Disclosure Schedules.

Section 4.10    Employee Matters.  As of the date hereof, the Company has approximately 70 employees.  The Company is involved in collective bargaining negotiations and subject to a National Labor Relations Board charge as described in Section 4.10 of the Disclosure Schedules.

Section 4.11    Intellectual Property.

(a)    Section 4.11(a) of the Disclosure Schedules lists all material Intellectual Property owned or used by the Company in the operation of its business.

(b)    To the Knowledge of the Company, the conduct of its business as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property rights of any third party.

(c)    The consummation of the transactions contemplated hereby or by any of the Ancillary Agreements will not alter or impair any rights of the Company to use any Intellectual Property material to the operation of its business except as set forth on Section 4.11(c) of the Disclosure Schedules.

Section 4.12    Material Contracts.

(a)    Except as set forth in Section 4.12 of the Disclosure Schedules, the Company is not a party to any material contracts (a "**Company Material Contract**").

Section 4.13    Title to Assets; Sufficiency of Assets.  The Company owns, and has good and valid title to, all assets purported to be owned by it.

Section 4.14    Real Property.  The Company does not own any real property or interests in real property, except as set forth in the Lease.

Section 4.15    Fees to Brokers and Finders.  The Company does not have any obligation to pay any fee or commission to any investment banker, broker, financial adviser, finder or other similar intermediary in connection with the transactions contemplated by this Agreement.

Section 4.16    Bank Accounts.  The Company has the banks accounts listed on Section 4.16 of the Disclosure Schedules.

Section 4.17    FCPA.  The Company (including any of its respective officers, directors, agents, employees or other Person acting on their behalf) has not, directly or indirectly, taken any action which would cause it to be in violation of the Foreign Corrupt Practices Act of 1977, as amended, or any rules or regulations thereunder, used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, made, offered or authorized any unlawful payment to foreign or domestic government officials or employees, whether directly or indirectly, or made, offered or authorized any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment, whether directly or indirectly.

15

*Execution Version*

Section 4.18    No Other Representations or Warranties.  Except for the representations and warranties contained in this Article IV, none of the Sellers, the Company nor any other Person has made or makes any express or implied representation or warranty, either written or oral, on behalf of the Sellers or the Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Sellers or the Company furnished or made available to the Purchaser or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers and the Company as of the Effective Date as follows:

Section 5.01    Organization and Qualification.    The Purchaser is a limited liability company, duly formed, validly existing and in good standing under the laws of California.

Section 5.02    Authority and Enforceability.

(a)    The Purchaser has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The Purchaser has taken all requisite corporate or other actions to authorize the execution and delivery of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by the Purchaser and, assuming the due authorization, execution and delivery by each of the other parties hereto, this Agreement constitutes the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to the Enforceability Exceptions.

(b)    The Purchaser and its Affiliates have all requisite power and authority to execute and deliver the Ancillary Agreements to which it will be a party, to perform its obligations thereunder and to consummate the transactions contemplated thereby.  The Purchaser has, and its Affiliates have, taken all requisite corporate or other actions to authorize the execution and delivery of the Ancillary Agreements to which it will be a party, the performance of its obligations thereunder and the consummation of the transactions contemplated thereby.  Each Ancillary Agreement, if and when executed by the Purchaser or its Affiliates upon the terms and subject to the conditions set forth therein and in this Agreement, will be duly executed and delivered by the Purchaser or its Affiliates, and, assuming the due authorization, execution and delivery by each of the other parties thereto, each such Ancillary Agreement will constitute the valid and binding obligation of the Purchaser or its Affiliates, as applicable, enforceable against the Purchaser or its Affiliates in accordance with its terms, subject to the Enforceability Exceptions.

Section 5.03    Governmental Filings and Consents.    No consents, authorizations, approvals, or waivers of, or notices or filings with, any Governmental Authority are required to be made or obtained by the Purchaser in connection with the execution and delivery of this Agreement and the Ancillary Agreements, the performance of its obligations hereunder and thereunder, and

16

*Execution Version*

the consummation of the transactions contemplated hereby and thereby, except for consents, approvals, authorizations, waivers, notices and filings set forth in Section 4.04 of this Agreement.

Section 5.04    No Violations.  Assuming the consents, approvals, authorizations, waivers, notices and filings referred to in Section 5.03, if any, are obtained or made, the execution and delivery of this Agreement and the Ancillary Agreements by Purchaser the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby do not and will not (a) conflict with or result in a violation or breach of, or default under, any provision of the Purchaser' organizational documents, or (b) conflict with or result in a violation or breach of any provision of any Law or Permit applicable to the Purchaser.

Section 5.05    Litigation; Governmental Orders.  There is no Action or claim pending or, to the Knowledge of the Purchaser, threatened, or, to the Knowledge of the Purchaser, governmental investigation threatened or pending by, against or involving the Purchaser, that would prevent Purchaser from consummating the transactions contemplated hereby, or to otherwise perform its obligations under this Agreement or any Ancillary Agreement to which the Purchaser is or will be a party, in any material respect.

Section 5.06    Fees to Brokers and Finders.  The Purchaser does not have any obligation to pay any fee or commission to any investment banker, broker, financial adviser, finder or other similar intermediary in connection with the transactions contemplated by this Agreement.

Section 5.07    Sufficiency of Funds.  The Purchaser has sufficient funds readily available to it without restriction to pay the Purchase Price in accordance with the terms of this Agreement and the Promissory Note.

Section 5.08    No Other Representations or Warranties.  Except for the representations and warranties contained in this Article V, none of the Purchaser nor any other Person has made or makes any express or implied representation or warranty, either written or oral, on behalf of the Purchaser, including any representation or warranty as to the accuracy or completeness of any information regarding the Purchaser furnished or made available to the Sellers or the Company, or any representation or warranty arising from statute or otherwise in law.

**ARTICLE VI**
**COVENANTS**

Section 6.01    Conduct of Business.  During the period from the date of this Agreement through the earlier of the Closing or the termination of this Agreement in accordance with its terms, except as otherwise expressly required or permitted by, and in accordance with, this Agreement (including, without limitation, distribution of cash and cash equivalents as provided in Section 7.02(d)), as required by applicable Law, or with the prior written consent of the Purchaser, the Company shall (x) conduct its business in the ordinary course of business consistent with past practice, (y) use reasonable best efforts to maintain and preserve intact its business organizations and operations and (z) not:

(a)    purchase, redeem or repurchase any part of the Interests;

17

*Execution Version*

(b)    issue, sell, pledge, transfer, dispose of or encumber any of its membership units or other equity interests or securities exercisable or convertible into, or exchangeable or redeemable for, any such member units or other equity interests, or any rights, warrants, options, calls or commitments to acquire any such member units or other equity interests, or merge with or into or consolidate with, or agree to merge with or into or consolidate with, any other Person;

(c)    split, combine, subdivide or reclassify any of its membership units or other equity interests;

(d)    (i) incur any indebtedness for borrowed money or issue any debt securities, (ii) make any loans, advances or capital contributions to, or investments in, any other Person (other than any transactions solely between or among the Company) or (iii) waive any material claims or rights of, or cancel any debts to, any of the Company;

(e)    amend (by merger, consolidation or otherwise) its organizational documents;

(f)    voluntarily adopt a plan of complete or partial liquidation or rehabilitation or authorize or undertake a dissolution, rehabilitation, consolidation, restructuring, recapitalization or other reorganization;

(g)    make any filings with any Governmental Authority relating to (i) the withdrawal or surrender of any license or Permit held by the Company or (ii) the withdrawal by the Company from any lines or kinds of business;

(h)    (i) make, revoke or amend any Tax election, (ii) enter into any closing agreement, settlement or compromise of any Tax Liability or refund, (iii) extend or waive the application of any statute of limitations regarding the assessment or collection of any Tax, (iv) file any request for rulings or special Tax incentives with any Tax Authority, (v) surrender any right to claim a Tax refund, offset or other reduction in Tax Liability, or (vi) adopt or change any method of Tax accounting;

(i)    except as set forth in <u>Section 6.01(i)</u> of the Disclosure Schedules, (i) modify, extend, or enter into any Collective Bargaining Agreement or (ii) recognize or certify any labor or trade union, works council, employee representative body, labor organization, or group of employees of the Company as the bargaining representative for any employees of the Company or any of its Subsidiaries;

(j)    terminate, cancel or materially modify or amend any insurance coverage maintained by the Company with respect to any material assets without replacing such coverage with a comparable amount of insurance coverage;

(k)    (i) acquire any corporation, partnership, joint venture, association or other business organization or division thereof, or substantially all of the assets of any of the foregoing or (ii) enter into any new lines of business or introduce any new material products or services; or

(l)    enter into any Contract with respect to any of the foregoing.

BN 83011036v1

*Execution Version*

Section 6.02    Access to Information; Confidentiality.

(a)    During the period from the date of this Agreement through the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Company shall (i) afford the Purchaser and its Representatives full and free access to and the right to inspect all of the properties, assets, premises, books and records, Contracts and other documents and data related to the Company, (ii) furnish the Purchaser and its Representatives with such financial, operating, Tax, litigation and other data and information related to the Company as the Purchaser or any of its Representatives may reasonably request that is in the possession or control of the Company. In exercising its rights hereunder, the Purchaser shall conduct itself so as not to unreasonably interfere in the conduct of the Company's businesses.

(b)    From and after the Closing, without the prior written consent of the Purchaser, the Sellers shall not, directly or indirectly, disclose (and will direct its respective Representatives not to disclose) any Confidential Information.  Prior to the Closing, without the prior written consent of the Sellers, the Purchaser shall not, directly or indirectly, disclose (and will direct its representatives not to disclose) any Confidential Information.  The term "**Confidential Information**" means any non-public information of the Company in spoken, printed, electronic or any other form or medium, including, but not limited to, non-public business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, transactions, potential transactions, know-how, trade secrets, databases, manuals, records, supplier information, financial information, accounting information, legal information, marketing information, pricing information, payroll information, personnel information, customer information, customer lists and supplier lists. Confidential Information shall not include any information that (a) is available in the public domain (other than as a result of disclosure in violation of this Agreement); (b) is lawfully acquired by a Party or any of its Affiliates or their respective Representatives from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation.  If a Party or its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of applicable Law, such shall promptly notify the other Parties in writing and shall disclose only that portion of such information which such Person is advised by its counsel in writing is legally required to be disclosed; provided that such Person shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

(c)    Except as and to the extent required by applicable Law or as otherwise set forth herein, neither the Purchaser, nor the Sellers will make (and each will direct its representatives not to make, directly or indirectly) any public comment, statement or communication with respect to, or otherwise to disclose or to permit the disclosure of the existence of this Agreement or the transaction between or among the Parties or any of the terms, conditions or other aspects of the transaction set forth in this Agreement.  If a Party is required by applicable Law to make any such disclosure, it must first provide to the other Parties the content of the proposed disclosure, the reasons that such disclosure is required by applicable Law and the time and place that the disclosure will be made.

*Execution Version*

Section 6.03    Reasonable Best Efforts; Regulatory Matters.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, the Purchaser, the Company and the Sellers, as applicable, shall use their respective commercially reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including (i) all Parties using commercially reasonable best efforts to (A) prepare and make all necessary, proper or advisable notices and filings with any Governmental Authority, and (B) obtain all necessary, proper or advisable consents, approvals, authorizations or waivers of any Governmental Authority, including remaining on as an owner until the DCC approves the requisite ownership transfer; and (ii) the Purchaser, the Company and People's (to the exclusion of Unrivaled) shall remove Bernard Steimann and/or People's from all Company corporate filings, including those with the California Secretary of State, responsible party tax filings and from all licenses and permits whether state or local. All such actions under this Section 6.03, shall be at the sole expense of the Purchaser.

(b)    The Purchaser and the Company shall reasonably consult with each other with respect to the making of all notices and filings with, and obtaining all consents, approvals, authorizations or waivers of, any Governmental Authority necessary, proper or advisable to consummate the transactions contemplated by this Agreement and each party shall keep the other apprised on a prompt basis of the status of such matters relating to such notices, filings, consents, approvals, authorizations and waivers. The Purchaser and the Company shall have the right to review in advance and shall be provided with a reasonable opportunity to comment on, and to the extent practicable each will consult the other on, in each case, subject to applicable Law, any material notice or filing with, or written materials submitted to, any Governmental Authority in connection with the transactions contemplated by this Agreement, and each Party shall in good faith consider comments of the other Parties thereon. The Party responsible for any such action shall promptly deliver to the other Parties evidence of the making of all notices, filings and submissions relating thereto, and any supplement, amendment or item of additional information in connection therewith. Notwithstanding the foregoing, in no event shall a Party be required to disclose to any other party any of its Trade Secrets.

(c)    The Purchaser and the Company shall promptly advise each other upon receiving any communication from any Governmental Authority whose consent, approval, authorization or waiver is necessary, proper or advisable to consummate the transactions contemplated by this Agreement, including promptly furnishing each other copies of any written or electronic communication. Each Party shall, to the extent reasonably practicable and permitted by applicable Law or Governmental Authority, (i) in advance, notify the other Parties, of any meeting any Governmental Authority in connection with the transactions contemplated by this Agreement, and reasonably consult with the other Parties in scheduling any of these meetings and (ii) give the other Parties a reasonable opportunity to participate in such meeting.

Section 6.04    Resignation. (a) the Company shall cause any position held by the Sellers or their Representatives with the Company to resign such position or positions, effective no later than three (3) Business Days after the date the Department of Cannabis Control approves the

*Execution Version*

requisite ownership transfer, and (b) Sellers hereby agrees to deliver any such resignations to such effect (the "**Resignation**").

Section 6.05   Public Disclosure.  Prior to the Closing, the Parties shall agree on the form and content of any initial press release that may be issued jointly or separately by a Party, and, except with the prior written consent of the Sellers and the Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), shall not issue nor shall any Affiliate of such party issue any other press release or other public statement or public communication with respect to this Agreement or the transactions contemplated hereby; provided that each of the Sellers, the Company and the Purchaser may, without the prior written consent of such other Parties, make such public statement or issue such public communication (a) as may be required by applicable Law and, if practicable under the circumstances, after reasonable prior consultation with such other parties, (b) that consists solely of information contained in prior announcements made by any or all of the Purchaser, the Company, the Sellers, or any of their or his respective Representatives or (c) to enforce its rights or remedies under this Agreement.

Section 6.06   Transfer Taxes.  Notwithstanding anything to the contrary contained herein, the Purchaser shall be responsible for the timely payment of all Transfer Taxes, if any, arising out of or in connection with the transactions contemplated by this Agreement.  Purchaser shall, and the Sellers shall cooperate to, prepare and timely file all necessary documentation and Tax Returns required to be filed with respect to such Transfer Taxes and shall promptly provide the Sellers with copies of any such documentation and Tax Returns.

Section 6.07   Release.  Effective as of the Closing Date, Purchaser hereby releases Sellers as to any claims that Purchaser or the Company may have against Sellers and each of their Representatives and Affiliates, arising from the Sellers having been members or managers of the Company prior to the Closing Date, provided, that, nothing contained in this Section 6.07 shall affect the rights, liabilities or obligations of any (a) Party under this Agreement and the Ancillary Agreements, (b) violation of Law by either Seller, or (c) claims that cannot be released under applicable Laws.

Section 6.08   Further Assurances.   From and after the Closing, the Purchaser, the Company and the Sellers shall, and shall cause their and his respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, notices and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.  From and after the Closing, upon receipt by the Company or Purchaser of any payment with respect to any accounts receivable of the Company attributable to any period prior to the Closing, the Purchaser shall, after Purchaser's receipt thereof, promptly remit such amounts to the Sellers by remitting such amounts to the account designated by the Sellers via wire or other mutually agreed upon method of payment.  In the event that the Sellers become aware that the Company or Purchaser may receive, or has received, any such payment attributable to a period prior to the Closing, any Seller shall promptly notify the Purchaser in writing thereof.

Section 6.09   Notice of Developments.  From time to time during the period from the date of this Agreement through the earlier of the Closing or the termination of this Agreement in accordance with its terms, if any Party becomes aware of any event, fact or condition or

21

*Execution Version*

nonoccurrence of any event, fact or condition that constitutes a breach of any representation, warranty, covenant or agreement of such Party, or would constitute a breach of any representation or warranty of such Party if such representation or warranty were made on the date of the occurrence or discovery of such event, fact or condition or on the Closing Date, then such Party will promptly provide the other Parties hereto with a written description of such event, fact or condition.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.01    Conditions to the Obligations of the Purchaser.    The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by the Purchaser) as of the Closing of the following conditions:

(a)    Representations and Warranties Regarding the Sellers.  The representations and warranties of the Sellers set forth in Article III shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent they refer to another date, in which case they shall be true and correct as though made on and as of such other date as may be qualified below).

(b)    Representations and Warranties Regarding the Company.    The representations and warranties of the Company set forth in Article IV shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent they refer to another date, in which case they shall be true and correct as though made on and as of such other date as may be qualified below).

(c)    Covenants of the Sellers.  The covenants and agreements of the Sellers set forth in this Agreement to be performed or complied with at or prior to the Closing shall have been duly performed or complied with in all material respects.

(d)    Covenants of the Company. The covenants and agreements of the Company set forth in this Agreement to be performed or complied with at or prior to the Closing shall have been duly performed or complied with in all material respects.

(e)    No Material Adverse Effect.  Except as may result from this Agreement or the Management Services Agreement, from the date of this Agreement, no Material Adverse Effect has occurred, and there shall be no event, change, circumstance, effect, development, condition or occurrence that, individually or in the aggregate, with or without the lapse of time, would reasonably be expected to have a Material Adverse Effect.

(f)    No Injunction or Prohibition.  No Governmental Authority of competent jurisdiction shall have enacted, enforced or entered any Law or issued a Governmental Order that is in effect on the Closing Date and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

*Execution Version*

(g)    <u>Closing Deliverables</u>.  The Purchaser shall have received (or waived receipt of) those deliverables described in <u>Section 2.04(a)</u>.

Section 7.02    <u>Conditions to the Obligations of the Sellers</u>.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement subject to the satisfaction (or waiver by Unrivaled) as of the Closing of the following conditions:

(a)    <u>Representations and Warranties</u>.  The representations and warranties set forth in <u>Article V</u> shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent they refer to another date, in which case they shall be true and correct as though made on and as of such other date as may be qualified below).

(b)    <u>Covenants</u>.  The covenants and agreements of the Purchaser set forth in this Agreement to be performed or complied with at or prior to the Closing shall have been duly performed or complied with in all material respects.

(c)    <u>No Injunction or Prohibition</u>.  No Governmental Authority of competent jurisdiction shall have enacted, enforced or entered any Law or issued a Governmental Order that is in effect on the Closing Date and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(d)    <u>Cash and Cash Equivalents</u>.  The Company shall have distributed all of its cash and cash equivalents.

(e)    <u>Closing Deliverables</u>.  The Sellers shall have received (or waived receipt of) those deliverables described in <u>Section 2.04(b)</u>.

**ARTICLE VIII**
**TERMINATION**

Section 8.01    <u>Termination</u>.  This Agreement may be terminated, and the transactions contemplated hereby abandoned, at any time prior to the Closing as follows:

(a)    by mutual written consent of the Purchaser and the Sellers;

(b)    by the Purchaser, if the Closing has not occurred on or before May 31, 2024 (as such date may be extended pursuant to this Agreement, the "**Outside Date**") unless the absence of the occurrence of the Closing shall be due to the failure of the Purchaser (or any of their Affiliates) to materially perform its obligations under this Agreement required to be performed by them on or prior to the Closing Date;

(c)    by the Sellers or the Company, if the Closing has not occurred on or before the Outside Date unless the absence of the occurrence of the Closing shall be due to the failure of the Sellers or the Company (or any of their Affiliates) to materially perform their obligations under this Agreement required to be performed by them on or prior to the Closing Date.

*Execution Version*

(d)      by the Purchaser or the Sellers if (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable;

(e)      by the Purchaser if (i) it is not in material breach of any of its obligations hereunder and (ii) a Seller or the Company is in material breach of any of their respective representations, warranties or obligations hereunder that renders or would render the conditions set forth in Section 7.01(a), Section 7.01(b), Section 7.01(c), or Section 7.01(d) incapable of being satisfied on the Outside Date, and such breach is either (A) not capable of being cured prior to the Outside Date or (B) if curable, is not cured within the earlier of (x) five (5) Business Days after the giving of written notice by the Purchaser to the Sellers and (y) two (2) Business Days prior to the Outside Date; or

(f)      by the Sellers if (i) the Sellers and Company are not in material breach of any of their obligations hereunder and (ii) any Purchaser is in material breach of any of its representations, warranties or obligations hereunder that renders or would render the conditions set forth in Section 7.02(a) or Section 7.02(b) incapable of being satisfied on the Outside Date, and such breach is either (A) not capable of being cured prior to the Outside Date or (B) if curable, is not cured within the earlier of (x) five (5) Business Days after the giving of written notice by the Sellers to the Purchaser and (y) two (2) Business Days prior to the Outside Date.

Section 8.02    Procedure Upon Termination.  In the event of termination and abandonment by the Sellers or the Purchaser, or both, pursuant to Sections 7.01 or 7.02, written notice thereof shall forthwith be given to the other Parties, and this Agreement shall terminate, without further action by any of the Parties, other than as described at Section 8.01.

Section 8.03    Effect of Termination.  If this Agreement is terminated in accordance with Section 8.01, this Agreement shall thereafter become void and have no effect, and no party shall have any Liability to any other party, its Affiliates or any of their respective directors, officers, employees, equity holders, partners, members, agents or representatives in connection with this Agreement, except that, (a) the obligations of the Parties contained in Section 6.02, this Section 8.03 and 10.10 shall survive and (b) termination will not relieve any party from Liability for any intentional and material breach of this Agreement or fraud prior to such termination. In the event of a termination under Sections 8.01(a), (c) or (f) of this Agreement, the Deposit shall be immediately released to People's and be considered "liquidated damages." The Parties acknowledge that People's actual damages in the event of a termination under Sections 8.01(a), (c) or (f) of this Agreement will be difficult to ascertain, that such liquidated damages represent the Parties best estimate of such damages, and that the Parties believe such liquidated damages are a reasonable estimate of such damages.  The Parties expressly acknowledge that the foregoing liquidated damages are intended not as a penalty, but as full liquidated damages, in the event of a termination under Sections 8.01(a), (c) or (f) of this Agreement and as compensation for taking the Company off the market during the term of the Parties' negotiations regarding the sale of the Company.  Sellers and the Company hereby waive and release any right to sue Purchaser, and hereby covenant not to sue Purchaser for specific performance of this Agreement or to prove that

24

*Execution Version*

People's actual damages exceed the Deposit which would be provided to People's as full liquidated damages.

## ARTICLE IX
## INDEMNIFICATION

Section 9.01   Survival.  The representations and warranties set forth in Article III, Article IV and Article V shall survive the Closing and shall remain in full and force and effect until the date that is twelve (12) months from the Closing Date (the "**Survival Period**").   All other covenants and agreements of the Parties set forth in this Agreement shall survive the Closing in accordance with their terms, and, in any event, shall not survive the applicable statutes of limitations.   Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from a non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

Section 9.02   Indemnification by the Sellers.  Subject to the other terms and conditions of this Agreement from and after the Closing, the Sellers as specifically indicated below shall indemnify and defend each of the Purchaser and its Affiliates (including the Company) and their respective Representatives (collectively, the "**Purchaser Indemnitees**") and shall hold each of them harmless from and against, any and all Losses incurred or sustained by, or imposed upon, the Purchaser Indemnitees based upon, arising out of, with respect to or by reason of, as follows:

(a)   Unrivaled with respect to any inaccuracy in or breach of any of the representations or warranties set forth in Section 3.01 and Article IV;

(b)   Unrivaled with respect to any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Unrivaled or by the Company pursuant to this Agreement;

(c)   People's with respect to any inaccuracy in or breach of any of the representations or warranties set forth in Section 3.02; and

(d)   People's with respect to any breach or non-fulfillment of any covenant, agreement or obligation to be performed by People's pursuant to this Agreement.

Section 9.03   Indemnification by the Purchaser.  Subject to the other terms and conditions of this Agreement, from and after the Closing, the Purchaser shall indemnify and defend the Sellers and their Affiliates and Representatives (collectively, the "**Sellers' Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Sellers' Indemnitees, based upon, arising out of, with respect to or by reason of:

(a)   any inaccuracy in or breach of any of the representations or warranties set forth in Article V, as of the date of this Agreement

*Execution Version*

(b)     the operations and liabilities of the Company following the Closing, except any other matter indemnifiable by the Sellers pursuant to Section 9.02;

(c)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Purchaser pursuant to this Agreement; or

(d)     any breach or non-fulfillment of Purchaser's obligations under Section 6.03(a)(iii) of this Agreement.

Section 9.04    Limitations; Effect of Investigation.  The indemnification provided for in Section 9.02 and Section 9.03 shall be subject to the following limitations:

(a)     The Sellers shall not be liable to the Purchaser Indemnitees for indemnification under Section 9.02(a) and (c), respectively, until the aggregate amount of all Losses in respect of indemnification under Section 9.02(a) and (c) of this Agreement exceeds $45,000.00 (the "**Threshold**"), in which event the named Seller shall be required to pay or be liable for all such Losses from the first dollar.

(b)     The aggregate amount of all Losses for which the named Seller shall be liable pursuant to Section 9.02(a) and (c) of this Agreement shall not exceed $900,000 (the "**Cap**").

(c)     Nothing in this Agreement shall limit Purchaser from exercising the right of set-off against the Promissory Note to satisfy the indemnification obligations of People's hereunder.

Section 9.05    Third-Party Claims.

(a)     If any Indemnified Party receives written notice of the assertion or commencement of any Action made or brought by any Person who is not a Party or an Affiliate of a Party or a Representative of the foregoing (a "**Third-Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes actually aware of such Third-Party Claim.  The failure to give such reasonably prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits material rights or defenses by reason of such failure.

(b)     The Indemnifying Party shall have the right to participate in, or, by giving written notice to the Indemnified Party, to assume the defense of, any Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense; provided that if the Indemnifying Party is a Seller, such Indemnifying Party shall not have the right to defend or direct the defense of any such Third-Party Claim (i) that seeks an injunction or other equitable relief against the Indemnified Party or (ii) that alleges a violation of any applicable Law.  In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to Section 9.05(d), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the

*Execution Version*

Indemnified Party.  The Indemnified Party shall have the right to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof.  The fees and disbursements of such counsel shall be at the expense of the Indemnified Party; provided that, if in the reasonable opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party, or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required.

(c)      If the Indemnifying Party elects not to defend such Third-Party Claim, the Indemnified Party may, subject to Section 9.05(d), pay, compromise, and defend such Third-Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third-Party Claim.

(d)      Notwithstanding anything to the contrary contained herein, the Indemnifying Party shall not settle any Third-Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed), except as provided in this Section 9.05.  If a firm offer is made to settle a Third-Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party.  If the Indemnified Party fails to consent to such firm offer within ten (10) Business Days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim, at its own expense, and in such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim shall not exceed the amount of such settlement offer.  If the Indemnified Party fails to consent to such firm offer and also fails to assume the defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim.  If the Indemnified Party has assumed the defense pursuant to Section 9.05(c), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

Section 9.06    Direct Claims.  Any Action by an Indemnified Party on account of a Loss that does not result from a Third-Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes actually aware of such Direct Claim.  The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits material rights or defenses by reason of such failure.  The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim.  Subject to confidentiality limitations and attorney-client privilege, the Indemnified Party shall allow the Indemnifying Party and its Representatives to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall reasonably assist the Indemnifying Party's investigation by giving such information and assistance as the

27

*Execution Version*

Indemnifying Party or any of its professional advisors may reasonably request (subject to confidentiality limitations and attorney-client privilege). If the Indemnifying Party does not so respond within such thirty (30) day period, then the Indemnifying Party shall be deemed to have accepted such claim, in which case the Indemnified Party shall be entitled to the remedies set forth in <u>Section 9.09</u> and shall otherwise be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

Section 9.07    <u>Payment</u>.  Subject to the Threshold and the Cap, once a Loss is agreed to or deemed accepted by the Indemnifying Party or adjudicated to be payable pursuant to this Agreement, if the Indemnified Party is (a) a Sellers' Indemnitee, the Purchaser shall deposit, or cause to be deposited, with such Sellers' Indemnitee, the amount of such Loss by wire transfer of immediately available funds to an account or accounts designated by the Sellers in writing, and (b) a Purchaser Indemnitee, the Sellers shall deposit, or cause to be deposited with the Purchaser, by wire transfer of immediately available funds to an account or accounts designated by the Purchaser, an aggregate amount equal to the amount of the Loss.  The Parties agree that should an Indemnifying Party not make full payment of any such obligations within thirty (30) Business Days of such agreement or adjudication, as applicable, any amount payable shall accrue interest from the date of agreement of the Indemnifying Party or adjudication to the date such payment has been made at a rate equal to six percent (6.0%) per annum.

Section 9.08    <u>Tax Treatment of Indemnification Payments</u>.  The Parties agree that all indemnification payments made under this Agreement shall be treated by the Parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

Section 9.09    <u>Exclusive Remedy</u>.  The indemnification provisions of this <u>Article IX</u> shall be the sole and exclusive remedy of the Purchaser following the Closing for any and all breaches or alleged breaches of any representations, warranties, covenants or agreements of the parties, or any other provision of this Agreement.  Notwithstanding the foregoing, nothing in this <u>Article IX</u>, or otherwise in this Agreement or in any of the Ancillary Agreements, shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to <u>Section 10.07</u> or to seek any remedy on account of any Party's fraud or intentional misrepresentation.

## ARTICLE X

## MISCELLANEOUS

Section 10.01    <u>Entire Agreement</u>.  This Agreement, the Exhibits and Schedules attached hereto, the Ancillary Agreements and the other documents, instruments, certificates and Contracts required to be delivered at Closing constitute the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters.

Section 10.02    <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) the same day when delivered personally by hand (with written confirmation of receipt by other than automatic means, whether electronic or otherwise), (b) the same day when sent by email on a Business Day prior to 5:00 pm Pacific Time, otherwise

*Execution Version*

on the next Business Day, or (c) one (1) Business Day following the day sent by a nationally recognized overnight courier (with written confirmation of receipt), in each case, at the following addresses and email addresses (or to such other address or email address as a party may have specified by notice given to the other parties pursuant to this provision):

**to the Company (before Closing):**

c/o Sabas Carrillo
3242 Halladay Street
Santa Ana, California  92705
sabas@blumholdings.com

**to Unrivaled:**

c/o Sabas Carrillo
3242 Halladay Street
Santa Ana, California  92705
sabas@blumholdings.com

With a copy, which shall not constitute notice, to:

Ryan Clark, VP
Douglas Wilson Companies
Via E-Mail:  rbaker@douglaswilson.com

Buchalter
18400 Von Karman Avenue
Suite 800
Irvine, CA 92612
Attn: Roger L. Scott

**to People's:**

c/o Jay Yadon
22 Executive Park, Suite 250
Irvine, CA 92614
jyadon@peoplescali.com

With a copy to:

Deron Colby, Esq.
Via email: dcolby@januscapitallaw.com

**to Purchaser:**

Haven Nectar LLC

29

*Execution Version*

> Attention:  Shubham Pandey, Manager
> 2633 Mckinney Avenue
> Suite 180-791
> Dallas, TX  75204
> shubham@usaeducationfund.com

With a copy, which shall not constitute notice, to:

> Ken Sobel, Esq.
> 2511 Via Viesta
> La Jolla, CA  92037
> Kennysocal711@gmail.com

Section 10.03  Amendment; Modification and Waiver.  Any provision of this Agreement may be amended, modified or waived if, and only if, such amendment, modification or waiver is in writing and signed, in the case of an amendment or modification, by the Purchaser and the Sellers, or in the case of a waiver, by the party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 10.04  Successors and Assigns.  Neither this Agreement nor any of the rights, interests or obligations under it may be directly or indirectly assigned, delegated, sublicensed or transferred by any of the parties, in whole or in part, to any other Person (including any bankruptcy trustee) by operation of law or otherwise, whether voluntarily or involuntarily, without the prior written consent of the other parties, provided that Purchaser may freely assign this Agreement to any of its Affiliates and to any acquirer or successor of Purchaser, whether direct, indirect or by operation of law, without the Sellers' consent.  Any attempted or purported assignment in violation of this Section 10.04 will be null and void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by each of the parties and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns (including, with respect to any trust, any additional or successor trustees of any such trust).

Section 10.05  No Third-Party Beneficiaries.  Except as specifically set forth herein, nothing expressed or implied in this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities upon any Person other than the parties and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns.

Section 10.06  Governing Law; Jurisdiction.

(a)     This Agreement, and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arising out of or relating to this Agreement or the negotiation, execution and delivery or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement) shall be governed by and construed in accordance with the Laws of the State of California, without regard to its applicable principles of conflicts of laws that might require the application of the laws of another jurisdiction.

30

*Execution Version*

(b)    Each of the parties hereby irrevocably and unconditionally (i) submits, for itself and its property, to the exclusive jurisdiction and venue of the federal or state court sitting in the State of California ("**California Courts**"), and any appellate court from any decision thereof, in any Action that may be based upon, arising out of or relating to this Agreement or the negotiation, execution and delivery or performance of this Agreement and agrees that all claims in respect of any such Action shall be heard and determined in the California Courts, (ii) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any Action that may be based upon, arising out of or relating to this Agreement or the negotiation, execution and delivery or performance of this Agreement in the California Courts, including any objection based on its place of incorporation or domicile, (iii) waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such Action in any such court, and (iv) agrees that a final judgment in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.  Each of the parties consents and agrees that service of process, summons, notice or document for any action permitted hereunder may be delivered by registered mail addressed to it at the applicable address set forth in Section 10.02 or in any other manner permitted by applicable Law. Any action or proceeding involving the terms and/or conditions of this Agreement shall be brought exclusively in the County of Orange, State of California.

Section 10.07  Specific Performance.  The Parties agree that irreparable damage would occur and that the Parties would not have any adequate remedy at law in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached or threatened to be breached and that money damages or other legal remedies would not be an adequate remedy for any such failure to perform or breach.  It is accordingly agreed that, without posting bond or other undertaking, the Parties shall be entitled to seek injunctive or other equitable relief to prevent breaches or threatened breaches of this Agreement and to seek to enforce specifically the terms and provisions of this Agreement in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.  In the event that any such action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at law.  The Parties further agree that (a) by seeking any remedy provided for in this Section 10.07, a Party shall not in any respect waive its right to seek any other form of relief that may be available to such Party under this Agreement, and (b) nothing contained in this Section 10.07 shall require any Party to institute any action for (or limit such Party's right to institute any action for) specific performance under this Section 10.07 before exercising any other right under this Agreement.

Section 10.08  Counterparts.    This Agreement may be executed in one or more counterparts, each of which will be deemed to constitute an original, but all of which shall constitute one and the same Agreement and may be executed and delivered by facsimile or other electronic means intended to preserve the original graphic or pictorial appearance of a document.

Section 10.09  Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is found by a court or other Governmental Authority of competent

31

*Execution Version*

jurisdiction to be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as would be enforceable.

Section 10.10 Transaction Expenses.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, all direct and indirect costs and Transaction Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such expenses.

**[SIGNATURE PAGE FOLLOWS]**

32

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**The PURCHASER:**

**Haven Nectar LLC**

By: _____
Name: Shubham Pandey
Title: Chief Executive Officer

**The COMPANY:**

**People's First Choice, LLC**

By: _____
Name: Sabas Carrillo
Title: Chief Executive Officer

**The SELLERS:**

**Unrivaled Brands, Inc.**

By: _____
Name: Sabas Carrillo
Title: Chief Executive Officer

**People's California, LLC**

By: _____
Name: Bernard Steimann
Title: Authorized Signatory

*Signature Page to the Membership Interest Purchase Agreement*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**The PURCHASER:**

**Haven Nectar LLC**

By:_____
Name: Shubham Pandey
Title: Chief Executive Officer

**The COMPANY:**

**People's First Choice, LLC**

By: *Sabas Carrillo*_____
CB70FD06D3B9400...
Name: Sabas Carrillo
Title:  Chief Executive Officer

**The SELLERS:**

**Unrivaled Brands, Inc.**

By:_____ *Sabas Carrillo*_____
CB70FD00D3B9400...
Name: Sabas Carrillo
Title:  Chief Executive Officer

**People's California, LLC**

By:_____
Name: Bernard Steimann
Title:  Authorized Signatory

*Signature Page to the Membership Interest Purchase Agreement*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**The PURCHASER:**

**Haven Nectar LLC**

By:_____

Name: Shubham Pandey
Title:  Chief Executive Officer

**The COMPANY:**

**People's First Choice, LLC**

By:_____

Name: Sabas Carrillo
Title:  Chief Executive Officer

**The SELLERS:**

**Unrivaled Brands, Inc.**

By:_____

Name: Sabas Carrillo
Title:  Chief Executive Officer

**People's California, LLC**

By: *Bernard Steimann* _____

Name: Bernard Steimann
Title:  Authorized Signatory

*Signature Page to the Membership Interest Purchase Agreement*

# DISCLOSURE SCHEDULES

to the

# PEOPLE'S FIRST CHOICE

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

## Dated effective as of June 10, 2024

These Disclosure Schedules are made and given pursuant to that certain Membership Interest Purchase Agreement (the "**Agreement**") made of even date herewith, by and among Haven Nectar LLC, a California limited liability company ("**Purchaser**"), and Unrivaled Brands, Inc., a Nevada corporation ("**Unrivaled**"), and People's California LLC, a California limited liability company ("**People's**"), the sole members of People's First Choice LLC, a California limited liability company (the "**Company**"). All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; provided, however, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate and such appropriateness is reasonably apparent from the face of such disclosure. Nothing in these Disclosure Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in these Disclosure Schedules (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, (3) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties, and (4) shall not constitute, or be deemed to be, an admission to any third party concerning such item. These Disclosure Schedules include references, brief descriptions or summaries of certain agreements and instruments, copies of which are available upon reasonable request. Such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents described, true and complete copies of which have been provided or will upon request be provided to the Purchaser or its counsel.

Section 4.05
No Violations

(c)

- *Air Commercial Real Estate Association Standard Industrial/Commercial Multi-Tenant Lease - Gross*, dated January 6, 2015 (the "Lease"), by and among Bharatkumar Lodhia and Gitanjali Lodhia (collectively, "Lessor"), and the Company ("Lessee").
  - o *Addendum to Standard Industrial/Commercial Multi-Tenant Lease-Gross*, by and between Lessor and Lessee.
  - o *Amendment to Standard Industrial/Commercial Multi-Tenant Lease-Gross*, dated April 1, 2015, by and between Lessor and Lessee.
  - o *Second Amendment to Standard Industrial/Commercial Multi-Tenant Lease-Gross*, dated November 30, 2016, by and between Lessor and Lessee.
    - ▪ *Agreement of Guarantors*, by Bernard E. Steimann and Brian J. Decker.
  - o *Third Amendment to Standard Industrial/Commercial Multi-Tenant Lease-Gross*, dated April 9, 2018, by and between Bharat Lodhia and Gitanjali Bharat Lodhia, Trustees of the Bharat Lodhia Living Trust 2016, and Lessee.
    - ▪ *Agreement of Guarantors*, by Bernard E. Steimann and Brian J. Decker.
  - o The Company is a party to the Lease, and the Lease will therefore be acquired by Purchaser at Closing.  Post-Closing, Unrivaled shall provide assistance as reasonably required in order to obtain the Lessor's consent to Purchaser's acquisition of the Lease. Purchaser shall replace Bernard E. Steimann and Brian J. Decker as guarantors to the Lease with SSS Partners, LLC or another guarantor acceptable to Lessor.

- *Amended and Restated Sublease*, effective as of March 31, 2020, by and between the Company ("Sublessor") and PF-People's Grand TC, LLC ("Sublessee") for the premises located at 2729 S. Grand Ave., Santa Ana, California 92705 (the "Premises").
  - o At Closing, People's shall cause Sublessee to vacate and surrender the Premises to Company.
  - o At Closing the Amended and Restated Sublease, and any right of Sublessee to occupy the Premises, shall be terminated.

- *Industrial Facilities Lease*, dated March 15, 2018, by and between Harvey Capital Corp., Agent for Ball & East LTD ("Landlord") and DTX Trade, Inc. ("Tenant").
  - o *Assignment of Lease*, dated March 25, 2021, by DTX Trade, Inc.
  - o *Assumption of Lease*, dated March 31, 2021, by New Patriot Holdings, Inc.
  - o *Consent to Assignment*, dated April 7, 2021, by Landlord.
  - o *Guaranty of Lease*, dated March 31, 2021, by Jay Yadon and Melissa Yadon.
  - o The Company is not a party to this Lease.  The Landlord's written consent is required to assign the lease from New Patriot Holdings, Inc. to Purchaser's designated entity, SSS Partners, LLC.  People's has already caused New Patriot Holdings, Inc. to begin efforts to obtain the Landlord's consent to the assignment.  Post-closing, People's shall use commercially reasonable efforts to cause New Patriot Holdings, Inc. to take all reasonable steps necessary to obtain the Landlord's consent to the Lease assignment, which People's anticipates will take 60 to 90 days post-Closing.  Until the Lease assignment is completed, the Company shall retain continued access to any parking subject to the Lease and subject to the Management and Shared Parking Agreement between the Company and New Patriot Holdings, Inc.

Section 4.06
Compliance with Laws; Permits

- Administrative Citation: On April 9 2024, the Company received an administrative citation AC#241160 from the City of Santa Ana asserting a failure to acquire a sign and building permit. The Company is currently resolving the issue with the City of Santa Ana as the City erroneously pulled the permit from approval prior to sending the administrative citation. The Company has not been fined and will continue to work with the City post-Closing to resolve the error on their part.

City of Santa Ana
Code Enforcement Division
20 Civic Center Plaza
Santa Ana, CA 92701

**#AC 241160 a**
OBS SWP ASGND

## ADMINISTRATIVE CITATION

An inspection of the following premises revealed violations of the Santa Ana Municipal Code:

Address/Location: 2721 S. Grand Ave

Business Name: People's First Choice, LLC dba Blum OC

Responsible

Person (s): Sabas Carillo

Address: 2721 S. Grand Ave

City/State/Zip: Santa Ana, CA 92705

Santa Ana, CA, Zip 92705

Customer # _____

CDLJID#: _____

ZONE M  CDBG# 740.03

APN# 411-132-02

### WARNING NOTICE

As of _____ at _____ am / pm, you are in violation of Santa Ana Municipal Code Section(s):

| SAMC Code Section | Description of Violation(s) | Corrections Required |
|---|---|---|
| | | |
| | | |
| | | |

Vehicle Yr: ___ Make: ___ Model: ___  Lic#/VIN: ___

**CORRECTIONS REQUIRED:** ( ) Refer to "Violation Sheet"   ( ) Refer to attached "Continuation of Violations"

**IMPORTANT!** Corrections must be completed within _____ hours / days.  Comply by (date) _____
The inspector may conduct a drive-by compliance inspection. You will be notified in writing with the **Notice of Administrative Fine**
if you are not in compliance (see section below). **You will then be liable for a fine in the amount of $100, $200, $500 and/or**
**$1000, $2500, $5000.**   *[These fines are subject to change pursuant to California Government Code Section 36900.]*
In addition to the fine, you may be cited each day that the violation exists beyond the correction date. Other enforcement action and
penalties may also result if compliance is not achieved by the correction date.

Received by: _____  Phone#: _____

**CODE OFFICER:** _____  CP# ___  **PHONE #:** (714) ___  Monday through Friday

Date Warning Mailed: _____  CP# ___  Date Complied: ___  CP# ___

### NOTICE OF ADMINISTRATIVE FINE

As of 04/09/2024 at 3:12 am /pm, you are in violation of Santa Ana Municipal Code Section(s):

| SAMC Code Section | Description of Violation(s) |
|---|---|
| SAMC 8-94 | CBC 105.1; SAMC 8-43 110.1 Building Permit Required. |
| | Obtain the required sign permits. |
| | Planning Division approval is required. |
| | Final inspection is required. * Please see attached addendum* |

(✓ See Attached Addendum Report)

| | | |
|---|---|---|
| ✓ 1ST CITATION | $ 100 | IS NOW DUE AND PAYABLE. |
| ( ) 2ND CITATION | $ ___ | IS NOW DUE AND PAYABLE. _____ |
| ( ) 3RD CITATION | $ ___ | IS NOW DUE AND PAYABLE. _____ |
| ( ) 4th CITATION | $ ___ | IS NOW DUE AND PAYABLE _____ |

Pursuant to Santa Ana Municipal Code Section 1-21.8, you have 15 days from the date of this administrative fine to file an appeal.
(See the reverse side of this Notice for payment and appeal information relating to a Request for Administrative Hearing.)

Received by: _____  Print Name: _____

( ) Refused to sign. Served via personal service.
(✓) Served via Certified and First Class mail  Date: 4/10/24  # 7022 1070 0001 5855 0427 CP# 60

Maria Ventura   Maria Ventura   CP# 60

Signature of Code Officer   Print Name

Phone #: (714) _____   Monday through Friday

Case # CE24-00058   ID # 60

Section 4.07(a)
Litigation; Governmental Orders

- *People's First Choice, LLC v. New Patriot Holdings, Inc.*, Orange County Superior Court Case No. 30-2024-01381362-CU-BC-CJC ("*PFC v. NPH*")

- *People's First Choice, LLC v. People's Vape, LLC*, Orange County Superior Court Case No. 30-2024-01377613-CU-UD-CJC ("*PFC v. People's Vape*")

- *People's Vape, LLC v. People's First Choice, LLC*, Orange County Superior Court Case No. 30-2024-01398989-CU-MC-NJC ("*People's Vape v. PFC*")

The Company shall file a Request for Dismissal with prejudice for the *PFC v. NPH* and *PFC v. People's Vape* cases within ten (10) days after the Closing. People's shall cause People's Vape, LLC, to file a Request for Dismissal with prejudice in the *People's Vape v. PFC* within ten (10) days after the Closing. In connection with such filings, the parties shall waive any and all legal fees and costs.  The Company and People's shall provide file-stamped copies of the Requests for Dismissal upon such filing.   In the event that a judgment is entered in the *PFC v. People's Vape* action prior to the entry of dismissal, the Company agrees, or in the event People's Vape, LLC prevails, People's agrees to cause People's Vape, LLC, not to take any action to enforce the judgment, and to file a satisfaction of judgment within ten (10) days of receiving notice of entry of judgment.

Section 4.08
Taxes

- Federal and State Income Tax Returns Prior to 2021 (under People's California LLC's ownership) have been filed.
- 2019 and 2020 Federal Income Tax Returns are under IRS examination.
- 2020 State Income Tax Returns has been filed with the FTB. $5,416.23 is due.
- 2021 Federal Income Tax Returns are under audit by the IRS.
- 2021 State Income Tax Returns has been filed with the FTB. $800 is due.
- 2022 Federal and State Income Tax Returns have been prepared but not filed.

- *City of Santa Ana Cannabis Business Tax* –

  In October 2023, the Company received a notice from the city of Santa Ana regarding a business license tax compliance examination of People's First Choice for the period of January 1, 2018 through May 31, 2021. The examination claims that the city of Santa Ana is owed $1.28 million in cannabis business taxes.

  Per Daphne Camacho, City of Santa Ana Tax Collector: "the total tax liabilities would have to be satisfied before any transfer of ownership is done.  Code Enforcement will not move forward with any new permits or applications until Finance has confirmed that all taxes are paid in full, including audit deficiencies."

  On May 29, 2024, the Company entered into two payment agreements with the City of Santa for $1,548,732: one payment agreement for Adult Use for $1,522,174 with a down payment of $160,834 for a 12 month payment plan of $115,000 a month; and another agreement for medical for $26,558 with a down payment of $6,558 for a 4 month payment plan of $5,000 a month. The down payments were remitted on May 31, 2024.

| City of Santa Ana | |
|---|---:|
| 2018 - 2021 Audit defiency - | 405,913.00 |
| 2024 Open Balance - | 385,696.72 |
| 2022 Adult Use Payment Plan - | 757,122.73 |
| **Total Due to City of Santa Ana** | **1,548,732.45** |

- *California Department of Tax and Fee Administration (CDTFA) Examination* –

  CDTFA is examining Q1 2023 excise tax return and Q1 and Q2 2023 sales and use tax returns; they have not released their final report of their examinations.

| CDTFA | |
|---|---|
| Excise Tax Owed for April 2024 | 239,900.50 |
| Sales Tax Penalty Payment Plan | 37,488.58 |
| **Total Due to CDTFA** | **277,389.08** |
| | |

Section 4.09
Employee Benefits

- All store employees were paid under the Terra Tech EIN during the time Unrivaled Brands owned PFC LLC.
- PFC LLC's filed under its own EIN from inception to Q1 2021. After Q1 2021, the store employees were paid under the New Patriot Holdings EIN.
- Employee benefits are provided pursuant to the Unrivaled "2024 health and welfare benefits guide" previously delivered to Purchaser.

Section 4.10
Employee Matters

- In NLRB Case 21-CA-336336 the United Food and Commercial Workers, Local 324 (Union) is alleging that People's First Choice, LLC, dba Blüm Santa Ana (Employer) has violated Section 8(a)(1) and (3) by laying off and otherwise discriminating against two Employees in regard to employment to discourage membership in the Union and violated Section 8(a)(1) and (5) by unilaterally changing the terms and conditions of employment without first giving the Charging Party notice and an opportunity to bargain about the layoffs. The Company has denied all allegations and has submitted appropriate responsive and defensive documents.
- In NLRB Case 21-CA-341718 the United Food and Commercial Workers, Local 324 (Union) is alleging that People's First Choice, LLC, dba Blüm Santa Ana (Employer) has violated Section 8(a)(5) and (1) by engaging in surface bargaining; and (2) by refusing to furnish information the Charging Party requested that is relevant to the bargaining process.

Section 4.11(a)
Intellectual Property

- *Blum*

# STATE TRADEMARK APPLICATIONS AND REGISTRATIONS:

CALIFORNIA

1. **BLÜM** (std. char. mark) Reg. No. 02003279; Owner of record: Blum Management Holdings, Inc.; Status: registered – Renew by October 6, 2024.

   **Services:** (Class 044) Cannabis dispensary.



Section 4.11(c)

Intellectual Property

- The Company is entering into a Trademark License Agreement for the continued use of the Blum trademark.

Section 4.12
Material Contracts

*Amended and Restated Sublease*, effective as of March 31, 2020, by and between the Company ("Sublessor") and PF-People's Grand TC, LLC ("Sublessee") for the premises located at 2729 S. Grand Ave., Santa Ana, California 92705 (the "Premises").

- At Closing, People's shall cause Sublessee to vacate and surrender the Premises to Company.
- At Closing the Amended and Restated Sublease, and any right of Sublessee to occupy the Premises, shall be terminated.

*Management and Shared Parking Agreement*, dated November 22, 2021, by and between the Company and New Patriot Holdings, Inc.

*Air Commercial Real Estate Association Standard Industrial/Commercial Multi-Tenant Lease - Gross*, dated January 6, 2015 (the "Lease"), by and among Bharatkumar Lodhia and Gitanjali Lodhia (collectively, "Lessor"), and the Company ("Lessee").

- *Addendum to Standard Industrial/Commercial Multi-Tenant Lease-Gross*, by and between Lessor and Lessee.
- *Amendment to Standard Industrial/Commercial Multi-Tenant Lease-Gross*, dated April 1, 2015, by and between Lessor and Lessee.
- *Second Amendment to Standard Industrial/Commercial Multi-Tenant Lease-Gross*, dated November 30, 2016, by and between Lessor and Lessee.
  - *Agreement of Guarantors*, by Bernard E. Steimann and Brian J. Decker.
- *Third Amendment to Standard Industrial/Commercial Multi-Tenant Lease-Gross*, dated April 9, 2018, by and between Bharat Lodhia and Gitanjali Bharat Lodhia, Trustees of the Bharat Lodhia Living Trust 2016, and Lessee.
  - *Agreement of Guarantors*, by Bernard E. Steimann and Brian J. Decker.
- The Company is a party to the Lease, and the Lease will therefore be acquired by Purchaser at Closing.  Post-Closing, Unrivaled shall provide assistance as reasonably required in order to obtain the Lessor's consent to Purchaser's acquisition of the Lease.  Purchaser shall replace Bernard E. Steimann and Brian J. Decker as guarantors to the Lease with SSS Partners, LLC or another guarantor acceptable to Lessor.

*Industrial Facilities Lease*, dated March 15, 2018 ("Parking Lease"), by and between Harvey Capital Corp., Agent for Ball & East LTD ("Landlord") and DTX Trade, Inc. ("Tenant").

- *Assignment of Lease*, dated March 25, 2021, by DTX Trade, Inc.
- *Assumption of Lease*, dated March 31, 2021, by New Patriot Holdings, Inc.
- *Consent to Assignment*, dated April 7, 2021, by Landlord.
- *Guaranty of Lease*, dated March 31, 2021, by Jay Yadon and Melissa Yadon.
- The Company is not a party to this Lease.  The Landlord's written consent is required to assign the lease from New Patriot Holdings, Inc. to Purchaser's designated entity, SSS Partners, LLC.  People's has already caused New Patriot Holdings, Inc. to begin efforts to obtain the Landlord's consent to the assignment.  Post-closing, People's shall use commercially reasonable efforts to cause New Patriot Holdings, Inc. to take all reasonable steps necessary to obtain the Landlord's consent to the Lease assignment, which People's anticipates will take 60 to 90 days post-Closing.  Until the Lease assignment is completed, the Company shall retain continued access to any parking subject to the Lease and subject to the Management and Shared Parking Agreement between the Company and New Patriot Holdings, Inc.

Section 4.16
Bank Accounts

**ABA/Routing Number**:      121144146

**Receiving Bank**:      Fresno First Bank
7690 N. Palm Ave. #101
Fresno, CA 93711

**Beneficiary Name**:      PEOPLE'S FIRST CHOICE, LLC DBA PEOPLE'S OC

**Beneficiary Address**:      2721 S Grand Ave
Santa Ana, California, 92705

**Account Number**:      100081178

Section 6.01
Labor Matters

- *The United Food and Commercial Workers, Local 324 (Union) achieved recognition on August 2023.  Commencing on December 21, 2023, the Company began good faith negotiations with Local 324 on a Collective Bargaining Agreement.  The parties subsequently met on February 15 and April 24 of 2024 but to date have not reached agreement on any draft language.  The parties have exchanged drafts, and the Company currently awaits a proposed revision from Local 324.*

**Exhibit A**

**Management Services Agreement**

[See attached]

A-1

# MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement ("**Agreement**") is made effective as of June 10, 2024 (the "**Effective Date**"), by and between Haven Nectar, LLC, a California limited liability company ("**Provider**"), and People's First Choice LLC d/b/a Blum OC, a California limited liability company (referred to as "**Company**"). Company and Provider are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties.**"

A.      Company holds a Regulatory Safety Permit issued by the City of Santa Ana, California, to engage in commercial cannabis operations at the premises located at 2721 South Grand Avenue, Santa Ana, California 92705 (the "**Premises**").

B.      Company holds a California commercial cannabis business license C10-0000212-LIC for cannabis retail and delivery ("**State Licenses**") issued to it by the California Department of Cannabis Control ("**DCC**").

C.      Unrivaled Brands, Inc., a Nevada corporation, and People's California LLC, a California limited liability company (together, "**Owners**") currently own One Hundred Percent (100%) of the membership interests in Company.

D.      Company, Owners, and Provider have entered into a Membership Interest Purchase Agreement ("**MIPA**") of approximate date herewith whereby Provider agreed to purchase all (100%) of Owners' membership interests in Company;

E.      Provider possesses the requisite knowledge and expertise with respect to the commercial cannabis licensing application process, management, and operation of licensed medical and adult-use cannabis facilities in the State of California (sometimes referred to herein as the "**State**");

F.      Company desires to engage and appoint Provider to assist Company with (i) maintaining the state and local licenses, and (ii) oversee and manage the business and operations of the Company at the Premises for and on behalf of the Company, and Provider desires to accept such appointment, all upon and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of these promises, and for such other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

1.      <u>Definitions</u>.

"**Applicable Law**" shall mean any and all published statutes, laws, regulations, and rules determined by the State of California and any counties or local jurisdictions in which the Parties may operate, including specifically but not limited to the Medicinal and Adult Use Cannabis Regulation and Safety Act ("**MAUCRSA**"). For purposes of this Agreement, the definitions in this paragraph shall include any and all federally mandated laws, rules, and regulations applicable to operating any other legal business within the United States of America; *provided, however*, that federal laws and regulations related to cannabis, including but not limited to 21 United States Code

§801, et seq., short titled the Controlled Substance Act (the "**CSA**"), are excluded from this definition.

"**Business**" shall mean the commercial cannabis business of Company and its related activities at the Premises.

"**Cannabis Licenses**" shall mean Company's cannabis license(s), certification(s) and/or accreditation(s) issued by Governmental Authorities, including but not limited to the CUP and State Licenses.

"**Cash Account**" shall have the meaning set forth in <u>Section 2.4.1</u> of this Agreement.

"**Confidential Information**" shall mean any and all proprietary, confidential or other non-public information concerning the business or operations of either Party, this Agreement and the MIPA and negotiations in connection therewith, or the Cannabis Licenses (including, without limitation, the application materials and any correspondence with any Governmental Authority), the Business, Owners, and all analyses, compilations, information, data, studies, business and operating documents, policies and procedures, financial information, accounting records, real property leases, equipment leases, vendor information, customer information, marketing or advertising plans, details, documents and information related to the Parties and the Owners, their respective businesses and affiliates, and any other documents, details and information, to the extent based on such furnished information or reflecting any Party's review of such furnished information. Confidential Information may be communicated orally, visually, in writing or in any other recorded or tangible form. All such data and information shall be considered to be "Confidential Information" whether or not marked or otherwise communicated as such. Notwithstanding anything contained herein to the contrary, Confidential Information shall not include information that: (a) is already known to the Receiving Party without restriction on use or disclosure prior to receipt of such information from the Disclosing Party; (b) is or becomes generally known by the public other than by breach of this Agreement by, or other wrongful act of, the Receiving Party; (c) is developed by the Receiving Party independently of, and without reference to or accessing, any Confidential Information of the Disclosing Party; or (d) is received by the Receiving Party from a third party who is not under any obligation to the Disclosing Party to maintain the confidentiality of such information.

"**Disclosing Party**" shall mean a Party who discloses Confidential Information to the other Party.

"**Expenses**" shall mean all actual expenses incurred in operating the Business, capital expenditures or otherwise in connection therewith, including, but not limited to, all expenses related to Cannabis Licenses, consents and approvals, rent, negotiation of real property leases, zoning, buildout costs, purchasing inventory, salaries and wages, incentives, paid absences, labor costs, payroll taxes, health care and retirement benefits, direct non-labor costs and similar expenses, and out-of-pocket costs and expenses and other expenses relating to the operation of the Business.

"**GAAP**" shall mean United States Generally Accepted Accounting Principles.

"**Governmental Authority**" shall mean any (a) region, state, county, city, town, village, district or other jurisdiction, (b) state, local, municipal, or other government, (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal), or (d) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

"**Gross Revenue**" shall mean the actual gross revenues realized from the business of Company during a specific reporting period before any deductions or expenses are subtracted.

"**Intellectual Property**" shall mean all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, divisions, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names, internet domain names, other source identifiers, and rights in telephone and facsimile numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all rights of publicity, privacy, and endorsement (including rights to the use of names, voices, likenesses, images, appearances, signatures, and biographical information of real persons), (d) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (e) all mask works and all applications, registrations, and renewals in connection therewith, (f) all trade secrets and Confidential Information (including customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (g) all computer software (including source code, object code, data, databases, and related documentation), (h) all advertising and promotional materials, (i) social media accounts and pages, (j) all other proprietary rights, and (k) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"**Management Service Fee**" shall have the meaning set forth in <u>Section 3</u> of this Agreement.

"**Monthly Statement**" shall have the meaning set forth in <u>Section 2.4.4</u> of this Agreement.

"**Net Profit**" shall have the meaning set forth in <u>Section 3</u> of this Agreement.

"**Operating Account**" shall have the meaning set forth in <u>Section 2.4.1</u> of this Agreement.

"**Person**" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a governmental entity (or any department, agency, or political subdivision thereof).

"**Receiving Party**" shall mean a Party that receives Confidential Information from the other Party.

"**Services**" shall mean all of the activities described in <u>Section 2.2</u> of this Agreement.

"**Taxes**" shall mean federal, state, and local taxes, including, but not limited to, income taxes, sales and excise taxes, and gross receipts business taxes in connection with business of Company.

"**Term**" shall mean the term of this Agreement, as the same may be terminated or extended pursuant to Section 4 of this Agreement.

2.      Duties of Provider.

2.1.    Engagement of Provider.  Company hereby retains and engages Provider to provide the Services pursuant to the terms and conditions of this Agreement, and Provider hereby accepts such retention and engagement subject to receipt of any approvals of such retention and/or engagement as may be required by Applicable Law.  Company hereby authorizes Provider to exercise such powers and to take such actions with respect to Company as are expressly set forth herein and as may be necessary for the performance of Provider's obligations under this Agreement.  Provider hereby accepts such appointment on the terms and conditions hereinafter set forth and agrees to manage, operate and maintain the Business of Company in an efficient and satisfactory manner consistent with this Agreement.

2.2.    Description of Services.  Provider shall be responsible for providing to Company, at the sole expense of Provider, all actions or services reasonably required for the day-to-day management and operation of the Business of Company not otherwise delegated to the managers of Company pursuant to the operating agreement of Company (collectively, the "**Services**"), including, without limitation, the services related to the Business set forth in this Section 2 and on Schedule 2.2 attached hereto.

2.3.    Application with Regulatory Authorities.  Provider acknowledges and understands that regulators require Company to disclose the identity of any or all of Company's owners or financially interested parties, including any individual who manages, directs, or controls the Business' State METRC® account.

Provider agrees to have Company disclose Provider, as required, in relation to Company and its Cannabis Licenses.  Provider hereby acknowledges that it and its personnel may become subject to background checks and other regulatory investigations, and may be required to comply with the State of California's owner qualifications provided in Cal. Code Regs. tit. 4, § 15000 et. seq.  In the event that any disclosed individual of Provider does not meet the State's owner qualifications, Provider shall be responsible for selecting a new, qualified individual to replace the disqualified individual within five (5) business days of the State's denial.  Provider further agrees to do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as Company or a Governmental Authority may request from time to time within five (5) calendar days of such request.

2.4.    Money Management; Tax Collection; Reporting.

2.4.1.  Provider shall establish and manage Company's bank account in the name of Company ("**Operating Account**"), subject to the terms and conditions set forth in this Agreement.  All Gross Revenue shall be deposited into the Operating Account.  Cash received

shall be deposited into a segregated vault if not deposited into the Operating Account ("**Cash Account**").  Provider shall count all cash, checks and/or other payments paid to Company and stored in the Cash Account at the close of business on the day such cash, checks and/or other payments are received into the Cash Account and shall deposit the same in the Operating Account promptly after receipt thereof.  The manager(s) of Provider (the "**Manager(s)**") will be listed as authorized signers on the Operating Account.  Company will execute any and all documents necessary to authorize the Manager(s) of Provider as authorized signatories on the Operating Account; *provided, however*, that, except as expressly provided herein, Provider's Manager(s) shall not have the authority to withdraw, transfer, or pay any amount from the Operating Account or Cash Account without the prior written consent of Company.  Furthermore, Provider and its Manager(s) shall not be permitted to incur debt, liabilities or obligations of any kind in the name of Company without Company's prior written consent, except for debt, liabilities or obligations incurred in the ordinary course of the Business.  Any violation of this Section shall constitute a material breach of this Agreement and be grounds for Company's immediate termination of this Agreement.  In no event shall this Section act as any waiver of rights or limitation of remedies for either Party as otherwise provided in this Agreement.

2.4.2.   Provider shall be responsible for collecting and transmitting all Taxes for the sales of Company's products and/or related to operations of the Business in compliance with Applicable Law.

2.4.3.   Provider shall maintain accurate and complete records of all financial and accounting information which is relevant to the calculation of Gross Revenue, Net Profit, Expenses, and Taxes, and also for reconciliation of the Operating Account, Cash Account, and other accounts and financial records of Company.

2.4.4.   Provider shall be responsible for providing to Company on a monthly basis a full accounting of all financial and accounting information which is relevant to the calculation of Gross Revenue, Net Profit, Expenses, and Taxes, and also for reconciliation of the Operating Account and Cash Account ("**Monthly Statement**"), in accordance with GAAP.  The Monthly Statement shall be provided on or before the date fifteen (15) days following each calendar month during the Term of this Agreement.

2.4.5.   Provider, on behalf of Company and using funds from the Operating Account (or Provider's own funds in the event the Operating Account does not have sufficient funds), will timely pay on or prior to the date due (a) all Taxes, estimated payments, assessments and governmental charges or levies imposed upon Company or its property or assets or in respect of any of its Business for the time period beginning after the Effective Date, and (b) all claims or demands of materialmen, mechanics, carriers, warehousemen, landlords, bailees and other like persons, any of the foregoing which, if unpaid, might result in the creation of a lien or encumbrance upon Company's property or assets.  Provider shall have the right to contest in good faith Taxes, assessments, charges, levies or liens against Company related to the Business that Company reasonably believes are not valid or legitimate.  Company shall cooperate with Provider in good faith and provide all information and documents necessary or desirable for Provider to perform its responsibilities under the provisions of this <u>Section 2.4.5</u>.  Notwithstanding anything to the contrary contained herein, Provider shall not be liable for any Taxes or claims levied against

Company resulting from Company's failure to disclose information to or cooperate with Provider in good faith.

2.5.    <u>Expenses</u>.  Provider shall be solely responsible for timely paying on or prior to the date due any and all Expenses regardless of whether there are sufficient funds in the Operating Account or Cash Account.  Should Provider fail to timely make any payment or perform any action contemplated by this Agreement, Company shall have the right to make such payment or perform such action on Provider's behalf.  Provider shall promptly, and in no event more than five (5) days following Company's written demand for the same, reimburse Company for any and all Expenses incurred by Company or its representatives and agents in connection with such payment or action, including payroll, taxes, and other costs associated therewith.

2.6.    <u>Rent</u>.  Provider shall be solely responsible for paying all rent, utility payments, and other amounts due for the real property utilized by Company for the Business during the Term, including but not limited to the Premises ("**Property Expenses**"), regardless of whether there are sufficient funds in the Operating Account or Cash Account.  In the event Provider fails to timely pay such Property Expenses, or provides prior written notice to Company notifying Company of Provider's inability to pay such Property Expenses, Company shall have the right to pay such Property Expenses on Provider's behalf.  Provider shall promptly, and in no event more than five (5) days following Company's written demand for the same, reimburse Company for any and all Property Expenses incurred by Company or its representatives and agents in connection with such payment or action.

2.7.    <u>Insurance</u>.  For the entire Term, commencing on the Effective Date, Provider shall be solely responsible for paying for Company's commercial general liability, property and casualty, professional liability, workers' compensation and other insurance coverage that is reasonably available and customary for Company's Business, in amounts that are adequate under Applicable Law and consistent with industry standards, and with responsible insurance carriers admitted and licensed to do business in applicable jurisdictions ("**Insurance Expenses**"), regardless of whether there are sufficient funds in the Operating Account or Cash Account.  In the event Provider fails to timely pay such Insurance Expenses, or provides prior written notice to Company notifying Company of Provider's inability to pay such Insurance Expenses, Company shall have the right to pay such Insurance Expenses on Provider's behalf.  Provider shall promptly, and in no event more than five (5) days following Company's written demand for the same, reimburse Company for any and all Insurance Expenses incurred by Company or its representatives and agents in connection with such payment or action.  Notwithstanding anything to the contrary herein, and in addition to Provider's indemnification of Company as set forth elsewhere in this Agreement, Provider hereby agrees to fully indemnify, protect, defend and hold harmless Company and its officers, directors, employees, agents and representatives from any insufficiency or lack of insurance coverage for the Business following the Effective Date.

2.8.    <u>Personnel</u>.  Provider shall be responsible for the hiring, termination, direction and management of all employment-related functions associated with the Business, including, without limitation, the training and monitoring the performance of all employees necessary to ensure the Business is adequately staffed. Provider shall be responsible for handling all administrative matters relating to payroll and wages for all personnel working at the Premises or conducting business related to the Business.  Such personnel shall at all times be paid directly by Provider from the

Operating Account.  For avoidance a doubt, any individual handling cannabis or cannabis products shall be the employee of Company but will be managed by Provider in accordance with the terms of this Agreement.  Provider acknowledges it is not authorized to hire any employees or engage any independent contractors in the name of Company without Company's written approval. Provider further expressly acknowledges its responsibility and liability to provide for the payment and withholding of appropriate amounts for income tax, social security, unemployment insurance, state disability insurance taxes, and any authorized payroll deductions from the wages or other compensation of its personnel and Company personnel.  Provider shall be responsible for all administrative functions related to the Business, including but not limited to processing and paying its payroll obligations and Company payroll obligations at Provider's expense.  Notwithstanding the foregoing, in the event the Parties determine that any of the personnel working at the Premises must be paid directly by Company in order to comply with Applicable Law, the Parties shall work together to ensure compliance with Applicable Law at Provider's sole expense.

2.9.    Other Capital Needs.  If the Parties reasonably determine that it would be in the best interest of the Business to provide additional capital to meet the needs of Company for the carrying on of the Business, then Provider shall be responsible for paying all such amounts at its sole cost and expense.

2.10.    Operating Standards; Compliance with Laws.  Provider shall use commercially reasonable efforts to advise Company of all information material to the operation of the Business so as to enable Provider to operate the Business in a proper, efficient, and competitive manner, in accordance with best operating standards that are consistent with the California retail cannabis industry generally and in compliance with all Applicable Law.  Provider shall comply with Applicable Law at all times while performing the Services detailed herein.

2.11.    Limitation of Authority.  Company retains plenary discretion and ability to limit and/or change the authority and duties granted to Provider pursuant to this Agreement at any time. The Parties do not intend to create a lease or any other interest in real property for Provider through this Agreement, and the Parties only intend to create a limited license.

2.12.    Financial Interest Holder.  Provider shall be disclosed on Company's local and state Cannabis Licenses as an "Owner" or "Financial Interest Holder" as the case may be, and as defined by MAUCRSA.  Upon termination of this Agreement, Provider shall be immediately removed as an Owner and or Financial Interest Holder from Company's Cannabis Licenses; *provided, however*, that Provider shall remain as an Owner or Financial Interest Holder in the event Provider has acquired equity securities in Company as contemplated by the MIPA or otherwise prior to the termination of this Agreement and retains such securities following the termination of this Agreement.  The understanding of the Parties is that disclosure of Provider as an "Owner" is solely for purposes of complying with MAUCRSA and such identification does not create, grant, or imply that Provider is a member of Company or otherwise has, or has a right to receive, any equity interest in Company.

3.    Compensation to Provider.  As consideration of Provider's performance of the Services, Provider shall receive a management services fee equal to one hundred percent (100%) of the Net Profit during the Term ("**Management Services Fee**"), payable following the end of the Term in accordance with Section 4.3.2.  For the purposes of this Agreement, "**Net Profit**" shall mean all

Gross Revenue of the Business' operations at the Premises, less (i) all expenses related to such Business operations, including but not limited to all taxes due on products and revenues, rent expense (if any), testing expenses, employee costs, material costs, build out expenses, licensing fees, utilities, and overhead, and (ii) a reasonable reserve as determined by Company but under no circumstances exceeding $50,000.  Provider shall maintain financial statements for the Business at the Premises.

4.    Term and Termination.

4.1.    Term.  Subject to Section 4.2, this Agreement shall have an initial term of six (6) months beginning on the Effective Date.  Notwithstanding the foregoing, in the event the conditions set forth in Section 4.2 are not met and the Term may otherwise expire, Company may extend the Term of this Agreement by periods equal to ninety (90) days from the then-applicable term in its sole discretion by delivering written notice to Provider.

4.2.    Termination. This Agreement shall terminate automatically upon the occurrence of both of the following: (a) the transactions contemplated by MIPA close and Provider acquires 100% ownership of Company as contemplated thereby, and (b) the Parties receive approval of Provider as an Owner of Company from the applicable state, city and local Governmental Authorities.  Additionally, this Agreement may be terminated:

4.2.1.    By Provider, in the event Company has breached any of its representations, warranties, or obligations under this Agreement or the MIPA and Company has failed to cure such breach within ten (10) days of receiving Provider's written notice of the same;

4.2.2.    By Company, in the event Provider has breached any of its representations, warranties, or obligations under this Agreement or the MIPA and Provider has failed to cure such breach within ten (10) days of receiving Company's written notice of the same; *provided, however*, that Company may immediately terminate this Agreement without prior notice in the event Provider commits any fraud or other violation of Applicable Law;

4.2.3.    By either Party upon prior written notice to the other Party if the MIPA is terminated; or

4.2.4.    By either Party, if (i) Provider is otherwise prohibited by the DCC or by any other state, city or local Governmental Authority to perform the Services as contemplated hereby, or (ii) Company fails to acquire or maintain any of the Cannabis Licenses necessary to conduct the Business.

In the event this Agreement is terminated pursuant to this Section 4.2, this Agreement shall immediately become null and void with no further rights or obligation of Parties, except for the obligations described in Section 4.3.

4.3.    Effect of Termination.

4.3.1.    The expiration or termination of this Agreement, for any reason, shall not release either Party from any obligation or liability to the other Party that: (a) has already accrued hereunder; (b) comes into effect due to the expiration or termination of this Agreement; or (c)

otherwise survives the expiration or termination of this Agreement based upon the express provisions contained in this Agreement.

4.3.2.   Following the termination of this Agreement, Provider shall, within thirty (30) days of the effective date of termination, (i) pay all unpaid amounts required to be paid by Provider pursuant to <u>Section 2</u> of this Agreement, (ii) provide a final and full accounting of all financial and accounting information which is relevant to the calculation of Gross Revenue, Net Profit, Expenses, Taxes, the Management Services Fee and also for reconciliation of the Operating Account and Cash Account, in accordance with GAAP, and (iii) remit all Taxes to the appropriate government agencies.  Within ten (10) days following completion of the foregoing and agreement between the Parties on the amount of Management Services Fee, with both Parties acting in good faith, the Management Services Fee shall be paid to Provider.

4.3.3.   Immediately upon the expiration or termination of this Agreement, each Party shall deliver to the other Party all of the other Party's property and assets, including but not limited to Confidential Information, in such Party's possession or control.  To the extent any such property or asset(s) is intangible or otherwise not able to be delivered to the other Party, each Party hereby agrees to destroy such intangible or undeliverable property or asset(s) within five (5) days of receiving the other Party's request for the same, and to provide the other Party with written, signed confirmation of such destruction.

5.    <u>Representations and Warranties of Company</u>.  Company hereby represents and warrants to Provider as follows:

5.1.   Company is a limited liability company duly organized and legally existing in good standing under the laws of the State of California and has all the requisite power and authority to carry on its business as now conducted and to consummate the transactions contemplated by this Agreement.

5.2.   The execution, delivery, and performance of this Agreement by Company has been duly approved by its manager, and no further limited liability company action is necessary on the part of Company to consummate the transactions contemplated by this Agreement, assuming due execution of this Agreement by the parties.

5.3.   Company maintains in effect insurance covering its assets and businesses and any liabilities relating to its assets and businesses in amounts reasonably believed adequate by Company, and such insurance coverage shall be maintained by Company.

5.4.   Company has all licenses and other required governmental permits, or authorizations, including, without limitation, all common carrier rights, certificates of public need, waste material transportation permits, trademarks, and trade names necessary to carry on the Business as now being conducted, without known conflict with valid licenses, permits, trademarks, and trade names of others.  All such licenses and permits are in full force and effect, no violations are recorded in respect to any such licenses or permits, and no proceeding is pending, or, to the knowledge of Company, threatened, to revoke, suspend, or otherwise limit such licenses or permits.  All licenses and permits will survive the execution of this Agreement.

5.5.    This Agreement and all other agreements of Company contemplated under this Agreement constitute valid and binding obligations of Company, enforceable in accordance with their respective terms.  Neither the execution and delivery of this Agreement (or any agreement contemplated under this Agreement) nor the consummation of the transactions contemplated by this Agreement will: (i) conflict with or violate any provision of the Articles of Organization or the Operating Agreement of Company; (ii) conflict with or violate any decree, writ, injunction, or order of any court or administrative or other governmental body which is applicable to, binding on, or enforceable against Company; or (iii) result in any breach of or default (or give rise to any right of termination, cancellation, or acceleration) under any mortgage, contract, agreement, indenture, will, trust, or other instrument which is either binding on or enforceable against Company or its assets.

5.6.    Company has the full power, right, and authority to enter into and perform this Agreement without the consent of any person, entity, or governmental agency, and the consummation of the transactions contemplated by this Agreement will not result in the breach or termination of any provision of or constitute a default under any lease, indenture, mortgage, deed of trust, or other agreement or instrument or any order, decree, statute, or restriction to which Company is a party or by which Company is bound or to which the outstanding capital securities of Company or any of the properties of Company is subject.

5.7.    No representation, statement, or information made or furnished by Unrivaled Brands, Inc. on behalf Company to Provider contained in this Agreement contains or shall contain any untrue statement of any material fact.

6.    <u>Representations and Warranties of Provider</u>.  Provider hereby represents and warrants to Company as follows:

6.1.    Havan Nectar is a California limited liability company, duly organized, validly existing, and in good standing under the laws of the State of California, and has all the requisite limited liability company power and authority to carry on its business as now conducted and to consummate the transactions contemplated by this Agreement.

6.2.    The execution, delivery, and performance of this Agreement by Provider has been duly approved by its Manager(s) and Member(s), as applicable, and no further [limited liability company] action is necessary on the part of Provider to consummate the transactions contemplated by this Agreement, assuming due execution of this Agreement by the Parties.

6.3.    Provider maintains in effect insurance covering its assets and businesses and any liabilities relating to its assets and businesses in amounts reasonably believed adequate by Provider, and such insurance coverage shall be maintained by Provider throughout the Term of this Agreement.

6.4.    Provider possesses all licenses and other required governmental or official approvals, permits, or authorizations, including, without limitation, all common carrier rights, certificates of public need, waste material transportation permits, trademarks, and trade names necessary to carry on its business and the Business as now being conducted, without known conflict with valid licenses, permits, trademarks, and trade names of others.  All such licenses and

permits are in full force and effect, and no violations are recorded in respect to any such licenses or permits, and no proceeding is pending, or to the knowledge of Provider threatened, to revoke, suspend, or otherwise limit such licenses or permits.  All licenses and permits will survive the execution of this Agreement.

6.5.     This Agreement and all other agreements of Provider contemplated under this Agreement constitute valid and binding obligations of Provider, enforceable in accordance with their respective terms.  Neither the execution and delivery of this Agreement (or any agreement contemplated under this Agreement) nor the consummation of the transactions contemplated by this Agreement will: (i) conflict with or violate any provision of the Articles of Organization or Operating Agreement of Provider; (ii) conflict with or violate any decree, writ, injunction, or order of any court or administrative or other governmental body which is applicable to, binding on, or enforceable against Provider; or (iii) result in any breach of or default (or give rise to any right of termination, cancellation, or acceleration) under any mortgage, contract, agreement, indenture, will, trust, or other instrument which is either binding on or enforceable against Provider or its assets.

6.6.     Provider has the full power, right, and authority to enter into and perform this Agreement without the consent of any person, entity, or governmental agency, and the consummation of the transactions contemplated by this Agreement will not result in the breach or termination of any provision of or constitute a default under any lease, indenture, mortgage, deed of trust, or other agreement or instrument or any order, decree, statute, or restriction to which Provider is a party or by which Provider is bound or to which the outstanding capital securities of Provider or any of the properties of Provider is subject.

6.7.     Provider will perform the Services in a, professional, timely and commercially reasonable manner, consistent with best industry standards, in accordance with Applicable Law, and in all cases at Provider's sole expense.

6.8.     To the best of Provider's knowledge, Provider has not been the subject of, nor does Provider have any reason to believe that Provider or any of its members, managers, officers, directors or affiliates will be the subject of, any civil, criminal or administrative investigation or proceeding brought by any Governmental Authority.

6.9.     No representation, statement, or information made or furnished by Provider to Company in this Agreement, or in connection with the transactions contemplated hereby contains, or shall contain, any untrue statement of any material fact or omits or shall omit any material fact necessary to make the information contained herein true.

7.     Independent Contractor Relationship.  Both Parties agree that this Agreement is not intended to create nor shall it be deemed or construed to create any relationship between the Parties other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement, and nothing contained in this Agreement shall render or constitute the Parties joint venturers, partners, or agents of each other or allow a Party to legally bind the other Party with respect to any third party.  Provider acknowledges and agrees that Company will not provide Provider with any employee benefits, including without limitation any

social security, unemployment, medical, or pension payments, and that income tax withholding is Provider's responsibility.

8.    <u>Indemnification by Company.</u>

8.1.    Company shall indemnify and hold Provider harmless from and against any and all damages, loss, cost, deficiency, assessment, liability, or other expense (including reasonable attorney's fees, costs of court, and costs of litigation, if any) suffered, incurred, or paid by Provider as a result of: (i) the untruth, inaccuracy, breach, or violation of any representation, warranty covenant, or other obligation of Company set forth in or made in connection with this Agreement; (ii) Company's gross negligence or willful misconduct; or (iii) the enforcement of Provider's right to indemnification under this Agreement.

8.2.    Provider shall give written notice to Company of any claim, action, suit, or proceeding relating to the indemnity provided here by Company not later than five (5) days after Provider has received notice of the claim, action, suit, or proceeding; *provided, however*, that failure to so give notice within such five (5) day period shall not alleviate Company of its indemnification obligations hereunder except to the extent that Company is prejudicially affected by such failure to timely provide notice.  Company shall have the right, at its option, to compromise or defend, at its own expense and by its own counsel (which counsel shall be reasonably satisfactory to Provider), any such action, suit, or proceeding.  Provider and Company agree to cooperate in any such defense or settlement and to give each other full access to all information relevant to such defense or settlement.

8.3.    The indemnification shall not extend to damages or costs caused by the gross negligence or willful or wrongful acts of Provider, including, without limitation, violations of Applicable Law.

9.    <u>Indemnification by Provider.</u>

9.1.    Provider shall indemnify and hold Company, the Owners and their respective members, managers, officers, directors, employees and agents harmless from and against any and all damages, loss, cost, deficiency, assessment, liability, or other expense (including reasonable attorney's fees, costs of court, and costs of litigation, if any) suffered, incurred, or paid by Company as a result of: (i) the untruth, inaccuracy, breach, or violation of any representation, warranty, covenant, or other obligation of Provider set forth in or made in connection with this Agreement; (ii) the assertion against Company of any liabilities or obligations of Provider or any claim relating to the operations of the Business or Provider's business; *provided, however*, Provider shall not indemnify Company to the extent that claims against Company arise from or relate to Company's failure to comply with its obligations under this Agreement; (iii) Provider's gross negligence or willful misconduct; or (iv) the enforcement of Company's right to indemnification under this Agreement.

9.2.    Company shall give written notice to Provider of any claim, action, suit, or proceeding relating to the indemnity provided in this Agreement by Provider not later than five (5) days after Company has received notice of any such claim, action, suit, or proceeding; *provided, however*, that failure to so give notice within such five (5) day period shall not alleviate Provider

of its indemnification obligations hereunder except to the extent that Company is prejudicially affected by such failure to timely provide notice. Provider shall have the right, at its option, to compromise or defend, at its own expense and by its own counsel (which counsel shall be reasonably satisfactory to company), any such action, suit, or proceeding. Provider and Company agree to cooperate in any such defense or settlement and to give each other full access to all information relevant to such defense or settlement.

9.3.    Except as expressly provided in this Agreement, the remedies provided in <u>Section 9</u> of this Agreement shall be cumulative and shall not preclude assertion by Company or the seeking of any other remedies available against Provider at law or in equity.

9.4.    The indemnification shall not extend to damages or costs caused by the willful or wrongful acts of Company, including, without limitation, violations of Applicable Law.

10.    <u>Confidentiality</u>.  The Receiving Party agrees that it will not at any time: (i) use, reproduce, or copy any Confidential Information of the Disclosing Party except as necessary in connection with the Agreement and as expressly permitted hereunder, or (ii) disclose Confidential Information of the Disclosing Party to any third party other than its officers, directors, employees, agents, accountants, agents attorneys and employees, each on a "need to know" basis, in the normal course of business (provided such parties are professionally obligated or have committed in writing to abide by confidentiality and non-use provisions not less stringent than those set forth in this subsection) without the other Party's prior written consent. If served with a subpoena, court order, or other compulsory process or legal requirement requiring disclosure of Confidential Information, the Receiving Party shall promptly notify the Disclosing Party of the demand (unless prohibited by law), take reasonable steps to protect the Confidential Information from public disclosure, and limit any such disclosure to the minimum extent necessary to comply with the legal requirement. The Receiving Party agrees to reasonably cooperate with the Disclosing Party at the Disclosing Party's expense if it decides to oppose production after it receives notice of such opposition, unless the Receiving Party (in the opinion of its legal counsel) deems such cooperation is not legally permitted or is otherwise detrimental to it. Upon termination or expiration of this Agreement or an earlier request by the Disclosing Party, the Receiving Party shall destroy or return, at the Disclosing Party's election, such Disclosing Party's Confidential Information in the Receiving Party's possession or control.

11.    <u>Waiver or Extension of Conditions</u>.  Company or Provider, in its sole discretion, may extend the time for, or waive the performance of, any of the obligations of the other Party, waive any inaccuracies in the representations or warranties by the other Party, or waive compliance by the other Party with any of the covenants or conditions contained in this Agreement.  Any extension or waiver shall be in writing and signed by the Party granting such extension or waiver. Any such extension or waiver in any particular case shall not act as an extension or waiver of any other provisions of this Agreement or any prior or subsequent act or omission by the obligated Party.

12.    <u>Intellectual Property</u>.  Except as expressly set forth herein, as between the Parties, each Party is and shall remain the owner of all Intellectual Property that it owns or controls as of the Effective Date or that it develops or acquires thereafter.  No Party shall have the right to, and shall not, directly or indirectly, sell, offer for sale, register, attempt to register, deliver, copy, modify,

alter, disassemble, reverse-engineer, or sublicense any Intellectual Property of the other Party without the prior written consent of the other Party.

13.    <u>Compliance with Lease</u>.  Provider shall, and shall cause its officers, Manager(s), service providers, visitors, agents and representatives to, comply with all the provisions of the Company's lease for the Premises, a copy of which has been made available to Provider.

14.    <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of California without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties.

15.    <u>Headings and Construction</u>.  The subject headings of the sections of this Agreement are included for purposes of convenience only and shall not affect the constructions or interpretation of any of its provisions. All use of the words "include" and "including" mean "include/including without limitation." Words importing the singular number only shall include the plural, and vice versa, words importing the masculine gender shall include the feminine gender and neuter gender, and vice versa, and words importing persons shall include a natural person, firm, trust, partnership, association, corporation, limited liability company, government board, agency, instrumentality, or other entity.

16.    <u>Counterparts; Electronic Signature</u>.  This Agreement may be executed in two or more counterparts or by electronic signature or facsimile, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  This Agreement may be executed and delivered using electronic means, including but not limited to electronic mail and portable document format (PDF), which shall be legally binding upon the Parties and their respective successors and assigns.

17.    <u>Entire Agreement; Modification</u>.  This Agreement constitutes the entire agreement and understanding between the Parties and supersedes any prior agreements and understandings relating to the subject matter of this Agreement.  This Agreement may be modified or amended only by a written instrument executed by all Parties to this Agreement.

18.    <u>Audit Right</u>.  Company shall have the right, upon not less than five (5) days' prior written notice to Provider, as to the Monthly Statements, to audit, examine and make copies of, or extracts from, the books of account and other financial and sales records of Provider (and Company's records maintained by Provider) in order to confirm the calculation of the Gross Revenue, Net Profit, Expenses, and Taxes, and for reconciliation of the Operating Account and the Cash Account.  Such right may be exercised by Company personnel or its designees, including through any independent certified public accountant designated by Company.  Provider shall cooperate with Company and its designees in all reasonable respects regarding such audit.  Company shall pay all fees and expenses incurred in any examination made by Company hereunder; *provided, however*, if an audit reveals a discrepancy greater than five percent (5%) in the amount of Gross Revenue, Net Profit, Expenses, or Taxes paid and/or reported in respect of the period covered by any Monthly Statement, Provider shall be solely responsible for all fees and expenses incurred in connection with such audit.  If an audit reveals any discrepancy in the amount of Gross Revenue, Net Profit, Expenses, or Taxes paid and/or reported in respect of the period covered by any

Monthly Statement, the Parties will reasonably cooperate to true-up the over- or under-payment within thirty (30) days of finally determining the correct amount of that should have been paid and/or reported.

19.    <u>Notices</u>.  All notices or other communications required or permitted hereunder shall be in writing shall be deemed duly given (i) if by personal delivery, when so delivered, (ii) if mailed, three (3) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient, (iii) if sent through an overnight delivery service in circumstances to which such service guarantees next day delivery, the following day, or (iv) when sent by electronic mail, the same day, in each case to the addresses or electronic mail address designated in writing by each Party hereto to the other Party.  Any Party may change the address or electronic mail address to which notices and other communications hereunder are to be delivered by giving the other Party no less than five (5) days prior written notice in the manner herein set forth**.**

20.    <u>No Assignment; Successors</u>.  No Party may assign this Agreement or assign any rights or delegate any duties under it without the prior written consent of the other Party.  Any purported transfer in violation of this Section will be void *ab initio*.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns and is not intended to confer upon any other person or entity any rights or remedies under this Agreement.

21.    <u>Prevailing Party</u>.  In the event that a Party commences a legal proceeding to enforce its rights under this Agreement, the substantially prevailing party shall, in addition to all other damages, be entitled to reasonable attorneys' fees and costs, costs of witnesses, and costs of investigation from the non-prevailing party or parties, including those incurred in any arbitration, bankruptcy or appeal procedure.

22.    <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.  In the event any provision or term hereof is deemed to have exceeded applicable legal authority or shall be in conflict with applicable legal limitations, such provision shall be reformed and rewritten as necessary to achieve consistency and compliance with such applicable law.

23.    <u>Further Assurances</u>.  The Parties hereby agree to execute and deliver such further and other documents and perform or cause to be performed such further acts and things as may be necessary or desirable to give full effect to this Agreement.

24.    <u>Equitable Remedies</u>.  In addition to any other remedies available to it at law or in equity, Company shall be entitled to seek injunctive relief (without the requirement of posting a bond or other form of security) to enforce the provisions of this Agreement.

25.    <u>No Third-Party Beneficiaries</u>.  Except as provided in Section 9, his Agreement is intended for the benefit of the Parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

26.    <u>Federal Waiver</u>.  The Parties expressly acknowledge and agree that (i) the use, possession, cultivation, manufacture, transportation, purchase and sale of cannabis is federally illegal, (ii) the federal laws and certain states' laws regarding the use, possession, cultivation, transportation,

manufacture and furnishing of cannabis (the "**Industry**") are in conflict; (iii) engaging in the lawful conduct of business operations in the Industry under state law may risk criminal or civil forfeiture, violation of federal law, and heightened risk of criminal or civil prosecution, crime and violence; and (iv) such inherent risks are assumed by each Party, and each Party has elected to execute and fulfill this Agreement despite such risks and waives any defense to enforcement of this Agreement based on cannabis being federally illegal.

27.    Change in Law.  If any change to Applicable Law has a materially adverse effect on the ability of either Party to carry out its obligations under this Agreement, such Party, upon written notice, may request renegotiation of this Agreement in good faith to amend this Agreement to the extent reasonably necessary or prudent to address the change in Applicable Law in a manner that accomplishes the intents and objectives of the Parties, as evidenced by the terms of this Agreement, in all material respects to the extent possible.  Such renegotiation will be undertaken in good faith and, if necessary, will include the use of a mutually approved independent third-party mediator. If the Parties are unable to renegotiate the terms within ninety (90) days after such notice and good faith negotiations, either Party may terminate this Agreement on sixty (60) days' further written notice or at the end of the Term (even if less than sixty (60) days remain until the end of the Term), whichever is earlier.  Notwithstanding the foregoing, in the event the change to Applicable Law causes, or could reasonably be expected to cause, Company's maintenance or approval of any of its Cannabis Licenses to be endangered as a result of Company being party to this Agreement, Company may immediately terminate this Agreement by providing written notice of the same to Provider.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the Parties have signed this Management Services Agreement as of the Effective Date.


PROVIDER:

Haven Nectar, LLC

By: _____
Name: Shubham Pandey
Title: Chief Executive Officer


COMPANY:

People's First Choice, LLC


By: _____
Name: Sabas Carrillo
Title: Manager


Acknowledged and
Approved:

OWNER:

Unrivaled Brands, Inc.


By: _____
Name: Sabas Carrillo
Title: Chief Executive Officer

## Schedule 2.2

### Description of Services

Capitalized terms used herein but not defined shall have the meaning set forth in the Agreement to which this schedule is attached.  Without limiting the generality of Section 2.2 of the Agreement, or any other description of the Services set forth in the Agreement, the Services to be rendered by Provider to Company shall include the following:

- Hiring, terminating, directing and managing all employment related functions, including without limitation the training and monitoring the performance of all employees of Company, ensuring that the Business is adequately staffed, and directing all employees in accordance with Company's policies and procedures;

- Developing marketing plans, including but not limited to promotional activities and advertising, and long-term business plans for Company, and implementing the plans approved by Company;

- Establishing, purchasing, and managing appropriate inventory and supply levels for the Business, including, but not limited to, supplies necessary for the production and distribution of cannabis as permitted under Applicable Law, office supplies, and technology supplies;

- Maintaining and renewing all of Company's Cannabis Licenses to ensure such Cannabis Licenses remain in good standing throughout the Term.  Provider shall be responsible for all out-of-pocket expenses, including governmental fees, consulting and professional fees, and other fees reasonably necessary to maintain and renew the Cannabis Licenses;

- Making or causing to be made all expenditures for operating the Business and the carrying out of the intent and purposes of the Agreement;

- Maintaining Company's facilities in good repair and working order;

- Overseeing, maintaining and supporting of technology systems, including seed to sale tracking system, point of sale systems, secure cash storage solutions, and confidential customer records;

- Tracking retail drivers as they make deliveries and managing any issues that arise, including general questions from drivers, responding to vehicle mechanical problems, and maintaining all retail deliveries on-schedule;

- Overseeing and managing the Company's Metrc account with access provided by the Company including having a responsible party complete the Metrc account manager training program;

- Ensuring compliance with all Applicable Law;

- Negotiating and facilitating contracts on behalf of Company; and

- Performing or causing to be performed all other activities in furtherance of the day-to-day operation of the Business as Provider determines are reasonably necessary or appropriate for the operation

Initials: _____, _____

or management of the Business, at Provider's sole expense, provided such activities are consistent with the Agreement.

[End of Page]

**Exhibit B**

**Form of Assignment of Membership Interests**

**[See Attached]**

B-1

BN 83011036v1

**ASSIGNMENT OF MEMBERSHIP INTERESTS IN
PEOPLE'S FIRST CHOICE, LLC**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers unto Haven Nectar LLC [100%] of the equity interest of the undersigned's right, title, and interest in and to PEOPLE'S FIRST CHOICE, LLC, a California limited liability company (the "**Company**"), including, without limitation, the undersigned's ownership and/or units in the Company and does hereby constitute and appoint the manager of the Company as its true and lawful attorney, irrevocable for it and in its name and stead and at the undersigned's own cost and charge, to take all lawful ways and means for the recovery and enjoyment thereof, and for that purpose to make and execute all necessary acts of assignment hereby ratifying and confirming all that its said attorney or its substitutes, shall lawfully do by virtue hereof.  This assignment shall be effective as of the date set forth below.

Dated: _____, 2024

**SELLERS:**

**Unrivaled Brands, Inc.**


By:_____
　　　Sabas Carrillo, CEO


**People's California, LLC**


By:_____
　　　Bernard Steinmann, Authorized Signatory

**BUYER:**


**Haven Nectar LLC**


_____
Shubham Pandey, CEO

B-2

**Exhibit C**

**Secured Promissory Note**

[See attached]

BN 83011036v1

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THIS SECURITY MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## SECURED PROMISSORY NOTE

$1,000,000.00                                                                  June 10, 2024

FOR VALUE RECEIVED, Haven Nectar LLC, a California corporation ("Borrower"),  hereby promises to pay to the order of People's California, LLC, a California limited liability company (together with any and all of its successors and assigns and/or any other holder of this Note, as hereinafter defined, "Lender"), without offset, in immediately available funds in lawful money of the United States of America, the principal sum of One Million and 00/100 Dollars ($1,000,000.00) (the "Loan Amount"), together with any Default Interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

Subject to the terms and conditions herein, on the date hereof, Lender shall make a loan (the "Loan") to Borrower, in an aggregate amount equal to the Loan Amount.  Once the Loan is made, any portion of the Loan repaid may not be re borrowed.

Section 1        Payment Schedule Amount.  This Note shall be payable in accordance with the following:

(a)        Payment Schedule.

(i)        Except for the Default Interest, interest shall not accrue on the unpaid balance of this Note.

(ii)        The principal balance of the Loan shall be payable in twenty-four (24) equal monthly installments of principal, commencing on June 10, 2024, and continuing on the first day of each calendar month thereafter.

(iii)        Any remaining principal balance on this Note and any Default Interest shall be payable in full on the earlier of (a) June 10, 2026, and (b) the earlier acceleration of this Note pursuant to the terms hereof (the "Maturity Date").

Section 2        Security; Guaranty; Loan Documents.  The security for this Note includes: (a) a Security Agreement (the "Security Agreement") of even date herewith from Borrower, for the benefit of Lender, conveying and encumbering the Collateral (as defined therein), for the benefit of Lender, conveying and encumbering the Collateral (as defined therein), and (b) a Guaranty and Security Agreement (the "Guarantor Security Agreement") of even date herewith from the Acquired Company (as defined therein), for the benefit of Lender, conveying and encumbering the Collateral (as defined therein).  This Note, the Borrower Security Agreement and the Guarantor Security Agreement, and all other documents now or hereafter securing, guaranteeing or executed in connection with the Loan, as the same may from time to

time be amended, restated, modified or supplemented, are herein sometimes called individually a "<u>Loan Document</u>" and together the "<u>Loan Documents</u>."

Section 3    <u>Default Interest</u>. During any period in which there exists an uncured breach or Event of Default by Borrower, and at all times following the Maturity Date, interest will accrue and be calculated and payable on the unpaid balance of the Loan at the rate of ten percent (10.00%) per year, compounded monthly.

Section 4    <u>Prepayment</u>.  Borrower may prepay the principal balance of this Note, in full at any time without payment of premium or penalty.

Section 5    <u>Late Charges</u>.  If Borrower shall fail to make any payment under the terms of this Note (other than the payment due at the Maturity Date) within thirty (30) days after the date such payment is due, Borrower shall pay to Lender on demand a late charge equal to five percent (5%) of the amount of such payment.  Such thirty (30) day period shall not be construed as in any way extending the due date of any payment.  The late charge is imposed for the purpose of defraying the expenses of Lender incident to handling such delinquent payment.  This charge shall be in addition to, and not in lieu of, any other amount that Lender may be entitled to receive or action that Lender may be authorized to take as a result of such late payment.

Section 6    <u>Certain Provisions Regarding Payments</u>.  All payments made under this Note shall be applied, to the extent thereof, first to late charges, then to accrued but unpaid Default Interest, and any balance to unpaid principal in the direct order of maturity, and to any other sums due and unpaid to Lender under the Loan Documents.  Remittances shall be made without offset, demand, counterclaim, deduction, or recoupment (each of which is hereby waived) and shall be accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the amount then due on any indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined), (b) waive, impair or extinguish any right or remedy available to Lender hereunder or under the other Loan Documents, or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect.  Payments received after 2:00 p.m. Pacific Time shall be deemed to be received on, and shall be posted as of, the following Business Day.  Whenever any payment under this Note or any other Loan Document falls due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

Section 7    <u>Events of Default</u>.  The occurrence of any Event of Default (as defined), under any of the Loan Documents (subject to any applicable grace or cure period) shall constitute an Event of Default under this Note.

Section 8    <u>Remedies</u>.  Upon the occurrence of an Event of Default, Lender may at any time thereafter exercise any one or more of the following rights, powers and remedies:

(a)    If an Event of Default under Section 7 has continued for a period of thirty (30) days, Lender may accelerate the Maturity Date of this Note and declare the unpaid principal balance and accrued but unpaid Default Interest on this Note, and all other amounts payable hereunder and under the other Loan Documents, at once due and payable, and upon such declaration the same shall at once be due and payable.

(b)    If Borrower fails to pay, when due, the obligations set forth under this Note, and such failure continues for a period of at least forty-five (45) consecutive days, Lender may seek recovery against

the Collateral and exercise all rights and remedies under the Borrower Security Agreement or the Guarantor Security Agreement.

(c)      Lender may set off the amount due against any and all accounts, credits, money, securities or other property now or hereafter on deposit with, held by or in the possession of Lender to the credit or for the account of Borrower, without the consent of Borrower.

(d)      Lender may exercise any of its other rights, powers and remedies under the Loan Documents or at law or in equity, including, but not limited to, immediately exercising all rights under the Borrower Security Agreement or the Guarantor Security Agreement subject to clause (b) above.

Section 9      Remedies Cumulative.  All of the rights and remedies of Lender under this Note and the other Loan Documents are cumulative of each other and of any and all other rights at law or in equity, and the exercise by Lender of any one or more of such rights and remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other rights and remedies.  No single or partial exercise of any right or remedy shall exhaust it or preclude any other or further exercise thereof, and every right and remedy may be exercised at any time and from time to time.  No failure by Lender to exercise, nor delay in exercising, any right or remedy shall operate as a waiver of such right or remedy or as a waiver of any Event of Default.

Section 10      Costs and Expenses of Enforcement.  Borrower agrees to pay to Lender on demand all actual out-of-pocket costs and expenses incurred by Lender in seeking to collect this Note or to enforce any of Lender's rights and remedies under the Loan Documents, including court costs and reasonable attorneys' fees and expenses, whether or not suit is filed hereon, or whether in connection with arbitration, judicial reference, bankruptcy, insolvency or appeal.

Section 11      Heirs, Successors and Assigns.  The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties.  The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents.

Section 12      General Provisions.  Time is of the essence with respect to Borrower's obligations under this Note.  Borrower hereby (a) waives demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agrees that Lender shall not be required first to institute suit or exhaust its remedies hereon against Borrower or to perfect or enforce its rights against Borrower or any security herefor; (c) consents to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after the Maturity Date, and to any other indulgences with respect hereto, without notice thereof to any of them; (d) submits (and waives all rights to object) to non-exclusive personal jurisdiction of California or federal court sitting in California in the County of Orange for the enforcement of any and all obligations under this Note and the other Loan Documents; (e) waives the benefit of all homestead and similar exemptions as to this Note; (f) agrees that its liability under this Note shall not be affected or impaired by any determination that any title, security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (g) hereby subordinates to the Loan and the Loan Documents any and all rights against Borrower and any security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full.  This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought.  Captions and headings in this Note are for convenience only and shall be disregarded in construing it.  This Note and its validity, enforcement and interpretation shall be governed by the laws of the State of California (without

regard to any principles of conflicts of laws) and applicable United States federal law. Any proceeding to enforce and/or interpret this Note shall occur in the County of Orange, State of California. Whenever a time of day is referred to herein, unless otherwise specified such time shall be the local time of the place where payment of this Note is to be made. The term "Business Day" shall mean a day on which banks are open for the conduct of substantially all of its banking business at its office in the city in which this Note is payable (excluding Saturdays and Sundays). The words "include" and "including" shall be interpreted as if followed by the words "without limitation." Neither Lender nor Borrower may assign this Note without the prior written consent of the other party, which consent shall not be unreasonably withheld, provided, however, that Lender may assign this Note without such prior written consent to an affiliate of Lender.

Section 13      Severability. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

Section 14      Notices.  Any notice, request, or demand to or upon Borrower or Lender shall be deemed given and complete upon personal delivery, or three (3) business days following mailing via United States registered or certified mail, return receipt requested, postage prepaid.  Notice may also be given by, and shall be deemed complete upon receipt of, electronic facsimile, provided that any facsimile notice shall only be deemed received if (a) the transmission thereof is confirmed, and (b) facsimile notice followed by written notice, made either by (i) personal delivery thereof, or (ii) via deposit in registered or certified mail, return receipt required, postage prepaid, within three (3) business days following the facsimile notice. Notice shall be deemed given on the date it is sent via facsimile in accordance with the foregoing provisions. Notices shall be addressed to the parties as follows:

To Borrower:

Haven Nectar LLC
Attn: Shubham Pandey, Manager
2633 Mckinney Avenue
Suite 180-791
Dallas, TX  75204
shubham@usaeducationfund.com

To Lender:

People's California, LLC
Attn: Bernard Steimann
3843 S. Bristol St., #614
Santa Ana, CA 92704
Email: Bernard@peoplescali.com

With Copy to:
Deron M. Colby, Esq.
22 Executive Park, Suite 250
Irvine, CA 92614
Email: dcolby@januscapitallaw.com

Section 15      No Usury.  It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent

that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section shall control every other covenant and agreement in this Note and the other Loan Documents.  If applicable state or federal law should at any time be judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Loan, or if Lender's exercise of the option to accelerate the Maturity Date, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of this Note and all other indebtedness secured by the Loan Documents, and the provisions of this Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder.  All sums paid or agreed to be paid to Lender for the use or forbearance of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan.

       Section 16     <u>Assignment</u>. Assignment.  Borrower may not assign this Note without the prior written consent of Lender, which consent shall not be unreasonably withheld. Lender may assign this Note without the prior written consent of Borrower.

       IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

Borrower:

Haven Nectar LLC
a California limited liability company

By:_____
Name:  Shubham Pandey
Title:  Manager

**Exhibit D**

**Pledge Agreement**

**[See attached]**

D-1

## GUARANTY AND SECURITY AGREEMENT

THIS GUARANTY AND SECURITY AGREEMENT (as may be amended, supplemented or otherwise modified from time to time, this "Agreement") dated as of June 10, 2024, is made by People's First Choice, LLC, a California limited liability company ("Pledgor" or "Guarantor"), in favor of People's California, LLC, a California limited liability company ("Lender").

## RECITALS

WHEREAS, Haven Nectar LLC, a California limited liability company ("Borrower"), entered into that certain Membership Interest Purchase Agreement, dated effective as of June 10, 2024 (the "MIPA"), by and among Borrower, Lender, Guarantor and Unrivaled Brands, Inc., a Nevada corporation.

WHEREAS, concurrently with or prior to the execution of this Agreement, Borrower acquired all of the issued and outstanding membership interests of Guarantor, pursuant to the terms of the MIPA;

WHEREAS, in connection with the MIPA, Lender has made a loan to Borrower evidenced by the Secured Promissory Note dated of even date herewith in the aggregate original principal amount of $1,000,000 (as the same may from time to time be amended, restated or otherwise modified, the "Note");

WHEREAS, Guarantor desires that Lender grant to Borrower the financial accommodations as described in the Note;

WHEREAS, Guarantor deems it to be in the direct pecuniary and business interests of Guarantor that Borrower obtain from Lender the Loan provided for in the Note; and

WHEREAS, in order to secure the Obligations (as defined below), Pledgor has agreed to pledge and grant a security interest in the Collateral (as defined below).

NOW THEREFORE, Guarantor understands that Lender is willing to enter into the Note and grant the financial accommodations provided for in the Note only upon certain terms and conditions, one of which is that Guarantor guarantee the payment of the Obligations, and this Agreement is being executed and delivered in consideration of Lender entering into the Note and each financial accommodation granted to Borrower by Lender, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor has agreed to enter into this Agreement for the benefit of the Lender.

Accordingly, the parties hereto agree as follows:

Section 1.        Definitions and Accounting Matters.

1.1    Definitions.  Capitalized terms used herein but not defined shall have the meaning ascribed thereto in the Note, or as applicable, the Uniform Commercial Code (as defined below).  In addition, as used herein:

"Agreement" has the meaning set forth in the introductory paragraph hereof.

"Borrower" has the meaning set forth in the introductory paragraph hereof.

"Collateral" means, collectively, (a) all of Pledgor's existing and future assets, including, but not limited to, (i) personal property, (i) accounts, (ii) chattel paper, (iii) deposit accounts, (iv) documents, (v) electronic chattel paper, (vi) equipment, (vii) fixtures, (viii) general intangibles (including

intellectual property rights), (ix) goods, (x) letter of credit rights, (xi) health care insurance receivable, (xii) instruments, (xiii) inventory, (xiv) investment property, (xv) payment intangible, (xvi) software, (xvii) tangible chattel paper, (xviii) general intangibles, and (xix) Pledged Securities; and (b) proceeds and products of any of the foregoing. Notwithstanding the foregoing, the term "Collateral" shall not include Pledgor's interest in the Trademark License Agreement entered into by and between Pledgor and Blum Management Holdings, Inc., a Delaware corporation, on the date hereof.

"Guarantor" has the meaning set forth in the introductory paragraph hereof.

"Guaranty Collateral" means, collectively, (a) the Collateral, and (b) all other property, if any, securing the Obligations or any part thereof at the time in question, whether under the Note or under that certain Security Agreement executed by Borrower in favor of Lender on the date hereof, or otherwise.

"Lien" shall mean, with respect to any property or asset, any lien, security interest, mortgage, pledge, charge, claim, lease, agreement, right of first refusal, option, limitation on transfer or use or assignment or licensing, restrictive easement, charge or any other encumbrance or restriction of any kind or other preferential arrangement having the practical effect of any of the foregoing, including any restriction on the ownership, use, voting, transfer, possession, receipt of income or other exercise of any attributes of ownership, in respect of such property or asset.

"Obligations" means, collectively, (a) all of Borrower's indebtedness and other obligations now or hereafter incurred by Borrower to Lender under the Note and the other Loan Documents, and includes the principal of and interest on the Loan until all of such obligations are satisfied, (b) each renewal, extension, consolidation or refinancing of any of the foregoing, in whole or in part; and (c) all costs and expenses, including reasonable attorneys' fees, incurred by Lender in connection with the collection of the obligations described in subparts (a) and (b) above or the enforcement of Pledgor's obligations under this Agreement, the Note or any other Loan Documents.

"Obligor" means any Person that, or any of whose property, is or shall be obligated on the Obligations or any part thereof in any manner and includes, without limiting the generality of the foregoing, Borrower or Guarantor, and any other co-maker, endorser, guarantor of payment, subordinating creditor, assignor, grantor of a security interest, pledgor, mortgagor or any hypothecator of property, if any.

"Person" means natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities.

"Pledged Securities" means (a) all of the shares of capital stock or other equity interests of a subsidiary of Pledgor, whether now owned or hereafter acquired or created, and all proceeds thereof collectively, (b) each addition, if any, thereto and each substitution, if any, therefor, in whole or in part, (c) the certificates representing the Pledged Securities, if any, and (d) the dividends, cash, instruments and other property distributed in respect of and other proceeds of any of the foregoing. As of the date hereof, the existing Pledged Securities are listed on the attached Exhibit A.

"Pledgor" has the meaning set forth in the introductory paragraph hereof.

"Pledgor Organizational Documents" means the operating agreement and other organizational documents of Pledgor.

"Revenue Payments" shall mean all revenue payments actually received by Guarantor

2

during an ongoing Event of Default.

"Transfer" has the meaning set forth in Section 5.5 hereof.

"UCC" means the Uniform Commercial Code as in effect on the date hereof in the State of California; provided, however, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest in any item or portion of the collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California, then UCC means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

Section 2.    Guaranty.

2.1    Guaranty of Obligations.  Guarantor hereby absolutely and unconditionally guarantees (as a guaranty of payment and not merely a guaranty of collection) the prompt payment in full of all of the Obligations as and when the respective parts thereof become due and payable.  If the Obligations, or any part thereof, shall not be paid in full when due and payable, Lender, in each case, shall have the right to proceed directly against Guarantor under this Agreement to collect the payment in full of the Obligations, regardless of whether or not Lender shall have theretofore proceeded or shall then be proceeding against Borrower or any other Obligor or Guaranty Collateral, if any, or any of the foregoing, it being understood that Lender, in its sole discretion, may proceed against any Obligor and any Guaranty Collateral and may exercise each right, power or privilege that Lender may then have, either simultaneously or separately, and, in any event, at such time or times and as often and in such order as Lender, in its sole discretion, may from time to time deem expedient to collect the payment in full of the Obligations.  Guarantor agrees that all payments made by Guarantor under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of any taxes.

2.2    Payments Conditional.  Whenever Lender shall credit any payment to the Obligations or any part thereof, whatever the source or form of payment, the credit shall be conditional as to Guarantor unless and until the payment shall be final and valid as to all the world.  Without limiting the generality of the foregoing, Guarantor  agrees that, if any check or other instrument so applied shall be dishonored by the drawer or any party thereto, or if any proceeds of Guaranty Collateral or payment so applied shall thereafter be recovered by any trustee in bankruptcy or any other Person, Lender, in each case, may reverse any entry relating thereto on its books and Guarantor shall remain liable therefor, even if Lender may no longer have in its possession any instrument evidencing the Obligations to which the payment in question was applied.

2.3    Guarantor's Obligations Absolute and Unconditional.  Regardless of the duration of time, regardless of whether Borrower may from time to time cease to be indebted to Lender and irrespective of any act, omission or course of dealing whatsoever on the part of Lender, Guarantor liabilities and other obligations under this Agreement shall remain in full effect until the payment in full of the Obligations.

2.4    Lender Has No Duty to Make Financial Accommodations.  Lender shall not at any time be under any duty to Guarantor to grant any financial accommodation to Borrower, irrespective of any duty or commitment, if any, of Lender to Borrower, or to follow or direct the application of the proceeds of any such financial accommodation.

2.5    Guarantor's Waiver of Notice, Presentment.  Guarantor waives (a) notice of the granting of any loan to Borrower or the incurring of any other indebtedness by Borrower or the terms and conditions thereof, (b) presentment, demand for payment and notice of dishonor of the Obligations or any part thereof,

3

or any other indebtedness incurred by Borrower to Lender, (c) notice of any indulgence granted to any Obligor, and (d) any other notice to which Guarantor might, but for this waiver, be entitled.

2.6     <u>Lender's Rights Not Prejudiced by Action or Omission</u>.  Lender, in its sole discretion, may, without any prejudice to its rights under this Agreement, at any time or times, without notice to or the consent of Guarantor, (a) grant Borrower whatever financial accommodations that Lender may from time to time deem advisable, even if Borrower might be in default in any respect and even if those financial accommodations might not constitute indebtedness the payment of which is guaranteed hereunder, (b) assent to any renewal, extension, consolidation or refinancing of the Obligations or any part thereof, (c) forbear from demanding security, if Lender shall have the right to do so, (d) release any Obligor or Collateral or assent to any exchange of Guaranty Collateral, if any, irrespective of the consideration, if any, received therefor, (e) grant any waiver or consent or forbear from exercising any right, power or privilege that Lender may have or acquire, (f) assent to any amendment, deletion, addition, supplement or other modification in, to or of any writing evidencing or securing any of the Obligations or pursuant to which any of the Obligations are created, (g) grant any other indulgence to any Obligor, (h) accept any Guaranty Collateral for, or any other Obligor upon, the Obligations or any part thereof, and (i) fail, neglect or omit in any way to realize upon any Guaranty Collateral, to perfect any security interest with respect to Guaranty Collateral, or to protect the Obligations or any part thereof or any Guaranty Collateral therefor.

2.7     <u>Liabilities Survive Guarantor's Dissolution</u>.  Guarantor's liabilities and other obligations under this Agreement shall survive any dissolution of Guarantor.

2.8     <u>Liabilities Absolute and Unconditional</u>.  Guarantor's liabilities and other obligations under this Agreement shall be absolute and unconditional irrespective of any lack of validity or enforceability of the Note, any Loan Document or any other agreement, instrument or document evidencing the Loan or related thereto, the existence of any claim, set-off or other rights that Guarantor may have against Borrower or any other Person, or any other defense available to Guarantor in respect of this Agreement (other than the payment in full of the Obligations).

2.9     <u>Guarantor's Obligations Independent</u>.  The obligations of Guarantor hereunder are as set forth in this Agreement and are independent of the obligation of any other Obligor, and a separate action or actions may be brought and prosecuted against Guarantor whether or not any action is brought against any other Obligor and whether or not any other Obligor is joined in any such action.

2.10    <u>Waiver of Guarantor's Rights Against Borrower and Guaranty Collateral</u>.  To the extent permitted by law, Guarantor  hereby waives any claim or other right that Guarantor might now have or hereafter acquire against Borrower or any other Obligor that arises from the existence or performance of Guarantor's liabilities or other obligations under this Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, and any right to participate in any claim or remedy of Lender against Borrower or any Guaranty Collateral that Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, until such time as the Obligations (other than contingent indemnity obligations) have been repaid in full.

2.11    <u>Full Recourse Obligations; Effect of Fraudulent Transfer Laws</u>.  It is the desire and intent of Guarantor  and Lender that this Agreement shall be enforced as a full recourse obligation of Guarantor to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  If and to the extent that the obligations of Guarantor under this Agreement would, in the absence of this sentence, be adjudicated to be invalid or unenforceable because of any applicable state or federal law relating to fraudulent conveyances or transfers, then the amount of Guarantor's liability

hereunder in respect of the Obligations shall be deemed to be reduced *ab initio* to that maximum amount that would be permitted without causing Guarantor's obligations hereunder to be so invalidated.

2.12    Stay of Acceleration.  In the event that acceleration of the time for payment of any of the Obligations is stayed, upon the insolvency, bankruptcy or reorganization of Borrower or any other Person, or otherwise, the Obligations shall nonetheless be payable by Guarantor immediately upon demand by Lender.

Section 3.    Pledge and Delivery of Collateral.

3.1    The Pledge and Collateral.  As collateral security for the prompt payment and performance in full when due (whether at stated maturity by acceleration or otherwise) of the Obligations, Pledgor hereby grants to Lender a senior Lien on and a first-priority security interest in all of the Collateral, including (without limitation) all of Pledgor's future Collateral, irrespective of any lack of knowledge by Lender of the creation or acquisition thereof.

3.2    Delivery of the Collateral.  During the continuance of an Event of Default, Lender shall have the right, at any time in its discretion and without notice to Pledgor, to transfer to or to register in the name of Lender or its nominee any or all of the Collateral, to be held by Lender or such nominee as security for the Obligations until (i) sold in accordance with this Agreement and applicable law or (ii) the Obligations have otherwise been satisfied.

3.3    Reinstatement.  The obligations of Pledgor under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of Pledgor in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 4.    Representations and Warranties.  Pledgor represents and warrants to Lender as of the date hereof that:

4.1    Existence.  Pledgor (i) is a limited liability company or corporation, as the case may be, organized under the State of California, (ii) has all requisite power, has all material governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, and (iii) is not insolvent, as defined in any applicable state or federal statute.

4.2    No Breach.  None of the execution and delivery of this Agreement, the Note, the other Loan Documents, or the consummation of the transactions herein or therein contemplated or compliance with the terms and provisions hereof or thereof will, conflict with or result in a breach of or require any consent (other than any consent that has been obtained) under the Pledgor Organizational Documents or any applicable law or regulation, or any order, writ, injunction or decree of any court or governmental authority or agency, or any agreement or instrument to which Pledgor is a party or by which Pledgor is bound or to which it is subject, or constitute a default under any such agreement or instrument, or (except for the Lien arising under this Agreement) result in the creation or imposition of any Lien upon any of the revenues or assets of Pledgor pursuant to the terms of any such agreement or instrument.

4.3    Necessary Action.  Pledgor has all necessary power and authority to execute, deliver and perform its obligations under this Agreement, the Note, the other Loan Documents; the execution, delivery and performance by Pledgor of this Agreement, the Note, the other Loan Documents have been duly authorized by all necessary action on its part; and this Agreement, the Note, the other Loan Documents have been duly and validly executed and delivered by Pledgor and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms, except as limited by (i) applicable bankruptcy,

insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief and other equitable remedies.

      4.4    <u>Approvals</u>.  No authorizations, approvals and consents of, and no filings and registrations with, any governmental or regulatory authority or agency are necessary for (a) the execution, delivery or performance by Pledgor of this Agreement, the Note, the other Loan Documents, or for the validity or enforceability thereof, (b) the grant by Pledgor of the assignments and security interests granted hereby; or the pledge by Pledgor of the Collateral pursuant hereto, (c) the perfection or maintenance of the pledge, assignment and security interest created hereby (including the first priority nature of such pledge, assignment and security interest) except for the filing of financing statements under the UCC or (d) the exercise by Lender of all rights and remedies in respect of the Collateral pursuant to this Agreement.

      Section 5.      <u>Covenants</u>.  Pledgor covenants and agrees that, until the payment and satisfaction in full of the Obligations:

      5.1    <u>Existence, etc</u>.  Pledgor shall preserve and maintain its existence and all of its material rights, privileges and franchises.  Pledgor shall comply with the requirements of all applicable laws, rules, regulations and orders of governmental or regulatory authorities.  Pledgor shall pay and discharge all taxes, assessments and governmental charges or levies imposed on them or on their income or profits or on any of their property prior to the date on which penalties attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings. Pledgor shall promptly provide Lender with written notice of correspondence from any governmental, regulatory or taxing authorities that Pledgor is in material violation of any law, rule or regulation with respect to the Collateral or Pledgor and which would reasonably be expected to impact Pledgor's compliance with its obligations hereunder.

      5.2    <u>Limitation on Sale and Liens</u>.  Pledgor shall not create or incur any Lien upon any of the Collateral except (i) the Liens created hereby; (ii) Liens existing as of or prior to the date hereof; and (iii) Liens that arise in connection with or as a result of the Closing (as defined in the MIPA).  Pledgor shall not file or suffer to be on file, or authorize or permit to be filed or to be on file, in any jurisdiction, any financing statement or like instrument with respect to the Collateral in which Lender is not named as the sole secured party.  Pledgor shall not transfer or create, incur or suffer to exist any Lien on the Collateral, other than the Lien created under this Agreement. Notwithstanding anything to the contrary contained herein, Pledgor shall be permitted to sell, transfer, convey, or otherwise dispose of any inventory, including cannabis inventory, in the ordinary course of business of Pledgor, and any such sale, transfer, conveyance or disposal shall not be deemed a breach of, event of default under, or a violation of, any of the terms of this Agreement.

      5.3    <u>Non-Petition</u>.  Pledgor agrees that it will not take any action to petition itself into bankruptcy or to enable any of the aforementioned to seek relief under any federal or state bankruptcy law.

      5.4    <u>Preservation of Collateral</u>.  Lender may, without Pledgor's prior written consent, for the account and reasonable expense of Pledgor, pay any amount or do any act required of Pledgor hereunder or reasonably requested by Lender to preserve, protect, maintain or enforce the Obligations, the Collateral or the security interests granted herein, and which Pledgor fails to do or pay within thirty (30) days of Lender's reasonable request therefor, and any such undisputed payments shall be deemed an advance by Lender to Pledgor and shall be payable by Pledgor within thirty (30) days after written demand, together with interest thereon, at the rate of interest then applicable to the Obligations from the date expended by Lender until paid.

5.5    Pledged Securities.  Pledgor shall not (a) vote or agree to issue certificates or other evidence of the Pledged Securities unless all such certificates or other evidence of the Pledged Securities have been delivered to Lender, together with undated transfer powers duly executed in blank by Pledgor or such other instruments of transfer as are acceptable to Lender, promptly after the issuance thereof, or (b) vote or agree to allow the Pledged Securities to become an uncertificated security under Article 8 of the Uniform Commercial Code as in effect in any applicable state from time to time unless, promptly after the Pledged Securities become uncertificated securities, the Pledgor provides to Lender a control agreement in form and substance satisfactory to Lender that perfects in favor of Lender a first-priority security interest in such uncertificated security.

5.6    Indebtedness.  (a) On the date hereof, Pledgor is not obligated under or in connection with any Indebtedness, other than such indebtedness as listed on the attached Exhibit B, in an aggregate amount not to exceed the balance thereof as listed on such Exhibit B (the "Permitted Indebtedness"), and any indebtedness or other financing obligations existing prior to the date hereof, other than Permitted Indebtedness, have been paid in full, terminated and are of no further effect and any liens or obligations in connection therewith have been released, and (b) on and after the date hereof, Pledgor shall not create, incur, assume, or be liable for any indebtedness, other than Permitted Indebtedness.

Section 6.    Payments With Respect to the Collateral.  During the continuance of an Event of Default, Lender shall collect, retain, control and distribute all Revenue Payments in such manner and priority as shall be determined by Lender and, in addition, may make any compromise or settlement deemed desirable by Lender with respect to, all or any of the Collateral, and/or extend the time of payment, arrange for payment in installments, or otherwise modify the terms of or release all or any of the Collateral, all without notice to or consent by Pledgor and without otherwise discharging or affecting the Obligations or the security interests granted herein except to the extent the Obligations are satisfied thereby.  If during the continuance of an Event of Default Pledgor receives any Revenue Payments, Pledgor shall hold the same in trust for Lender, shall not commingle them with other funds of Pledgor and shall immediately deliver and pay over same to Lender all such payments and to become part of the Collateral for disposition pursuant to the terms of this Agreement.

Section 7.    Further Assurances: Remedies.  In furtherance of the grant of the security interest pursuant to Section 3 hereof, Pledgor hereby agrees with Lender as follows:

7.1    Delivery and Other Perfection.  Pledgor shall, upon written request by Lender, give, execute, deliver, file and/or record any financing statement, notice, instrument, document, agreement or other papers that are legally necessary to create, preserve, perfect or validate the security interest granted pursuant hereto or to enable Lender to exercise and enforce its rights hereunder with respect to such pledge and security interest. Pledgor hereby irrevocably authorizes Lender to at any time and from time to time file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto relative to all or any part of the Collateral but only after first providing Pledgor with copies of any such financing statements and amendments. Pledgor also ratifies its authorization for Lender to file in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof. Pledgor shall reimburse Lender all its costs and expenses, including attorneys' fees, related to Lender exercising its rights hereunder.

7.2    Pledged Collateral.

(a)    Pledgor shall not nor shall have the right to directly or indirectly, without the prior written consent of Lender, attempt to waive, alter, amend, modify, supplement or change in any way, or release, subordinate, terminate or cancel in whole or in part, or give any consent under, any of the instruments, documents, policies or agreements constituting the Collateral or exercise any of the rights,

options or interests of Pledgor as party, holder, Lender or beneficiary thereunder.  Pledgor agrees that all rights to do any and all of the foregoing have been pledged to and, following an Event of Default, may be exercised by Lender, and Pledgor agrees, upon reasonable request from Lender, from time to time to (i) do any of the foregoing, (ii) join Lender in doing so, or (iii) confirm the right of Lender to do so and shall execute such instruments and undertake such actions as Lender may reasonably request in connection therewith.  Unless Pledgor shall have provided prior written notice and received the written consent of Lender, Pledgor shall not make any election, compromise, adjustment or settlement in respect of any of the Collateral.  Notwithstanding anything herein to the contrary, so long as no Event of Default shall have occurred and be continuing, Pledgor shall have the right to exercise all of Pledgor's rights under the Pledgor Organizational Documents to which it is a party (and in the ordinary course of business) for all purposes not inconsistent with any of the terms of this Agreement, the Note, the other Loan Documents or any other instrument or agreement referred to herein or therein, provided that Pledgor agrees that it will not take any action in any manner that is inconsistent with the terms of this Agreement, the Note, the other Loan Documents or any such other instrument or agreement.  All dividends and distributions paid in respect of the Collateral shall be directed by Lender, in its sole and absolute discretion, to repay the Obligations.  Lender shall execute and deliver to Pledgor or cause to be executed and delivered to Pledgor all such proxies, powers of attorney, distribution and other orders, and all such instruments, without representation, recourse or warranty, as Pledgor may reasonably request for the purpose of enabling Pledgor to exercise the rights and powers which they are entitled to exercise pursuant to this Section 7.2.

(c)    Anything to the contrary notwithstanding, (i)  Pledgor shall remain liable under the Pledgor Organizational Documents to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by Lender of any of the rights hereunder shall not release Pledgor from any of its duties or obligations under the Pledgor Organizational Documents, and (iii) Lender shall have no obligation or liability under the Pledgor Organizational Documents by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Pledgor thereunder to the extent arising prior to Lender taking title to the Collateral or to take any action to collect or enforce any claim for payment assigned hereunder.  Pledgor covenants that until such time as the Obligations are fully satisfied, (i) Pledgor shall, at its own expense, take any and all actions necessary or desirable to preserve, protect and defend the security interest of the Lender in the Collateral and the perfection and priority thereof against any and all adverse claims, including appearing in and defending all actions and proceedings which purport to affect any of the foregoing; (ii) Pledgor shall pay or cause to be paid all taxes and other levies with respect to the Collateral when the same become due and payable except to the extent contested in good faith with appropriate reserves therefor on Pledgor's books and records; (iii) and Pledgor shall not directly or indirectly, whether voluntarily, involuntarily, by operation of law or otherwise create or permit to exist any lien or other encumbrance on or with respect to any of the Collateral, except for liens for taxes not yet due and payable.

7.3    Events of Default.

The occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of law or otherwise, shall constitute an "Event of Default":

(a)    Borrower's failure to pay, when due, the Obligations set forth under the Note, provided that Borrower shall be granted a thirty (30) day period to cure such default following notice of such default from Lender to Borrower, provided, however, that in no event shall an Event of Default be deemed to have occurred if Borrower and/or its affiliates is withholding the unpaid amount(s) in connection with (a) a direct verifiable claim for indemnification that has been submitted for recovery under the indemnity provisions in the MIPA that apply to Lender, or (b) a third party claim that has been filed (i.e., a formal proceeding has been initiated) and which could reasonably be expected to result in damages recoverable under the indemnity provisions in the MIPA that are applicable to Lender;

8

(b)    Borrower or Pledgor materially breaches any term or condition of this Agreement, the Note, or the other Loan Documents;

(c)    the validity, binding effect or enforceability of this Agreement or any other Loan Document against Guarantor shall be contested by Guarantor, Guarantor shall deny that it has any or further liability or obligation under any Loan Document;

(d)    any proceeding, action, petition or filing under Title 11 of the United States Code entitled "<u>Bankruptcy</u>", as now and hereafter in effect or any successor statute (the "<u>Bankruptcy Code</u>"), or any similar state or federal law now or hereafter in effect relating to bankruptcy, reorganization or insolvency, or the arrangement or adjustment of debts affecting Pledgor, shall be filed by or against Pledgor, consented to or acquiesced in by Pledgor, or if Pledgor shall institute any proceeding with respect to the dissolution or liquidation of Pledgor, shall make an assignment for the benefit of creditors.

7.4    <u>After Events of Default</u>.  During the period during which an Event of Default shall have occurred and be continuing:

(a)    Pledgor shall not distribute, transfer, or encumber any of the Collateral;

(b)    If an Event of Default under Section 7.3(a) hereof has occurred and continues for a period of at least thirty (30) days, Lender (i) shall have all of the rights and remedies with respect to the Collateral of a secured party under the UCC (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if Lender were the sole and absolute owner of the Collateral, (ii) in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect or receive any money or property, at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so, and (iii) may, at its option, apply all or any part of the Collateral to the Obligations in such order and priority as shall be selected by Lender;

(c)    If Borrower or Pledgor has not cured such Event of Default within any cure period provided for herein but in no event later than forty-five (45) days of receiving a written notice of default, Lender may, upon notice to Pledgor as required by applicable law of the time and place, with respect to the Collateral or any part thereof which shall then be or shall thereafter come into the possession, custody or control of Lender or any of its agents, sell, assign or otherwise dispose of all or any part of such Collateral, at such place or places as Lender deems best, and for cash or on credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of time or place thereof (except such notice as is required above or by applicable statute and cannot be waived) and Lender or anyone else who may be the Lender, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale), and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of Pledgor, any such demand, notice or right and equity being hereby expressly waived and released.  Lender may, without publication but upon notice required by applicable law, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned; The proceeds of each collection, sale or other disposition under this <u>Section 7.4</u> shall be applied in accordance with <u>Section 7.5</u> hereof; and

9

(d)    Lender shall not be obligated to resort to its rights or remedies with respect to any other security for or guaranty of payment of the Obligations before resorting to its rights and remedies against Pledgor or the Collateral hereunder.  All rights and remedies of Lender shall be cumulative and not in the alternative.

7.5    <u>Application of Proceeds</u>.  Except as otherwise herein expressly provided, the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by Lender under this <u>Section 7</u>, shall be applied by Lender:

<u>First</u>, to the payment of the costs and expenses of such collection, sale or other realization, including reasonable out-of-pocket costs and expenses of Lender and the reasonable fees and expenses of their respective agents and counsel, and all reasonable expenses, and advances made or incurred by Lender in connection therewith;

<u>Second</u>, to the payment in full of the Obligations in such order as Lender may determine in its sole discretion; and

<u>Finally</u>, to the payment to Pledgor or to whomsoever may be lawfully entitled to receive any surplus then remaining.

As used in this <u>Section 7</u>, "proceeds" of Collateral shall mean cash, securities and other property realized in respect of, and distributions in kind of, Collateral, including any thereof received under any reorganization, liquidation or adjustment of debt of Pledgor or any issuer of or obligor on any of the Collateral.

7.6    <u>Attorney-in-Fact</u>.  During the continuance of any Event of Default, Lender is hereby appointed the attorney-in-fact of Pledgor solely for the purpose of carrying out the provisions of this <u>Section 7</u> and taking any reasonable action which Lender reasonably deems necessary to accomplish the purposes hereof.

7.7    <u>Enforcement Expenses</u>.  Except in connection with any indemnification claim made by a Pledgor pursuant to the MIPA where the indemnification obligation relates to Lender during an Event of Default, Pledgor agrees to pay the reasonable, documented, out-of-pocket expenses actually incurred by Lender that arise out of the enforcement of  the provisions of this <u>Section 7</u>, or performance by Lender of any obligations of Pledgor in respect of the Collateral which Pledgor has failed or refused to perform, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement in respect of any of the Collateral, and for the care of the Collateral and defending or asserting rights and claims of Lender in respect thereof, by litigation or otherwise and all such expenses shall be Obligations to Lender secured under <u>Section 3</u> hereof.

7.8    <u>Termination</u>.  Upon the payment,  performance in full, or reduction pursuant to the terms of the Note, this Agreement or the other Loan Documents of all Obligations, then this Agreement and the Note shall terminate, and Lender shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral received in respect thereof, to or on the order of Pledgor and Lender will promptly deliver, at Pledgor's sole cost, any UCC termination statements and any other releases and documentation necessary to evidence the same.

7.9    <u>Indemnification</u>. Pledgor agrees to indemnify and to hold the Lender harmless from and against all losses, liabilities, claims, damages, costs and expenses (including actual attorneys' fees and disbursements and court costs) ("<u>Losses</u>") arising out of third-party claims to the extent related to or arising

out of the Loan Documents or any actual or proposed use of proceeds of the Loan or any of the Obligations, but excluding any Losses to the extent any such Losses are indemnifiable by Lender under the MIPA.

7.10    Security Interest Absolute. All rights of Lender and security interests hereunder, and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of: (a) any lack of validity or enforceability of any of the Note, the other Loan Documents or any other agreement or instrument relating thereto; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any of the Note, the other Loan Documents or any other agreement or instrument relating thereto; (c) any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Obligations; or (d) any other circumstance which might otherwise constitute a defense available to, or a discharge of, Pledgor.

7.11    Waivers. To the fullest extent permitted by law Pledgor hereby waives any defense that may arise by reason of: any failure of Lender to marshal any present or future collateral security (including but not limited to the Collateral) or to resort to such collateral security or other assurances of payment in any particular order.  Pledgor acknowledges that each of the waivers set forth herein is made after consultation with legal counsel and with full knowledge of its significance and consequences.

Section 8.    Miscellaneous.

8.1    No Waiver.  No failure on the part of Lender or any of its agents to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by Lender or any of its agents of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  The remedies provided herein are cumulative and are not exclusive of any remedies provided by law.

8.2    GOVERNING LAW, JURISDICTION.  THIS AGREEMENT, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY CALIFORNIA LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW. ANY PROCEEDING TO ENFORCE AND/OR INTERPRET THIS AGREEMENT SHALL OCCUR IN THE COUNTY OF ORANGE, STATE OF CALIFORNIA.

8.3    Notices.  All notices, demands, consents, approvals, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder (collectively, "Notices") shall be in writing and shall be given by (a) personal delivery, (b) facsimile transmission or (c) a reputable overnight courier service, fees prepaid, addressed as follows:

To Pledgor:

Haven Nectar LLC
Attn: Shubham Pandey, Manager
2633 Mckinney Avenue
Suite 180-791
Dallas, TX  75204
shubham@usaeducationfund.com

To Lender:

People's California, LLC

11

Attn: Bernard Steimann
3843 S. Bristol St., #614
Santa Ana, CA 92704
Email: Bernard@peoplescali.com

With Copy to:
Deron M. Colby, Esq.
22 Executive Park, Suite 250
Irvine, CA 92614
Email: dcolby@januscapitallaw.com

Either Pledgor or Lender may designate another addressee (and/or change its address) for Notices hereunder by a Notice given pursuant to this Section 8.3.  A Notice sent in compliance with the provisions of this Section 8.3 shall be deemed given on the date of receipt.

8.4     Waivers, Modifications, etc.  The terms of this Agreement may be waived, altered, modified or amended only by an instrument in writing duly executed by Pledgor and Lender.  Any such waiver, alteration, modification, amendment or waiver shall be binding upon Lender and Pledgor.

8.5     Successors and Assigns.  This Agreement shall be binding upon the successors and permitted assigns of Pledgor and inure to the benefit of the successors and permitted assigns of Lender. Each representation and agreement made by Pledgor in this Agreement shall be deemed to run to, and each reference in this Agreement to Lender shall be deemed to refer to, Lender and each of its successors and assigns.

8.6     Further Assurances.  Pledgor and Lender agree that, at any time and from time to time, such parties shall execute and deliver such further documents and do such further acts and things as may be reasonably required in order to effect the purposes of this Agreement, the Note or the other Loan Documents, including, in the case of Lender, to execute and deliver any documentation required by any of Pledgor's affiliates' current or future lenders or creditors to clarify and confirm that the Collateral does not include any assets of Pledgor that are not specifically identified as "Collateral" herein which includes any of the assets of any of Pledgor's affiliates or any of the assets of Pledgor not existing and owned by Pledgor as of the date of the Closing (as defined in the MIPA).

8.7     Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.

8.8     Severability.  If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of Lender in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

8.9     Assignment.  Pledgor may not assign this Agreement without the prior written consent of Lender, which consent shall not be unreasonably withheld. Lender may assign this Agreement without the prior written consent of Pledgor.

8.10     Attorneys' Fees and Costs. Pledgor agrees to pay to Lender on demand all actual out-of-pocket costs and expenses incurred by Lender in seeking to enforce any of Lender's rights and remedies

under this Agreement, including court costs and reasonable attorneys' fees and expenses, whether or not suit is filed hereon, or whether in connection with arbitration, judicial reference, bankruptcy, insolvency or appeal.

IN WITNESS WHEREOF, Pledgor has caused this Agreement to be duly executed and delivered as of the date first above written.

**PLEDGOR**:

PEOPLE'S FIRST CHOICE, LLC

By:_____
Name: Shubham Pandey
Title: Chief Executive Officer

(Guaranty and Security Agreement)

EXHIBIT A

PLEDGED SECURITIES

| Pledgor | Name of Subsidiary | Jurisdiction of Subsidiary | Ownership Percentage |
|---|---|---|---|
| People's First Choice, LLC | N/A | California | 100% |

# EXHIBIT B

LIST OF PERMITTED INDEBTEDNESS

None.

**Exhibit E**

**Security Agreement**

[See attached]

E-1

BN 83011036v1

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (as may be amended, supplemented or otherwise modified from time to time, this "Agreement") dated as of June 10, 2024, is made by Haven Nectar LLC, a California limited liability company ("Pledgor"), in favor of People's California, LLC, a California limited liability company ("Lender").

## RECITALS

WHEREAS, Pledgor entered into that certain Membership Interest Purchase Agreement, dated effective as of June 10, 2024 (the "MIPA"), by and among Pledgor, Lender, Unrivaled Brands, Inc., a Nevada corporation, and People's First Choice, LLC, a California limited liability company ("PFC").

WHEREAS, concurrently with the execution of this Agreement, Pledgor acquired all of the issued and outstanding membership interests of PFC (the "Acquired Company"), pursuant to the terms of the MIPA and Lender has sold or agreed to sell to Pledgor twenty percent (20%) of those membership interests, pursuant to the terms of the MIPA;

WHEREAS, in connection with the MIPA, Lender has made a loan to Pledgor evidenced by the Secured Promissory Note dated of even date herewith in the aggregate original principal amount of $1,000,000 (as the same may from time to time be amended, restated or otherwise modified, the "Note"); and

WHEREAS, in order to secure the Obligations (as defined below), Pledgor has agreed to pledge and grant a security interest in the Collateral (as defined below).

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor has agreed to enter into this Agreement for the benefit of the Lender.

Accordingly, the parties hereto agree as follows:

Section 1.        Definitions and Accounting Matters.

1.1      Definitions.  Capitalized terms used herein but not defined shall have the meaning ascribed thereto in the Note, or as applicable, the Uniform Commercial Code (as defined below).  In addition, as used herein:

"Agreement" has the meaning set forth in the introductory paragraph hereof.

"Collateral" means, collectively, (a) the Pledged Securities and each addition, if any, thereto and each substitution, if any, therefor, in whole or in part, (b) the certificates representing the Pledged Securities, if any, and (c) the dividends, cash, instruments and other property distributed in respect of and other proceeds of any of the foregoing.

"Lien" shall mean, with respect to any property or asset, any lien, security interest, mortgage, pledge, charge, claim, lease, agreement, right of first refusal, option, limitation on transfer or use or assignment or licensing, restrictive easement, charge or any other encumbrance or restriction of any kind or other preferential arrangement having the practical effect of any of the foregoing, including any restriction on the ownership, use, voting, transfer, possession, receipt of income or other exercise of any attributes of ownership, in respect of such property or asset.

"<u>Obligations</u>" means, collectively, (a) all of Pledgor's indebtedness and other obligations now or hereafter incurred by Pledgor to Lender under the Note and the other Loan Documents, and includes the principal of and interest on the Loan until all of such obligations are satisfied, (b) each renewal, extension, consolidation or refinancing of any of the foregoing, in whole or in part; and (c) all costs and expenses, including reasonable attorneys' fees, incurred by Lender in connection with the collection of the obligations described in subparts (a) and (b) above or the enforcement of Pledgor's obligations under this Agreement, the Note or any other Loan Documents.

"<u>Person</u>" means natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities.

"<u>Pledged Securities</u>" means all of the shares of capital stock or other equity interest of the Acquired Company held by Pledgor, whether now owned or hereafter acquired or created, and all proceeds thereof.

"<u>Pledgor</u>" has the meaning set forth in the introductory paragraph hereof.

"<u>Pledgor Organizational Documents</u>" means the operating agreement and other organizational documents of the Pledgor.

"<u>Revenue Payments</u>" shall mean all revenue payments actually received by the Acquired Company during an ongoing Event of Default.

"<u>Transfer</u>" has the meaning set forth in <u>Section 4.5</u> hereof.

"<u>UCC</u>" means the Uniform Commercial Code as in effect on the date hereof in the State of California; provided, however, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interest in any item or portion of the collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California, then UCC means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

Section 2.        <u>Pledge and Delivery of Collateral</u>.

2.1    <u>The Pledge and Collateral</u>.  As collateral security for the prompt payment and performance in full when due (whether at stated maturity by acceleration or otherwise) of the Obligations, Pledgor hereby grants to Lender a senior Lien on and a first-priority security interest in all of the Collateral, including (without limitation) all of Pledgor's future Collateral, irrespective of any lack of knowledge by Lender of the creation or acquisition thereof.

2.2    <u>Delivery of the Collateral</u>.  During the continuance of an Event of Default, Lender shall have the right, at any time in its discretion and without notice to Pledgor, to transfer to or to register in the name of Lender or its nominee any or all of the Collateral, to be held by Lender or such nominee as security for the Obligations until (i) sold in accordance with this Agreement and applicable law or (ii) the Obligations have otherwise been satisfied.

2.3    <u>Reinstatement</u>.  The obligations of Pledgor under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of Pledgor in respect of the

Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 3.    <u>Representations and Warranties</u>.  Pledgor represents and warrants to Lender as of the date hereof that:

3.1    <u>Existence</u>.  Pledgor (i) is a limited liability company organized under the State of California, (ii) has all requisite power, has all material governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, and (iii) is not insolvent, as defined in any applicable state or federal statute.

3.2    <u>No Breach</u>.  None of the execution and delivery of this Agreement, the Note, the other Loan Documents, or the consummation of the transactions herein or therein contemplated or compliance with the terms and provisions hereof or thereof will, conflict with or result in a breach of or require any consent (other than any consent that has been obtained) under the Pledgor Organizational Documents or any applicable law or regulation, or any order, writ, injunction or decree of any court or governmental authority or agency, or any agreement or instrument to which Pledgor is a party or by which Pledgor is bound or to which it is subject, or constitute a default under any such agreement or instrument, or (except for the Lien arising under this Agreement) result in the creation or imposition of any Lien upon any of the revenues or assets of Pledgor pursuant to the terms of any such agreement or instrument.

3.3    <u>Necessary Action</u>.  Pledgor has all necessary power and authority to execute, deliver and perform its obligations under this Agreement, the Note, the other Loan Documents; the execution, delivery and performance by Pledgor of this Agreement, the Note, the other Loan Documents have been duly authorized by all necessary action on its part; and this Agreement, the Note, the other Loan Documents have been duly and validly executed and delivered by Pledgor and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief and other equitable remedies.

3.4    <u>Approvals</u>.  No authorizations, approvals and consents of, and no filings and registrations with, any governmental or regulatory authority or agency are necessary for (a) the execution, delivery or performance by Pledgor of this Agreement, the Note, the other Loan Documents, or for the validity or enforceability thereof, (b) the grant by Pledgor of the assignments and security interests granted hereby; or the pledge by Pledgor of the Collateral pursuant hereto, (c) the perfection or maintenance of the pledge, assignment and security interest created hereby (including the first priority nature of such pledge, assignment and security interest) except for the filing of financing statements under the UCC or (d) the exercise by Lender of all rights and remedies in respect of the Collateral pursuant to this Agreement.

Section 4.    <u>Covenants</u>.  Pledgor covenants and agrees that, until the payment and satisfaction in full of the Obligations:

4.1    <u>Existence, etc</u>.  Pledgor shall preserve and maintain its existence and all of its material rights, privileges and franchises.  Pledgor shall comply with the requirements of all applicable laws, rules, regulations and orders of governmental or regulatory authorities.  Pledgor shall pay and discharge all taxes, assessments and governmental charges or levies imposed on them or on their income or profits or on any of their property prior to the date on which penalties attach thereto, except for any such tax, assessment, charge or levy the payment of which is being contested in good faith and by proper proceedings. Pledgor shall promptly provide Lender with written notice of correspondence from any governmental, regulatory or taxing authorities that Pledgor is in material violation of any law, rule or regulation with respect to the

Collateral or the Acquired Company and which would reasonably be expected to impact Pledgor's compliance with its obligations hereunder.

4.2    <u>Limitation on Sale and Liens</u>.  Pledgor shall not create or incur any Lien upon any of the Collateral except (i) the Liens created hereby; (ii) Liens existing as of or prior to the date hereof; and (iii) Liens that arise in connection with or as a result of the Closing (as defined in the MIPA).  Pledgor shall not file or suffer to be on file, or authorize or permit to be filed or to be on file, in any jurisdiction, any financing statement or like instrument with respect to the Collateral in which Lender is not named as the sole secured party.  Pledgor shall not transfer or create, incur or suffer to exist any Lien on the Collateral, other than the Lien created under this Agreement. Notwithstanding anything to the contrary contained herein, the Acquired Company shall be permitted to sell, transfer, convey, or otherwise dispose of any inventory, including cannabis inventory, in the ordinary course of business of Acquired Company, and any such sale, transfer, conveyance or disposal shall not be deemed a breach of, event of default under, or a violation of, any of the terms of this Agreement

4.3    <u>Non-Petition</u>.  Pledgor agrees that it will not take any action to petition itself into bankruptcy or to enable any of the aforementioned to seek relief under any federal or state bankruptcy law.

4.4    <u>Preservation of Collateral</u>.  Lender may, without Pledgor's prior written consent, for the account and reasonable expense of Pledgor, pay any amount or do any act required of Pledgor hereunder or reasonably requested by Lender to preserve, protect, maintain or enforce the Obligations, the Collateral or the security interests granted herein, and which Pledgor fails to do or pay within thirty (30) days of Lender's reasonable request therefor, and any such undisputed payments shall be deemed an advance by Lender to Pledgor and shall be payable by Pledgor within thirty (30) days after written demand, together with interest thereon, at the rate of interest then applicable to the Obligations from the date expended by Lender until paid.

4.5    <u>Pledged Securities</u>.  Pledgor shall not (a) vote or agree to issue certificates or other evidence of the Pledged Securities unless all such certificates or other evidence of the Pledged Securities have been delivered to Lender, together with undated transfer powers duly executed in blank by Pledgor or such other instruments of transfer as are acceptable to Lender, promptly after the issuance thereof, or (b) vote or agree to allow the Pledged Securities to become an uncertificated security under Article 8 of the Uniform Commercial Code as in effect in any applicable state from time to time unless, promptly after the Pledged Securities become uncertificated securities, the Pledgor provides to Lender a control agreement in form and substance satisfactory to Lender that perfects in favor of Lender a first-priority security interest in such uncertificated security.

4.6    <u>Reserved</u>.

Section 5.    <u>Payments With Respect to the Collateral</u>.  During the continuance of an Event of Default, Lender shall collect, retain, control and distribute all Revenue Payments in such manner and priority as shall be determined by Lender and, in addition, may make any compromise or settlement deemed desirable by Lender with respect to, all or any of the Collateral, and/or extend the time of payment, arrange for payment in installments, or otherwise modify the terms of or release all or any of the Collateral, all without notice to or consent by Pledgor and without otherwise discharging or affecting the Obligations or the security interests granted herein except to the extent the Obligations are satisfied thereby.  If during the continuance of an Event of Default Pledgor receives any Revenue Payments, Pledgor shall hold the same in trust for Lender, shall not commingle them with other funds of Pledgor and shall immediately deliver and pay over same to Lender all such payments and to become part of the Collateral for disposition pursuant to the terms of this Agreement.

Section 6.    Further Assurances: Remedies.  In furtherance of the grant of the security interest pursuant to Section 2 hereof, Pledgor hereby agrees with Lender as follows:

6.1    Delivery and Other Perfection.  Pledgor shall, upon written request by Lender, give, execute, deliver, file and/or record any financing statement, notice, instrument, document, agreement or other papers that are legally necessary to create, preserve, perfect or validate the security interest granted pursuant hereto or to enable Lender to exercise and enforce its rights hereunder with respect to such pledge and security interest.  Pledgor hereby irrevocably authorizes Lender to at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto relative to all or any part of the Collateral but only after first providing Pledgor with copies of any such financing statements and amendments.  Pledgor also ratifies its authorization for Lender to file in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof. Pledgor shall reimburse Lender all its costs and expenses, including attorneys' fees, related to Lender exercising its rights hereunder.

6.2    Pledged Collateral.

(a)    Pledgor shall not and shall not have the right to directly or indirectly, without the prior written consent of Lender, attempt to waive, alter, amend, modify, supplement or change in any way, or release, subordinate, terminate or cancel in whole or in part, or give any consent under, any of the instruments, documents, policies or agreements constituting the Collateral or exercise any of the rights, options or interests of Pledgor as party, holder, Lender or beneficiary thereunder.  Pledgor agrees that all rights to do any and all of the foregoing have been pledged to and, following an Event of Default, may be exercised by Lender, and Pledgor agrees, upon reasonable request from Lender, from time to time to (i) do any of the foregoing, (ii) join Lender in doing so, or (iii) confirm the right of Lender to do so and shall execute such instruments and undertake such actions as Lender may reasonably request in connection therewith.  Unless Pledgor shall have provided prior written notice and received the written consent of Lender, Pledgor shall not make any election, compromise, adjustment or settlement in respect of any of the Collateral.  Notwithstanding anything herein to the contrary, so long as no Event of Default shall have occurred and be continuing, Pledgor shall have the right to exercise all of Pledgor's rights under the Pledgor Organizational Documents to which it is a party (and in the ordinary course of business) for all purposes not inconsistent with any of the terms of this Agreement, the Note, the other Loan Documents or any other instrument or agreement referred to herein or therein, provided that Pledgor agrees that it will not take any action in any manner that is inconsistent with the terms of this Agreement, the Note, the other Loan Documents or any such other instrument or agreement.  All dividends and distributions paid in respect of the Collateral shall be directed by Lender, in its sole and absolute discretion, to repay the Obligations.  Lender shall execute and deliver to Pledgor or cause to be executed and delivered to Pledgor all such proxies, powers of attorney, distribution and other orders, and all such instruments, without representation, recourse or warranty, as Pledgor may reasonably request for the purpose of enabling Pledgor to exercise the rights and powers which it is entitled to exercise pursuant to this Section 6.2.

(c)    Anything to the contrary notwithstanding, (i) Pledgor shall remain liable under the Pledgor Organizational Documents to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by Lender of any of the rights hereunder shall not release Pledgor from any of its duties or obligations under the Pledgor Organizational Documents, and (iii) Lender shall have no obligation or liability under the Pledgor Organizational Documents by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Pledgor thereunder to the extent arising prior to Lender taking title to the Collateral or to take any action to collect or enforce any claim for payment assigned hereunder.  Pledgor covenants that until such time as the Obligations are fully satisfied, (i) Pledgor shall, at its own expense, take any and all actions necessary or desirable to preserve, protect and defend the security interest of the Lender in the Collateral and the

perfection and priority thereof against any and all adverse claims, including appearing in and defending all actions and proceedings which purport to affect any of the foregoing; (ii) Pledgor shall pay or cause to be paid all taxes and other levies with respect to the Collateral when the same become due and payable except to the extent contested in good faith with appropriate reserves therefor on Pledgor's books and records; (iii) and Pledgor shall not directly or indirectly, whether voluntarily, involuntarily, by operation of law or otherwise create or permit to exist any lien or other encumbrance on or with respect to any of the Collateral, except for liens for taxes not yet due and payable.

      6.3      <u>Events of Default</u>.

      The occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of law or otherwise, shall constitute an "<u>Event of Default</u>":

      (a)      Pledgor's failure to pay, when due, the Obligations set forth under the Note, provided that Pledgor shall be granted a thirty (30) day period to cure such default following notice of such default from Lender to Pledgor, provided, however, that in no event shall an Event of Default be deemed to have occurred if Pledgor and/or its affiliates is withholding the unpaid amount(s) in connection with (a) a direct verifiable claim for indemnification that has been submitted for recovery under the indemnity provisions in the MIPA that are applicable to Lender, or (b) a third party claim that has been filed (i.e., a formal proceeding has been initiated) and which could reasonably be expected to result in damages recoverable under the indemnity provisions that are applicable to Lender in the MIPA;

      (b)      Pledgor materially breaches any term or condition of this Agreement, the Note, or the other Loan Documents;

      (c)      any proceeding, action, petition or filing under Title 11 of the United States Code entitled "<u>Bankruptcy</u>", as now and hereafter in effect or any successor statute (the "<u>Bankruptcy Code</u>"), or any similar state or federal law now or hereafter in effect relating to bankruptcy, reorganization or insolvency, or the arrangement or adjustment of debts affecting Pledgor, shall be filed by or against Pledgor, consented to or acquiesced in by Pledgor, or if Pledgor shall institute any proceeding with respect to the dissolution or liquidation of Pledgor, shall make an assignment for the benefit of creditors.

      6.4      <u>After Events of Default</u>.  During the period during which an Event of Default shall have occurred and be continuing:

      (a)      Pledgor may not distribute, transfer, or encumber any of the Collateral;

      (b)      If an Event of Default under Section 6.3(a) hereof has occurred and continues for a period of at least thirty (30) days, Lender (i) shall have all of the rights and remedies with respect to the Collateral of a secured party under the UCC (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if Lender were the sole and absolute owner of the Collateral, (ii) in its discretion may, in its name or in the name of Pledgor or otherwise, demand, sue for, collect or receive any money or property, at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so, and (iii) may, at its option, apply all or any part of the Collateral to the Obligations in such order and priority as shall be selected by Lender;

(c)    If Pledgor has not cured such Event of Default within any cure period provided for herein but in no event later than forty-five (45) days of receiving a written notice of default, Lender may, upon notice to Pledgor as required by applicable law of the time and place, with respect to the Collateral or any part thereof which shall then be or shall thereafter come into the possession, custody or control of Lender or any of its agents, sell, assign or otherwise dispose of all or any part of such Collateral, at such place or places as Lender deems best, and for cash or on credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of time or place thereof (except such notice as is required above or by applicable statute and cannot be waived) and Lender or anyone else who may be the Lender, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale), and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of Pledgor, any such demand, notice or right and equity being hereby expressly waived and released.  Lender may, without publication but upon notice required by applicable law, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned; The proceeds of each collection, sale or other disposition under this <u>Section 6.4</u> shall be applied in accordance with <u>Section 6.5</u> hereof; and

(d)    Lender shall not be obligated to resort to its rights or remedies with respect to any other security for or guaranty of payment of the Obligations before resorting to its rights and remedies against Pledgor or the Collateral hereunder.  All rights and remedies of Lender shall be cumulative and not in the alternative.

6.5    <u>Application of Proceeds</u>.  Except as otherwise herein expressly provided, the proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by Lender under this <u>Section 6</u>, shall be applied by Lender:

<u>First</u>, to the payment of the costs and expenses of such collection, sale or other realization, including reasonable out-of-pocket costs and expenses of Lender and the reasonable fees and expenses of their respective agents and counsel, and all reasonable expenses, and advances made or incurred by Lender in connection therewith;

<u>Second</u>, to the payment in full of the Obligations in such order as Lender may determine in its sole discretion; and

<u>Finally</u>, to the payment to Pledgor or to whomsoever may be lawfully entitled to receive any surplus then remaining.

As used in this <u>Section 6</u>, "proceeds" of Collateral shall mean cash, securities and other property realized in respect of, and distributions in kind of, Collateral, including any thereof received under any reorganization, liquidation or adjustment of debt of Pledgor or any issuer of or obligor on any of the Collateral.

6.6    <u>Attorney-in-Fact</u>.  During the continuance of any Event of Default, Lender is hereby appointed the attorney-in-fact of Pledgor solely for the purpose of carrying out the provisions of this <u>Section 6</u> and taking any reasonable action which Lender reasonably deems necessary to accomplish the purposes hereof.

6.7    <u>Enforcement Expenses</u>.  Except in connection with any indemnification claim made by Pledgor pursuant to the MIPA for an indemnification applicable to Lender during an Event of Default, Pledgor agrees to pay the reasonable, documented, out-of-pocket expenses actually incurred by Lender that

arise out of the enforcement of the provisions of this Section 6, or performance by Lender of any obligations of Pledgor in respect of the Collateral which Pledgor has failed or refused to perform, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement in respect of any of the Collateral, and for the care of the Collateral and defending or asserting rights and claims of Lender in respect thereof, by litigation or otherwise and all such expenses shall be Obligations to Lender secured under Section 2 hereof.

6.8    Termination.  Upon the payment,  performance in full, or reduction pursuant to the terms of the Note, this Agreement or the other Loan Documents of all Obligations, then this Agreement and the Note shall terminate, and Lender shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral received in respect thereof, to or on the order of Pledgor and Lender will promptly deliver, a Pledgor's sole cost, any UCC termination statements and any other releases and documentation necessary to evidence the same.

6.9    Indemnification. Pledgor agrees to indemnify and to hold the Lender harmless from and against all losses, liabilities, claims, damages, costs and expenses (including actual attorneys' fees and disbursements and court costs) ("Losses") arising out of third-party claims to the extent related to or arising out of the Loan Documents or any actual or proposed use of proceeds of the Loan or any of the Obligations, but excluding any Losses to the extent any such Losses are indemnifiable by Lender under the MIPA.

6.10    Security Interest Absolute. All rights of Lender and security interests hereunder, and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of: (a) any lack of validity or enforceability of any of the Note, the other Loan Documents or any other agreement or instrument relating thereto; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any of the Note, the other Loan Documents or any other agreement or instrument relating thereto; (c) any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Obligations; or (d) any other circumstance which might otherwise constitute a defense available to, or a discharge of, Pledgor.

6.11    Waivers. To the fullest extent permitted by law Pledgor hereby waives any defense that may arise by reason of: any failure of Lender to marshal any present or future collateral security (including but not limited to the Collateral) or to resort to such collateral security or other assurances of payment in any particular order.  Pledgor acknowledges that each of the waivers set forth herein is made after consultation with legal counsel and with full knowledge of its significance and consequences.

Section 7.    Miscellaneous.

7.1    No Waiver.  No failure on the part of Lender or any of its agents to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by Lender or any of its agents of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  The remedies provided herein are cumulative and are not exclusive of any remedies provided by law.

7.2    GOVERNING LAW, JURISDICTION.  THIS AGREEMENT, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY CALIFORNIA LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW. ANY PROCEEDING TO ENFORCE AND/OR INTERPRET THIS AGREEMENT SHALL OCCUR IN THE COUNTY OF ORANGE, STATE OF CALIFORNIA.

7.3     Notices.  All notices, demands, consents, approvals, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder (collectively, "Notices") shall be in writing and shall be given by (a) personal delivery, (b) facsimile transmission or (c) a reputable overnight courier service, fees prepaid, addressed as follows:

> To Pledgor:
>
> Haven Nectar LLC
> Attn: Shubham Pandey, Manager
> 2633 Mckinney Avenue
> Suite 180-791
> Dallas, TX  75204
> shubham@usaeducationfund.com
>
> To Lender:
>
> People's California, LLC
> Attn: Bernard Steimann
> 3843 S. Bristol St., #614
> Santa Ana, CA 92704
> Email: Bernard@peoplescali.com
>
> With Copy to:
> Deron M. Colby, Esq.
> 22 Executive Park, Suite 250
> Irvine, CA 92614
> Email: dcolby@januscapitallaw.com

Either Pledgor or Lender may designate another addressee (and/or change its address) for Notices hereunder by a Notice given pursuant to this Section 7.3.  A Notice sent in compliance with the provisions of this Section 7.3 shall be deemed given on the date of receipt.

7.4     Waivers, Modifications, etc.  The terms of this Agreement may be waived, altered, modified or amended only by an instrument in writing duly executed by Pledgor and Lender.  Any such waiver, alteration, modification, amendment or waiver shall be binding upon Lender and Pledgor.

7.5     Successors and Assigns.  This Agreement shall be binding upon the successors and permitted assigns of Pledgor and inure to the benefit of the successors and permitted assigns of Lender.  Each representation and agreement made by Pledgor in this Agreement shall be deemed to run to, and each reference in this Agreement to Lender shall be deemed to refer to, Lender and each of its successors and assigns.

7.6     Further Assurances.  Pledgor and Lender agree that, at any time and from time to time, such parties shall execute and deliver such further documents and do such further acts and things as may be reasonably required in order to effect the purposes of this Agreement, the Note or the other Loan Documents, including, in the case of Lender, to execute and deliver any documentation required by any of Pledgor's affiliates' current or future lenders or creditors to clarify and confirm that the Collateral does not include any assets of Pledgor that are not specifically identified as "Collateral" herein which includes any of the assets of any of Pledgor's affiliates or any of the assets of Pledgor not existing and owned by Pledgor as of the date of the Closing (as defined in the MIPA).

7.7     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.

7.8     <u>Severability</u>.  If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of Lender in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

7.9     <u>Assignment</u>.  Pledgor may not assign this Agreement without the prior written consent of Lender, which consent shall not be unreasonably withheld. Lender may assign this Agreement without the prior written consent of Pledgor.

7.10     <u>Attorneys' Fees and Costs</u>. Pledgor agrees to pay to Lender on demand all actual out-of-pocket costs and expenses incurred by Lender in seeking to enforce any of Lender's rights and remedies under this Agreement, including court costs and reasonable attorneys' fees and expenses, whether or not suit is filed hereon, or whether in connection with arbitration, judicial reference, bankruptcy, insolvency or appeal.

IN WITNESS WHEREOF, Pledgor has caused this Agreement to be duly executed and delivered as of the date first above written.

**PLEDGOR**:

Haven Nectar LLC
a California limited liability company

By:_____
Name:  Shubham Pandey
Title:    Chief Executive Officer

**<u>EXHIBIT 4</u>**

## AMENDED AND RESTATED
## OPERATING AGREEMENT
### of
## PEOPLE'S COSTA MESA, LLC
### *a California limited liability company*

This Limited Liability Company Amended and Restated Operating Agreement (this "**Agreement**") of People's Costa Mesa, LLC, a limited liability company formed under the laws of the State of California (the "**Company**"), is made effective as of November 4, 2021 (the "**Effective Date**"), by and between Unrivaled Brands, Inc., a Nevada corporation ("**Unrivaled**") and People's California, LLC, a California limited liability company ("**People's**") (as used, herein, Unrivaled and People's may each be referred to as a "**Member**" and collectively be referred to as the "**Members**"), with reference to the following facts:

WHEREAS, the Company has been formed under the California Revised Uniform Limited Liability Company Act (as amended from time to time, the "**Act**");

WHEREAS, this Agreement shall provide for the governance of the Company and the conduct of Company's business and specify each Member's relative rights and obligations with respect to the Company; and

NOW, THEREFORE, the Members by this Agreement set forth the limited liability company operating agreement for the Company from this date forward upon the terms and subject to the conditions of this Agreement.

## ARTICLE 1
## ORGANIZATION OF THE COMPANY

     1.1    <u>Formation and Governance</u>.  The Company became a limited liability company under the Act when the Articles of Organization were filed.  The rights, duties and liabilities of the Company, the Members and the Manager are determined pursuant to the Articles of Organization and this Agreement and, to the extent they do not otherwise provide, by the Act.

     1.2    <u>Name</u>.  The name of the limited liability company is "People's Costa Mesa, LLC."  The Manager may file any fictitious name certificates and similar filings, and any amendments thereto that the Manager consider appropriate or advisable.

     1.3    <u>Purposes</u>.  The purpose of the Company is to engage in any lawful activities for which limited liability companies may be organized under the laws of the State of California.

     1.4    <u>Office</u>.  Until changed by the Manager, the principal place of business of the Company shall be 1844 Newport Blvd, Costa Mesa, CA 92627.

     1.5    <u>Duration</u>.  The Company commenced on the date the Articles of Organization were filed with the California Secretary of State and shall continue until dissolved pursuant to the terms of this Agreement or the Act.

     1.6    <u>Fiscal Year</u>.  The fiscal year of the Company shall be the calendar year.

1.7     Registered Agent.  The name and address of the Company's registered agent in the State of California is and shall be, until changed by the Manager in its discretion, as set forth in the Company's Statement of Information filed with the State of California.

1.8     Bank Accounts.  All Company funds shall be deposited in the Company's name in one or more accounts at such bank(s) as the Manager may select from time to time.

1.9     Tax Matters.

(a)     Unrivaled Brands, Inc., is hereby designated as the "partnership representative" of the Company within the meaning of Section 6223(a) of the Code. If any state or local tax law provides for a tax matters partner/partnership representative or person having similar rights, powers, authority or obligations, the person designated as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code shall also serve in such capacity (in any such federal, state or local capacity, the "**Tax Representative**"). The Manager may name a replacement Tax Representative at any time.  The Tax Representative shall represent the Company in all tax matters to the extent allowed by law.   Notwithstanding the foregoing, The Tax Representative shall take no action without the authorization of the Manager, other than such action as may be required by applicable law. Any cost or expense incurred by the Tax Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.

(b)     The Company has elected to be treated as an association taxable as a corporation for U.S. federal and applicable state and local income tax purposes (the "**Election**").  Each Member shall cooperate fully with the Company and the Tax Representative for purposes of the Election. Due to the Election, the provisions in this Agreement that apply to an entity treated as a partnership for U.S. income tax purposes are hereby deemed null and void and without effect as of the effective date of the Election.

(c)     The provisions contained in this Section 1.9 shall survive the termination of the Company, the termination of this Agreement and, with respect to any Member, the transfer or assignment of any portion of such Member's interest in the Company.

1.10     Withholding.  Each Member agrees to furnish the Company with any representations and forms as are reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations the Company may have.  All distributions made by the Company under this Agreement will be reduced by any tax or other amounts required to be withheld by the Company under applicable law.  Any amounts withheld from a distribution by the Company to a Member pursuant to any federal, state, local or foreign tax law shall be treated as if the same had been distributed to that Member hereunder.  Any other amount required to be paid by the Company to a taxing authority with respect to a Member pursuant to any federal, state, local or foreign tax law in connection with any payment to or tax liability (estimated or otherwise) of the Member shall be treated as a loan from the Company to that Member.  If such loan is not repaid within thirty (30) calendar days from the date the Company notifies that Member of the withholding, the loan shall bear interest at an annual rate equal to the lesser of (a) ten percent (10%) per annum or (b) the highest non-usurious rate permitted by applicable law under such circumstances from the date of the applicable notice to the date of repayment.  In addition to all other remedies the Company may have, the Company may withhold distributions that would otherwise be payable to that Member and apply those distributions instead to the repayment of the loan and accrued interest.

# ARTICLE 2
## MEMBERS, MEMBERSHIP INTERESTS,
## CAPITAL ACCOUNTS, AND PROFITS INTERESTS

2.1     <u>Members; Membership Interests</u>.   Company shall have two (2) classes of Members. Unrivaled shall be a Class A Member and People's shall be a Class B Member.   Each class shall have separate rights and responsibilities as set forth in this Section 2.1

a.     <u>Class A: Unrivaled's Membership Interest</u>.  As a Class A Member, Unrivaled shall have all rights as a Member as set forth in the Act, including without limitation:

i.     <u>Voting Rights.</u> Unrivaled shall have one hundred percent (100%) of the right to Vote and participate in management of Company, except as otherwise set forth in this Agreement.  As used herein, "**Vote**" means a written consent or approval, a ballot cast at a meeting, or a voice vote. Unrivaled shall have the sole right to Vote to appoint the Manager of the Company.  Unrivaled shall have the sole right to Vote to admit new Members to the Company.

ii.     <u>Information Rights</u>. Unrivaled shall have the right to receive information concerning the business and affairs of the Company as provided for under the Act.

iii.     <u>Allocation of Net Profits</u>.  Unrivaled shall receive allocations of 100% of the Net Profits and Net Losses in accordance with its Economic Interest which is reflected on <u>Schedule I</u>, except as otherwise provided for in Section 2.1(b)(iii) hereof.

iv.     <u>Distributions</u>. Unrivaled shall receive 100% of any distributions made by the Company in accordance with its Economic Interest which is reflected on <u>Schedule I</u>, except as otherwise provided for in Section 2.1(b)(iv) hereof.

b.     <u>Class B: People's Membership Interest</u>.  As a Class B Member, People's rights as a Member shall be limited, as set forth herein:

i.     <u>Voting Rights</u>.  Except as otherwise expressly set forth herein People's <u>shall not</u> have the right to Vote on any matters and <u>shall not</u> have the right to participate in management of Company.  People's <u>shall not</u> have the right to Vote to appoint the Manager of the Company.  People's <u>shall not</u> have the right to Vote to admit new Members to the Company.

ii.     <u>Information Rights</u>.  People's shall have the right to receive information concerning the business and affairs of the Company only to the extent required by the Act.

iii.     <u>Allocation of Net Profits</u>.  People's <u>shall not</u> receive allocations of Net Profits and Net Losses, in accordance with its Economic Interest which is reflected on <u>Schedule I</u>. If at any time after the Effective Date and with respect to the operation of the Company for the period following the Effective Date, People's incurs a Tax Liability Amount, People's shall be entitled to a Tax Distribution equal to People's Tax Liability Amount.

iv.     <u>Distributions; "Profits Interest"</u>. People's <u>shall not</u> receive distributions, in accordance with its Economic Interest which is reflected on <u>Schedule I</u>, except as otherwise provided for in Section 2.1(b)(iii) hereof.

2.2     Ownership and Percentage Interests. The percentage interest in the Company ("**Percentage Interest**") means, for any particular Member as of any date of determination, the percentage set forth opposite such Member's name on Schedule I attached hereto under the column "Member's Percentage Interest," which schedule shall be amended by the Manager from time to time to properly reflect the admission of new Members or any other event having an effect on any Member's Percentage Interest.

2.3     Separate Capital Account for Each Member.  The Company shall establish and maintain a separate capital account ("**Capital Account**") for each Member in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended ("**Code**"), and the final, proposed and temporary income tax regulations promulgated from time to time thereunder ("**Treasury Regulations**").  Each Member's Capital Account shall be credited and debited in accordance with the Code and the Treasury Regulations. Each Member's Capital Account balance as of the Effective Date is set forth on Schedule I attached hereto under the column "Member's Capital Account Balance."

2.4     Initial Capital Contributions; Schedule of Contributions. The initial Capital Contributions of the Members are set forth on Schedule I attached hereto under the column "Member's Capital Contributions".  No Member may withdraw any initial or additional Capital Contribution to, or receive any distributions from, the Company except as otherwise expressly provided in this Agreement.

2.5     Additional Capital Contributions.  No Member will be required to make, any additional Capital Contribution, without the prior written consent of the Manager.  Subject to the foregoing provisions of this Section 2.5, any additional Capital Contributions made pursuant to this Section 2.5 shall be credited to the contributing Member's Capital Account in accordance with Section 2.3, and Schedule I attached hereto shall be updated in accordance with Section 2.4.

2.6     No Interest on Capital; In Kind Distributions.  No interest shall be paid on Members' Capital Contributions.  No Member shall be entitled to demand or receive any property from the Company other than cash except as provided in this Agreement.

2.7     Limitation of Liability. The liability of the Members shall be limited in accordance with the provisions of the Act.

## ARTICLE 3
## ALLOCATIONS AND DISTRIBUTIONS

3.1     Allocations.  Net Profits and Net Losses for each fiscal year of the Company (or portion thereof) and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, in strict compliance with the Code and the Treasury Regulations, to each Member in accordance with that Member's Economic Interest.

3.2     Distributions.  The Company shall, at the Manager's sole discretion, provided such is not otherwise prohibited by law, make distributions of cash subject to the following distribution schedule:

a.     Subject to Section 3.2(b), cash available for distribution (if any) shall be distributed among the Class A Members pro rata in proportion to their Economic Interests at such times as shall be determined by the Manager in the Manager's sole discretion.  Cash available for distribution shall be determined by the Manager and shall mean available funds remaining in the Company accounts after all current debts and obligations of the Company have been paid or provided for and a reasonable reserve (as

DocuSign Envelope ID: 78587D59-69D6-49F1-A9E3-98B970FEEEF3

determined by the Manager) for operating expenses, debt servicing and other contingencies has been set aside.

        b.    Within ninety (90) days after the end of any fiscal year, to the extent of cash available for distribution (if any), the Manager shall cause the Company to distribute to each Member with respect to each taxable year of the Company (excluding the taxable year in which the Company is being liquidated) an amount of cash equal to such Member's Tax Liability Amount for such taxable year (a "**Tax Distribution**"). For this purpose, a Member's "**Tax Liability Amount**" for any such taxable year of the Company means an amount equal to the excess of (i) the Assumed Tax Rate multiplied by (ii) the excess of (a) the taxable income (including separately stated items) and gain allocated to such Member for such taxable year of the Company (as shown on the applicable Internal Revenue Service Form 1065 Schedule K-1 filed by the Company) minus (b) the cumulative losses that have been allocated to such Member for each taxable year of the Company to the extent such losses have not previously reduced taxable income and gain pursuant to this provision over the cumulative distributions made to such Member under Section 3.2(a) (excluding Tax Distributions) during such taxable year. The "**Assumed Tax Rate**" shall mean the rate representing the highest federal and California income tax rate in effect for an unmarried individual resident of the State of California, taking into account the character of the income (e.g., long-term or short-term capital gain, ordinary or tax-exempt, or "qualified business income," "qualified REIT dividend" income or "qualified publicly traded partnership income" under Code Section 199A). All Tax Distributions made to a Member pursuant to this Section 3.3(b) shall be treated as an advance distribution to such Member and shall reduce the amount of any distribution (other than Tax Distributions) to which such Member thereafter becomes entitled under this Agreement, whether from proceeds of the liquidation of the Company, under Sections 3.3(a), 9.2, or otherwise. For the avoidance of doubt, Tax Distributions under this Section 3.3(b) to any Member will not take into account any tax items allocated to the Member pursuant to Section 704(c) of the Code. Notwithstanding the foregoing, no Tax Distribution shall be payable in connection with a sale or liquidation of the Company or a Capital Event.

        3.3    <u>Tax Allocation Matters</u>. Except as otherwise provided herein, all items of income, gain, loss deduction or credit for federal, state and local income tax purposes will be allocated in strict compliance with Code and the Treasury Regulations, in the same manner as the Company's corresponding "book" items. Each Member's allocable share of the taxable income or loss of the Company, depreciation, depletion, amortization and gain or loss with respect to any contributed property, or with respect to revalued property, shall be determined in the manner provided in the Code and the Treasury Regulations. Allocations pursuant to this Section are solely for federal, state and local tax purposes and except to the extent allocations are reflected in the allocations of the Company's corresponding "book" items. Allocations under this Section will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items or distributions pursuant to any provision of this Agreement.

        3.4    <u>Allocations in Respect of Transferred Membership Interests</u>. If any Membership Interest (or portion thereof) is transferred during any fiscal year, each item of income, gain, loss, deduction or credit of the Company for that fiscal year shall be assigned pro rata to each day in the particular period of that fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each item so assigned to any such day shall be allocated to the Member based upon that Member's respective Membership Interest at the close of that day. Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date that sale or other disposition occurs. If any Membership Interest (or portions thereof) are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the

economic attributes of the transferor (e.g., Capital Contributions balance, Adjusted Capital Contributions balance, Capital Account balance) to the extent attributable to the Membership Interest (or portion thereof) so transferred.

3.5     Section 1.83-3(l) Compliance.  Each Class A Member agrees, and agrees to cause the Company, to comply with all of the requirements of the safe harbor set forth in Proposed Treasury Regulations Section 1.83-3(l), and any corresponding future provision of the Code or the Treasury Regulations, whereby each Class A Member hereby agrees that the fair market value of any Profits Interest that is transferred in connection with the performance of services is treated as being equal to the liquidation value of that Profits Interest as of the date of issuance or grant.

# ARTICLE 4
## ACCOUNTING AND RECORDS

4.1     Books of Account.  The Company shall keep complete and accurate business and accounting books and records, which shall be open to inspection at the Company office by any Class A Member or Class A Member's authorized representative at any reasonable time.  Each Class A Member shall have the right to cause a special audit and/or review of Company books and records. All fees and expenses of such special audit or review shall be borne by said Class A Member.

4.2     Accountants.  The Manager may retain at the Manager's sole election, an independent accounting firm to review Company books and records annually, or more frequently if the Manager so decide, or to review other accounting determinations as requested by the Manager.

# ARTICLE 5
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1     Management by Manager.

a.      The Company shall be a single manager, manager-managed limited liability company.  The Manager of the Company ("**Manager**") shall be appointed exclusively by Unrivaled at Unrivaled's sole discretion. The initial Manager of the Company is as set forth in Schedule I.

b.      All decisions, elections and consents to be made in connection with the direction, management and control of the Company shall, except as expressly provided otherwise in this Agreement, be reserved to the Manager.  Subject to Section 5.2, to any provisions hereof permitting Class A Members to make unilateral decisions, and to the mandatory voting provisions of the Act or other applicable law, all actions to be taken by the Members shall be made by the Class A Members, including without limitation the actions described in Section 5.2(b).

c.      The Manager, solely in the Manager's capacity as Manager, (i) shall make no Capital Contribution and (ii) shall have no interest in profits, losses or distributions of the Company.

5.2     Members' Voting Rights.

a.      Except as otherwise expressly provided in this Agreement, on any matter or action that is subject to the approval of the Members, Unrivaled shall have the exclusive right to vote and the Vote of Unrivaled shall be equal to a Vote of one hundred percent (100%) of the Members.  People's shall have no Vote or voting rights on any matter or action.  In the event that People's is required to Vote under

DocuSign Envelope ID: 78587D59-6906-49F3-A0E3-98B970FEEEF3

applicable law, People's hereby grants to Unrivaled a proxy to Vote all of People's Membership Interest in any manner as desired by Unrivaled in Unrivaled's sole discretion. People's acknowledges that the proxy granted hereby, is given to secure the performance of a duty, is coupled with an interest and shall be irrevocable until the duty is performed. This Agreement does not grant any other proxies and should not be interpreted as doing so.

b.    Notwithstanding the foregoing, none of the following actions may be authorized or undertaken by the Company without the prior written consent of People's for so long as People's (i) holds a Membership Interest and (ii) is not in breach of this Agreement (including, without limitation, Section 8.3 hereof): (i) modify or amend this Agreement in a manner that adversely affects the Class B Members, except as otherwise required by applicable laws or regulations; (ii) amend the Company's Articles of Organization in a manner that adversely affects the Class B Members; (iii) modify any material tax election or change the Company's method of accounting for income tax purposes, amend any material tax return, enter into any closing agreement, settle any tax claim or assessment, or consent to any extension or waiver of the limitation period applicable to any tax claim or assessment relating to Company, relating to any period prior to the date hereof, if such election, change, agreement, settlement or consent would have the effect of directly increasing the tax liability of the Company; or (iv) sell, adjust, split, combine or reclassify any of its units or other equity interests, in any manner that adversely affects the Class B Members; (v) enter into any agreement, or otherwise become obligated, to do any action identified in this Section 5.2(b).

5.3    <u>No Manager Compensation</u>.  Subject to Section 6.5 or unless the Unrivaled otherwise agrees, no Manager shall receive compensation for his, her or its services to the Company as a Manager.

5.4    <u>Meetings</u>.  Members shall meet from time to time on the call of the Manager or any Member.  Upon reasonable advance notice, Unrivaled shall have the right to have advisors, attorneys and consultants attend Member meetings at the expense of Unrivaled, provided that no meeting shall be delayed due to the unavailability of any such person.  People's <u>shall not</u> have the right to have advisors, attorneys and consultants attend Member meetings. Members may participate in a meeting through the use of conference telephone, video conferencing or similar communications equipment or methods as long as all Members participating can hear one another and speak to one another.

5.5    <u>Action Without Meeting</u>.  Any action that may be taken at a meeting of the Members may be taken without meeting if a consent in writing, setting forth the action so taken is signed by Unrivaled.

ARTICLE 6
MANAGER AND OFFICERS

6.1    <u>Appointment and Removal of Manager</u>.  Unrivaled may, from time to time, in its sole discretion, remove or appoint a new Manager.

6.2    <u>Appointment and Removal of Officers</u>.  The Manager may appoint a President, Chief Financial Officer, Secretary and/or other officers of the Company.  Any officer of the Company shall exercise such powers and perform such duties as are typically exercised by similarly titled officers in a corporation or as shall otherwise be determined from time to time by the Manager, but subject in all cases to the supervision and control of the Manager.  Any officer of the Company may be terminated and removed from office at any time by the Manager, with or without cause.  Multiple offices, or all offices, may be held by one person.  Officers may, but need not, be Members.

6.3    <u>Signing Authority of Manager and Officers</u>.  The Manager or officer (if any) of the Company shall have such authority to sign checks, contracts, instruments and other documents on behalf of the Company as may be delegated to them from time to time by the Manager, provided, however, that:

   a. any contract that is approved by the Manager or otherwise in accordance with this Agreement may be signed by any Manager or any officer; and

   b. any Manager or officer may enter into, without any additional approval by the Manager or the Members, on behalf of the Company, any contract (written or otherwise): (i) that does not involve or include any mortgaging or pledging of, or otherwise placing a lien or encumbrance on (other than a statutory lien for taxes not yet due and payable) or granting of a security interest in, any of the material assets or securities of the Company; (ii) that, individually or when aggregated with a group of related contracts, does not involve consideration in excess of $100,000.00 in the aggregate; (iii) that does not call for performance over a period of more than one (1) month, unless such contract may be cancelled by the Company upon 30 days' (or less) notice without premium or penalty; (iv) that does not prohibit the Company from freely engaging in business or from freely competing with any person or entity anywhere in the world; (v) that does not impose on the Company the obligation to indemnify, defend or hold harmless any person or entity whereby the Company has or reasonably could be expected to have indemnification obligations in excess of $100,000; (vi) under which no Manager, Member or any affiliate or relative (by blood or marriage) of any Manager or Member has any rights or derives any benefits; (vii) that does not provide for the guaranty by the Company or any of its affiliates of the indebtedness or obligations of, or the performance by, any third party; or (viii) that does not require, directly or indirectly, the approval of the Members under Section 5.2.

6.4    <u>Acts of Manager and Officers as Conclusive Evidence of Authority</u>.  Any note, mortgage, deed of trust, evidence of indebtedness, contract, certificate, statement, conveyance or other instrument or obligation in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person or entity, when signed by Manager, the President, Chief Financial Officer, the Secretary (if any) or any Vice-President (if any), is not invalidated as to the Company by any lack of authority of the signing Manager or officer(s) in the absence of actual knowledge on the part of the other person or entity that the signing Manager or officer(s) had no authority to execute the same.

6.5    <u>Compensation of Officers</u>.  Each officer of the Company (including, without limitation, the Manager to the extent he or she is separately an officer of the Company) shall serve without compensation.

ARTICLE 7<br>
STANDARD OF CARE; COMPETITION AND<br>
OUTSIDE INTERESTS; CONFIDENTIALITY

7.1    <u>Standard of Care</u>.

   a. To the fullest extent permitted by the Act and other applicable law as a manager-managed limited liability company, neither any Member nor the Tax Representative, nor any officer of the Company, shall owe any duty, including, without limitation, any fiduciary duty of loyalty or care, to the Company, any other Member or any other person or entity party to or otherwise bound by this Agreement except to the extent otherwise expressly set forth in this Agreement or in other written agreements to which such Member is a party or by which it is bound. To the extent that such duties cannot be eliminated, such duties shall be limited and modified to the fullest extent permitted by the Act and other

applicable law and as specifically set forth in Sections 7.2; provided, however, that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

b.      To the fullest extent permitted by the Act and other applicable law, the fiduciary duties of the Manager shall be limited to the following, in each case as limited and modified to the fullest extent permitted by the Act and other applicable law and as specifically set forth in Sections 7.2 and 7.3:

i.      Duty of loyalty, which shall be limited to (A) accounting to the Company and hold as trustee for it any property, profit, or benefit derived by such Manager in the conduct and winding up of the activities of the Company or derived from a use by such Manager of the Company's property, including the appropriation of a Company opportunity (subject to Sections 7.2 and 7.3); (B) refraining from dealing with the Company in the conduct or winding up of the activities of the Company as or on behalf of a person having an interest adverse to the Company; and (C) refraining from competing with the Company in the conduct or winding up of the activities of the Company (subject to Sections 7.2 and 7.3); and

ii.      Duty of care in the conduct and winding up of the activities of the Company, which shall be limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

The foregoing are duties are further limited and modified as set forth in Sections 7.2 and 7.3, and the Members hereby acknowledge and agree that such limitations and modifications are reasonable in all respects; provided, however, that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

7.2     <u>Transactions with any Manager or Member</u>.  Subject to Section 5.2(b), any Manager or Member may, and may cause any of his/her/its affiliates to, engage in, notwithstanding that it may constitute a conflict of interest, any transaction (including, without limitation, the purchase, sale, lease or exchange of any property, the lending of money, the rendering of any service or the establishment of any salary, other compensation or other terms of employment) with the Company so long as such transaction (a) is approved in writing by the Manager (if the Manager are not a party to or beneficiary of such transaction), and (b) otherwise is on terms no less favorable to the Company than it reasonably could expect to receive from an unaffiliated third party in an arms' length transaction. Moreover, the approval required to authorize or ratify any acts or transactions that would otherwise violate the duty of loyalty set forth under Section 7.1 shall be the approval of the Unrivaled.

7.3     <u>Confidentiality</u>.  All books, records, financial statements, tax returns, budgets, business plans and projections of the Company, all other information concerning the business, affairs and properties of the Company and all of the terms and provisions of this Agreement, in each case shall be held in confidence by each Member and his/her/its respective affiliates, subject to any obligation to comply with (a) any applicable law, (b) any rule or regulation of any legal authority or securities exchange, (c) any subpoena or other legal process to make information available to the persons entitled thereto, (d) any accounting or audit request by Unrivaled as part of its financial audits or (e) any investor reporting to Unrivaled's equity or debt investors from time to time.  Such confidentiality shall be maintained to the same degree as such Member maintains his/her/its own confidential information (but in no event to a lesser degree than a reasonable person would maintain his/her/its confidential information) and shall be maintained until such time, if any, as any such confidential information either is, or becomes, published or a matter of public knowledge through no fault, directly or indirectly, of such Member or any of its affiliates, agents or representatives.

DocuSign Envelope ID: 78587D59-690G-49F1-A9E3-98B970FEEEF3

## ARTICLE 8
## TRANSFER RESTRICTIONS

8.1    <u>Generally</u>.

(a)    No Class B Member shall directly or indirectly transfer (which, for the purposes of this Agreement, shall include, without limitation, any transfer, conveyance, sale, gift or other disposition), mortgage, pledge, encumber, hypothecate or alienate all or any portion of his/her/its Membership Interest, whether voluntarily or by operation of law (a "**Transfer**"), except as permitted by this Article 8.

(b)    Notwithstanding Section 8.1(a), a Member may Transfer all or any portion of his/her/its Membership Interest provided that such Member is a Class A Member or, if such Member is a Class B Member, such Class B Member has received the prior written consent of Unrivaled and the Manager to such Transfer.

8.2    <u>Prohibited Transfer Is Void</u>.

(a)    Any purported Transfer of all or any portion of a Class B Member's Membership Interest that is not authorized by this Section 8 or that is in breach of (or results in breach of) Section 8 shall be void and of no effect, except that it also shall constitute a material breach of this Agreement.

(b)    No Transfer of all or any portion of a Class B Member's Membership Interest shall be permitted or recognized if its consummation would cause (or reasonably could be expected to cause) a breach or violation of any agreement to which the Company is a party or by which any of its property is bound, including, without limitation, any loan or security agreement in respect of the Company or any of its property.

(c)    Notwithstanding any provision of this Agreement to the contrary, there shall be no Transfer (including, without limitation, any Permitted Transfer) of any Membership Interest (or portion thereof) if such transfer would: (i) constitute a transaction effected through an "established securities market" within the meaning of Treasury Regulations Section 1.7704-1(b) or otherwise cause the Company to be a "publicly traded partnership" within the meaning of Section 7704 of the Code; or (ii) effect a termination of the Company under Section 708 of the Code (but only if such termination would result in material adverse consequences to the Company or any Member under federal, state or local law, as determined by the Manager).

8.3    <u>Option to Purchase</u>.    Unrivaled shall have the Option to purchase all of People's' Membership Interest in accordance with the terms and subject to the conditions set forth in the membership interest purchase agreement to be entered into by and among Unrivaled, the Company and People's, among others, in a form to be agreed upon by the parties hereto ("**Costa Mesa MIPA**").

8.4    <u>Restriction on Transfer</u>.  From the Effective Date until the earlier of the consummation of the Costa Mesa MIPA or the termination of the Costa Mesa MIPA, each in accordance with the terms and subject to the conditions of the Costa Mesa MIPA, People's may not offer to Transfer any of People's' Membership Interest to any Person except Unrivaled.

8.5    <u>Drag Along Rights</u>.  In the event that Unrivaled enters into an agreement with any person or persons (the "**Drag-Along Purchaser**") regarding Transfer of all of Unrivaled's Membership Interest,

DocuSign Envelope ID: 78587D59-69D6-49E1-A9E3-98B970FEEEF3

Unrivaled shall be entitled, in Unrivaled's sole and exclusive discretion, to require each Member of Company to include all of its Membership Interest in the Transfer (the "**Drag-Along Right**"), provided that such parties strictly comply with the following provisions:

a.        Unrivaled shall provide written notice to People's at least thirty (30) business days prior to the communication of the proposed Transfer, which notice shall include the identity of the Drag-Along Purchaser, the offer price, and other material terms and conditions of the proposed Transfer (the "**Drag-Along Notice**").

b.        Upon receipt of the Drag-Along Notice, People's shall be obligated to Transfer all of its Membership Interest at the same price, proportional to their percentage ownership of the Membership Interest, being subject, to the same representations and warranties (but only to its knowledge with respect to the matters relating to the Company), covenants, indemnities, holdback, escrow and other material provisions of the proposed Transfer.

c.        All fees and expenses incurred in connection with the Transfer shall be the sole responsibility of Unrivaled.

d.        Unrivaled shall be entitled to one hundred percent (100%) of the proceeds received from such sale, minus the Option Exercise Price, which shall be paid to People's directly by the Drag-Along Purchaser.

8.6    <u>Permitted Transfers and Permitted Transferees</u>.

(a)        Any permitted transferee covered by Section 8.6(b), any other transferee of all or any portion of a Member's Membership Interest whose transfer is pre-approved by the Unrivaled as contemplated by Section 8.1(b), or any Transferee which is done in compliance with Section 8.5, is, with respect to the associated Permitted Transfer, a "**Permitted Transferee**" for the purposes of this Agreement.  Any transfer permitted by and complying with Section 8.6(b), or for which the transferor Member obtains the prior written approval of the Manager and Unrivaled in accordance with Section 8.1(b), or which is done in compliance with Section 8.5, is a "**Permitted Transfer**" for the purposes of this Agreement.

(b)        If a Permitted Transfer is from People's to a person or entity who, prior to such transfer, was not a Member, then the Permitted Transferee shall become a Class B Member (non-Voting).

8.7    <u>Admission of Substituted Member</u>.  If a Permitted Transfer is to be consummated and if the subject Permitted Transferee is not, prior to such consummation, a Member, then the Permitted Transferee of such Permitted Transfer shall be admitted to the Company as a substituted Member subject to satisfaction of the following conditions: (a) the Permitted Transfer is consummated in compliance with this Agreement and all regulatory approvals required for such Permitted Transfer have been obtained; (b) Unrivaled approves the form and content of the instruments and documents regarding such Permitted Transfer; (c) the Permitted Transferee accepts and adopts in writing all of the terms and conditions of this Agreement, as then in effect; (d) the transferor Member or the Permitted Transferee pays all costs and expenses incurred by the Company in connection with such admission, including, without limitation, legal and accounting fees; and (e) upon admission, the Percentage Interests shall be adjusted and <u>Schedule I</u> shall be amended accordingly, including, without limitation, to reflect such Permitted Transferee's admission to the Company as a Class A Member or Class B Member, as applicable.

DocuSign Envelope ID: 78587D59-69D6-49E1-A9E3-98B970FEEEF3

8.8    <u>Restrictions on Transferees</u>.  A transferee of all or any part of a Member's Membership Interest who does not become a substituted Member shall have no right to require any information or accounting of the Company's transactions, to inspect the Company's books or to vote on Company matters. In addition, subject to Section 8.2, such transferee shall only be entitled to receive the share of distributions and the allocations of Net Profits and Net Losses and other items of income, gain, loss, deduction and credit to which the transferor would otherwise have been entitled, if any.

ARTICLE 9
DISSOLUTION

9.1    <u>Dissolution of the Company</u>.  The Company shall dissolve: (a) on the date stated in the Certificate (if any); (b) at the election of Unrivaled; or (c) the occurrence of any other event causing a dissolution of the Company under Section 18-801 of the Act.

9.2    <u>Distribution of Assets Upon Liquidation or Capital Event</u>.  Upon the liquidation or dissolution of the Company, after payment of the Company's debts and liabilities and the provision for adequate reserves (as reasonably determined by the Manager), the assets of the Company shall promptly be distributed solely to Class A Members following, in the event that People's owns any Membership Interest as of such time, payment to People's of the Option Exercise Price.

9.3    <u>Restoration of Negative Capital Accounts</u>.  Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account balance (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), that Member shall not have any obligation to make any contribution to the capital of the Company, and the negative balance of that Member's Capital Account shall not be considered a debt owed by that Member to the Company or to any other person for any purpose whatsoever.

9.4    <u>Distribution of Assets in Kind</u>.  After all debts of the Company have been paid, the Voting Members may determine (which determination shall be binding on all Members) to distribute all or a portion of the assets of the Company in kind.

9.5    <u>Certificate of Dissolution</u>.  Upon completion of the winding up of the Company, the Members shall prepare, execute and deliver to the California Secretary of State a certificate of dissolution in accordance with the Act.

9.6    <u>Recourse to Assets</u>.  Each Member agrees to look solely to the assets of the Company for any distributions or return of such Member's Capital Contributions.

ARTICLE 10
INDEMNIFICATION

10.1    <u>Indemnification Generally</u>.  Subject to any limitations on indemnification mandated by the Act, and except with respect to any breach of purchase agreement for the purchase by Unrivaled of Membership Interests in the Company entered into by the Members by the Class B Members or the other sellers party thereto, or any matters that constitute indemnifiable matters under Section 10.02 of such purchase agreement and any Damages related thereto the Company shall indemnify and hold harmless any person (an "**<u>Indemnified Person</u>**") made, or threatened to be made, a party to an action or proceeding,

DocuSign Envelope ID: 78587D59-69D6-49F1-A0E3-98B970FEEF3

whether civil, criminal or investigative (a "**Proceeding**"), including an action by or in the right of the Company, by reason of the fact that such Indemnified Person was or is (a) a Manager of the Company, (b) a Member, (c) an officer of the Company, (d) the Tax Representative, (e) an Affiliate of a Manager, the Tax Representative, a Member or an officer of the Company, or (f) an officer, director, shareholder, partner, member, employee, manager or agent of any of the foregoing, or by reason of the fact that such person was or is serving at the request of the Company as a manager, Tax Representative, director, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against Damages incurred as a result of such Proceeding or any appeal thereof; provided, however, that no such person shall be indemnified or held harmless if and to the extent that the Damages for which indemnification is sought results from any of such person's (or such person's agent's or representative's) acts or omissions (i) in bad faith, (ii) for a purpose which the person at issue (A) did not reasonably believe to be in, or not opposed to, the best interests of the Company and (B) with respect to criminal proceedings, additionally had no reasonable cause to believe was unlawful, (iii) that involves fraud, willful misconduct, gross negligence or reckless disregard of duty, (iv) that constitutes a material breach of this Agreement, or (v) from which such person derives an improper personal benefit. The Company's indemnification obligations hereunder shall survive the termination of the Company. As used herein, "**Damages**" means any and all judgments, fines, taxes, amounts paid in settlement, and reasonable expenses (including investigation, accounting and attorneys' fees).

10.2    <u>Contract Right; Expenses</u>. The right to indemnification conferred in this Article 10 shall be a contract right and shall include the right to require the Company to advance the expenses incurred by the Indemnified Person in defending any such Proceeding in advance of its final disposition; provided, however, that the payment of such expenses in advance of the final disposition of a Proceeding shall be made only upon receipt by the Company of an undertaking, by or on behalf of the Indemnified Person, to repay all amounts so advanced if it shall be determined that such Indemnified Person is not entitled to be indemnified under this Article 10 or otherwise.

10.3    <u>Indemnification of Employees and Agents</u>. The Company may, to the extent authorized from time to time by the Manager, grant rights to indemnification and to advancement of expenses to any employee or agent of the Company to the fullest extent of the provisions of this Article 10 with respect to the indemnification and advancement of expenses of a Manager, Tax Representative, Members and officers of the Company.

10.4    <u>Nonexclusive Right</u>. The right to indemnification and the payment of expenses incurred in defending a Proceeding in advance of its final disposition conferred in this Article 10 shall not be exclusive of any other right which any person may have or hereafter acquire under any statute or agreement, or under any insurance policy obtained for the benefit of the Company or any Manager, tax matters partner, tax representative, Member and/or any officer of the Company.

10.5    <u>Insurance</u>. The Manager may cause the Company to purchase and maintain insurance on behalf of any person (including, without limitation, the Manager, Tax Representative, Member and/or officer of the Company) who is or was an agent of the Company against any liability asserted against that person and incurred by that person in any such capacity or arising out of that person's status as an agent of the Company, whether or not the Company would have the power to indemnify that person against liability under this Agreement or applicable law.

# ARTICLE 11
## MISCELLANEOUS

**11.1    Entire Agreement.**  This Agreement and the Articles of Organization constitute the complete and exclusive statement of agreement among the Manager and the Members with respect to their respective subject matters and supersede all prior written and oral agreements or statements between or among the Manager and/or the Members with respect to such subject matter, and this Agreement amends and restates, and supersedes, in its entirety, any previous operating agreements of the Company existing prior to the date hereof, which shall be of no force or effect.

**11.2    Amendments.**  Except as otherwise expressly provided herein, all amendments to this Agreement or the Articles of Organization must be made in a writing and signed by all of the Class A Members.  Any such amendment shall be binding on all Members.

**11.3    Offset Privilege; No Partition.**  Any monetary obligation owing from the Company to any Member may be offset by the Company against any monetary obligation then owing from that Member to the Company.  No Member shall have the right to seek the partition any property belonging to the Company.  Upon any breach of the preceding sentence by any Member, the other Members shall be entitled to a decree or order restraining and enjoining any application, action or petition for partition and shall not be required to post bond in conjunction therewith.

**11.4    Remedies Cumulative.**  Except as otherwise provided herein, the remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

**11.5    Notices.**  Any notice to be given to the Company, the Manager or any Member in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address, facsimile number or email address specified by the party to receive the notice by courier or other means of personal service, when received if sent by facsimile or email, or three (3) calendar days after deposit of the notice by first class mail, postage prepaid, or certified mail, return receipt requested.  Manager's and Member's initial address, facsimile number and/or email address for such notices is specified on Schedule I.  Any party may, by giving five (5) calendar days' prior written notice to the other parties, designate any other address, facsimile number or email address as the new address, facsimile number or email address to which notice to such first party is to be given.  Any notice to the Company shall be directed to the attention of Manager at such Manager's most-current address, facsimile number or email address under this Notices paragraph.

**11.6    Attorneys' Fees.**  The prevailing party in any action to enforce this Agreement shall be entitled to its costs and fees (including, without limitation, reasonable attorneys' fees and expert witness fees) incurred in connection with such action.

**11.7    Governing Law; Jurisdiction.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to any conflicts of laws principles of the State of California or any other jurisdiction that would call for the application of the law of any jurisdiction other than the State of California.  Manager and each Member consents to the exclusive jurisdiction of the state courts sitting in Orange County, California in any action on a claim arising out of, under or in connection with this Agreement or any of the transactions contemplated by this Agreement. The parties hereto acknowledge and agree (a) that cannabis businesses are not permitted under, or may

otherwise violate, federal law and (b) that any illegality or violation of federal law applicable to cannabis businesses shall not be a defense to enforceability of this Agreement.

11.8    Interpretation.    Article and Section headings in this Agreement are inserted only for convenience of reference and are not to be considered in the interpretation or construction of any provision of this Agreement.   This Agreement shall not be construed as if it had been prepared by one of the parties, but rather as if all parties had prepared it.

11.9    Severability.  If any provision of this Agreement or the application of that provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of that provision to persons or circumstances other than those to which it is held invalid shall not be affected.

11.10    No Third Party Rights.  No Person other than the Manager, a Member or a person entitled to indemnification pursuant to Article 10 shall have any legal or equitable right, remedy or claim, or be a beneficiary, under or in respect of this Agreement.

11.11    Multiple Counterparts; Signatures.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.   This Agreement may be executed and delivered by PDF, facsimile and/or electronic signatures, and any such PDF, facsimile or electronic signature shall be deemed an original for purposes of evidencing execution of this Agreement.

11.12    Definitions.  The undefined capitalized terms set forth in this Agreement shall have the meaning prescribed in Schedule II attached hereto and incorporated herein.

11.13    Successors in Interest.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their personal representatives and, subject to the applicable provisions of this Agreement, their successors and assigns.

IN WITNESS WHEREOF, the Members and the Manager have executed this Agreement, and acknowledge and agree to this Agreement, in each case effective as of the Effective Date.

MANAGER AND CLASS A MEMBER:          CLASS B MEMBER:

Unrivaled Brands, Inc.                People's California, LLC

By: _Francis Knuettel II_            By: _Bernard Steimann_
Name: Francis Knuettel II            Name: Bernard Steimann
Title: CEO                           Title: Managing Member

## SCHEDULE I

## MANAGER AND MEMBERS
### (as of November 4, 2021)

**MANAGER:**

**Name**: Unrivaled Brands, Inc.                    Address: 3242 S. Halladay Street, Santa Ana, CA 92705

**MEMBERS:**

| MEMBERS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Member's Name | Member's Address/Facsimile/Email | Member's Capital Contributions | Member's Capital Account Balance | Class of Membership Interest | Number of Membership Interest Units | Profits Interest Fully Vested or Subject to Vesting? | Member's Percentage Interest | Voting Member or Non-Voting Member? | "Economic Interest" |
| Unrivaled Brands, Inc. ("**Unrivaled**") | 3242 S. Halladay Street, Santa Ana, CA 92705 | | | Class A | 50 | Fully Vested | 50% | Voting Member | 100% |
| People's California, LLC ("**People's**") | 3843 S. Bristol Street, #601, Santa Ana, CA 92704 | | | Class B | 50 | Fully Vested | 50% | Non-Voting Member | 0% |
| | | **Total**: | **Total**: | | **Total**: 100 | | **Total**: 100% | | **Total**: 100% |

## SCHEDULE II

## DEFINITIONS

"**Adjusted Capital Contribution**" of a Member means the excess of (i) that Member's aggregate Capital Contributions to the Company, over (ii) distributions to that Member under Section 9.2 (including pursuant to Section 3.2(b)).

"**Book Value**" means, with respect to any asset of the Company, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Book Value of any asset contributed by a Member to the Company shall be such asset's gross fair market value (as determined by the Manager) at the time of such contribution;

(ii)     The Book Value shall be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that the depreciation deduction taken into account each fiscal year for purposes of adjusting the Book Value of an asset shall be the amount of Depreciation with respect to such asset taken into account for purposes of computing Net Profits or Net Losses for the fiscal year;

(iii)     The Book Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-(b)(2)(iv)(m) of the Treasury Regulations and this Agreement; provided, however that Book Values shall not be adjusted pursuant to this subsection (iii) to the extent that the Manager, in the Manager's sole discretion, determine that an adjustment pursuant to subsection (v) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (iii);

(iv)     The Book Value of any asset distributed to a Member by the Company shall be such asset's gross fair market value (as determined by the Manager) at the time of such distribution; and

(v)     The Book Value of all Company assets shall be adjusted to equal their respective gross fair market values (taking Section 7701(g) of the Code into account), as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; (c) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member, and (d) the liquidation of the Company within the meaning of Section 1.704-l(b)(2)(ii)(g) of the Treasury Regulations; provided that an adjustment described in clauses (a), (b) or (c) of this paragraph shall be made only if the Manager determine that such adjustment is necessary to reflect the relative economic interests of the Members in the Company.

"**Capital Contribution**" means, with respect to any Member, the amount of cash and the fair market value of other property (determined by the Manager as of the date of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by each Member to the capital of the Company.

"**Capital Event**" means: (A) the purchase or other acquisition directly from the Members, by a person or entity (or group of persons or entities), in one transaction or a series of related transactions, of at least a majority of all of the then-outstanding Membership Interests; or (B) a merger, consolidation or other reorganization in which (I) the Company is a constituent party, or (II) a subsidiary of the Company is a constituent party (and in the case of (II), the Company issues shares of its capital stock (or analogous equity interests) pursuant to such merger, consolidation or reorganization), except any such merger, consolidation or reorganization involving the Company or such subsidiary in which the voting equity interests of the Company outstanding immediately prior to such merger, consolidation or reorganization continue to represent, or are converted into or exchanged for voting equity interests that represent, immediately following such merger, consolidation or reorganization, at least a majority, by voting power, of the voting equity interests of (1) the surviving or resulting entity; or (2) if the surviving or resulting entity is a wholly owned subsidiary of another entity immediately following such merger, consolidation or reorganization, the parent entity of such surviving or resulting entity.

"**Depreciation**" means an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for the fiscal year or other period for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of the fiscal year or other period, Depreciation will be an amount which bears the same ratio to the beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for the fiscal year or other period bears to the beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for the fiscal year or other period is zero, Depreciation will be determined by reference to the beginning Book Value using any reasonable method selected by the Manager.

"**Membership Interest**" means, for any Member, that Member's total interest as a member of the Company, including that Member's share of the Company's Net Profits, Net Losses, distributions, his/her/its right to inspect the books and records of the Company and his/her/its right, to the extent specifically provided in this Agreement or in the Act and not otherwise restricted herein, to participate in the business, affairs and management of the Company and to vote or grant consent with respect to matters coming before the Company.

"**Net Profits**" and "**Net Losses**" means, for each fiscal period, the net income and net loss, respectively, of the Company for such period as determined in accordance with federal income tax principles (including rules governing depreciation and amortization), subject to the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses shall be added to such taxable income or loss;

(b)      Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Losses shall be subtracted from Net Profits or Net Losses;

(c)      Gains or losses resulting from any disposition of a Company asset with respect to which gains or losses are recognized for federal income tax purposes shall be computed with reference to the Book Value of the Company asset disposed of, notwithstanding the fact that the adjusted tax basis of such Company asset differs from its Book Value;

(d)      In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there will be taken into account Depreciation;

(e)      If the Book Value of any Company asset is adjusted upon the events and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), the amount of the adjustment will be taken into account as gain or loss from the disposition of the asset for purposes of computing Net Profits or Net Losses;

(f)      To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses; and

(g)      Any gain, income, deductions or losses specially allocated pursuant to Section 3.2 shall not be taken into account in determining Net Profits or Net Losses.

**<u>EXHIBIT 5</u>**

**AMENDED AND RESTATED**
**OPERATING AGREEMENT**
of
**PEOPLE'S FIRST CHOICE, LLC**
*a California limited liability company*

This Limited Liability Company Amended and Restated Operating Agreement (this "**Agreement**") of People's First Choice, LLC, a limited liability company formed under the laws of the State of California (the "**Company**"), is made effective as of November 22, 2021 (the "**Effective Date**"), by and between Unrivaled Brands, Inc., a Nevada corporation ("**Unrivaled**") and People's California, LLC, a California limited liability company ("**People's**") (as used, herein, Unrivaled and People's may each be referred to as a "**Member**" and collectively be referred to as the "**Members**"), with reference to the following facts:

WHEREAS, the Company has been formed under the California Revised Uniform Limited Liability Company Act (as amended from time to time, the "**Act**");

WHEREAS, this Agreement shall provide for the governance of the Company and the conduct of Company's business and specify each Member's relative rights and obligations with respect to the Company; and

NOW, THEREFORE, the Members by this Agreement set forth the limited liability company operating agreement for the Company from this date forward upon the terms and subject to the conditions of this Agreement.

ARTICLE 1
ORGANIZATION OF THE COMPANY

1.1     Formation and Governance. The Company became a limited liability company under the Act when the Articles of Organization were filed. The rights, duties and liabilities of the Company, the Members and the Manager are determined pursuant to the Articles of Organization and this Agreement and, to the extent they do not otherwise provide, by the Act.

1.2     Name. The name of the limited liability company is "People's First Choice, LLC." The Manager may file any fictitious name certificates and similar filings, and any amendments thereto that the Manager consider appropriate or advisable.

1.3     Purposes. The purpose of the Company is to engage in any lawful activities for which limited liability companies may be organized under the laws of the State of California.

1.4     Office. Until changed by the Manager, the principal place of business of the Company shall be 2721 S. Grand Ave, Santa Ana, CA 92705.

1.5     Duration. The Company commenced on the date the Articles of Organization were filed with the California Secretary of State and shall continue until dissolved pursuant to the terms of this Agreement or the Act.

1.6     Fiscal Year. The fiscal year of the Company shall be the calendar year.

1.7     Registered Agent.  The name and address of the Company's registered agent in the State of California is and shall be, until changed by the Manager in its discretion, as set forth in the Company's Statement of Information filed with the State of California.

1.8     Bank Accounts.  All Company funds shall be deposited in the Company's name in one or more accounts at such bank(s) as the Manager may select from time to time.

1.9     Tax Matters.

(a)     Unrivaled Brands, Inc., is hereby designated as the "partnership representative" of the Company within the meaning of Section 6223(a) of the Code. If any state or local tax law provides for a tax matters partner/partnership representative or person having similar rights, powers, authority or obligations, the person designated as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code shall also serve in such capacity (in any such federal, state or local capacity, the "**Tax Representative**"). The Manager may name a replacement Tax Representative at any time.  The Tax Representative shall represent the Company in all tax matters to the extent allowed by law.   Notwithstanding the foregoing, The Tax Representative shall take no action without the authorization of the Manager, other than such action as may be required by applicable law. Any cost or expense incurred by the Tax Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.

(b)     The Company has elected to be treated as an association taxable as a corporation for U.S. federal and applicable state and local income tax purposes (the "**Election**"). Each Member shall cooperate fully with the Company and the Tax Representative for purposes of the Election. Due to the Election, the provisions in this Agreement that apply to an entity treated as a partnership for U.S. income tax purposes are hereby deemed null and void and without effect as of the effective date of the Election.

(c)     The provisions contained in this Section 1.9 shall survive the termination of the Company, the termination of this Agreement and, with respect to any Member, the transfer or assignment of any portion of such Member's interest in the Company.

1.10     Withholding.  Each Member agrees to furnish the Company with any representations and forms as are reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations the Company may have.  All distributions made by the Company under this Agreement will be reduced by any tax or other amounts required to be withheld by the Company under applicable law.  Any amounts withheld from a distribution by the Company to a Member pursuant to any federal, state, local or foreign tax law shall be treated as if the same had been distributed to that Member hereunder.  Any other amount required to be paid by the Company to a taxing authority with respect to a Member pursuant to any federal, state, local or foreign tax law in connection with any payment to or tax liability (estimated or otherwise) of the Member shall be treated as a loan from the Company to that Member.  If such loan is not repaid within thirty (30) calendar days from the date the Company notifies that Member of the withholding, the loan shall bear interest at an annual rate equal to the lesser of (a) ten percent (10%) per annum or (b) the highest non-usurious rate permitted by applicable law under such circumstances from the date of the applicable notice to the date of repayment.  In addition to all other remedies the Company may have, the Company may withhold distributions that would otherwise be payable to that Member and apply those distributions instead to the repayment of the loan and accrued interest.

## ARTICLE 2
## MEMBERS, MEMBERSHIP INTERESTS,
## CAPITAL ACCOUNTS, AND PROFITS INTERESTS

2.1 <u>Members; Membership Interests</u>.  Company shall have two (2) classes of Members. Unrivaled shall be a Class A Member and People's shall be a Class B Member.  Each class shall have separate rights and responsibilities as set forth in this Section 2.1

a. <u>Class A: Unrivaled's Membership Interest</u>.  As a Class A Member, Unrivaled shall have all rights as a Member as set forth in the Act, including without limitation:

i. <u>Voting Rights.</u> Unrivaled shall have one hundred percent (100%) of the right to Vote and participate in management of Company, except as otherwise set forth in this Agreement.  As used herein, "**Vote**" means a written consent or approval, a ballot cast at a meeting, or a voice vote. Unrivaled shall have the sole right to Vote to appoint the Manager of the Company.  Unrivaled shall have the sole right to Vote to admit new Members to the Company.

ii. <u>Information Rights</u>. Unrivaled shall have the right to receive information concerning the business and affairs of the Company as provided for under the Act.

iii. <u>Allocation of Net Profits</u>.  Unrivaled shall receive allocations of 100% of the Net Profits and Net Losses in accordance with its Economic Interest which is reflected on <u>Schedule I</u>, except as otherwise provided for in Section 2.1(b)(iii) hereof.

iv. <u>Distributions</u>. Unrivaled shall receive 100% of any distributions made by the Company in accordance with its Economic Interest which is reflected on <u>Schedule I</u>, except as otherwise provided for in Section 2.1(b)(iv) hereof.

b. <u>Class B: People's Membership Interest</u>.  As a Class B Member, People's rights as a Member shall be limited, as set forth herein:

i. <u>Voting Rights</u>.  Except as otherwise expressly set forth herein People's <u>shall not</u> have the right to Vote on any matters and <u>shall not</u> have the right to participate in management of Company.  People's <u>shall not</u> have the right to Vote to appoint the Manager of the Company.  People's <u>shall not</u> have the right to Vote to admit new Members to the Company.

ii. <u>Information Rights</u>.  People's shall have the right to receive information concerning the business and affairs of the Company only to the extent required by the Act.

iii. <u>Allocation of Net Profits</u>.  People's <u>shall not</u> receive allocations of Net Profits and Net Losses, in accordance with its Economic Interest which is reflected on <u>Schedule I</u>. If at any time after the Effective Date and with respect to the operation of the Company for the period following the Effective Date, People's incurs a Tax Liability Amount, People's shall be entitled to a Tax Distribution equal to People's Tax Liability Amount.

iv. <u>Distributions; "Profits Interest"</u>. People's <u>shall not</u> receive distributions, in accordance with its Economic Interest which is reflected on <u>Schedule I</u>, except as otherwise provided for in Section 2.1(b)(iii) hereof.

3

2.2     Ownership and Percentage Interests. The percentage interest in the Company ("**Percentage Interest**") means, for any particular Member as of any date of determination, the percentage set forth opposite such Member's name on Schedule I attached hereto under the column "Member's Percentage Interest," which schedule shall be amended by the Manager from time to time to properly reflect the admission of new Members or any other event having an effect on any Member's Percentage Interest.

2.3     Separate Capital Account for Each Member.  The Company shall establish and maintain a separate capital account ("**Capital Account**") for each Member in accordance with Section 704(b) of the Internal Revenue Code of 1986, as amended ("**Code**"), and the final, proposed and temporary income tax regulations promulgated from time to time thereunder ("**Treasury Regulations**").  Each Member's Capital Account shall be credited and debited in accordance with the Code and the Treasury Regulations. Each Member's Capital Account balance as of the Effective Date is set forth on Schedule I attached hereto under the column "Member's Capital Account Balance."

2.4     Initial Capital Contributions; Schedule of Contributions. The initial Capital Contributions of the Members are set forth on Schedule I attached hereto under the column "Member's Capital Contributions".  No Member may withdraw any initial or additional Capital Contribution to, or receive any distributions from, the Company except as otherwise expressly provided in this Agreement.

2.5     Additional Capital Contributions.  No Member will be required to make, any additional Capital Contribution, without the prior written consent of the Manager.  Subject to the foregoing provisions of this Section 2.5, any additional Capital Contributions made pursuant to this Section 2.5 shall be credited to the contributing Member's Capital Account in accordance with Section 2.3, and Schedule I attached hereto shall be updated in accordance with Section 2.4.

2.6     No Interest on Capital; In Kind Distributions.  No interest shall be paid on Members' Capital Contributions.  No Member shall be entitled to demand or receive any property from the Company other than cash except as provided in this Agreement.

2.7     Limitation of Liability. The liability of the Members shall be limited in accordance with the provisions of the Act.

# ARTICLE 3
## ALLOCATIONS AND DISTRIBUTIONS

3.1     Allocations.  Net Profits and Net Losses for each fiscal year of the Company (or portion thereof) and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, in strict compliance with the Code and the Treasury Regulations, to each Member in accordance with that Member's Economic Interest.

3.2     Distributions.  The Company shall, at the Manager's sole discretion, provided such is not otherwise prohibited by law, make distributions of cash subject to the following distribution schedule:

a.     Subject to Section 3.2(b), cash available for distribution (if any) shall be distributed among the Class A Members pro rata in proportion to their Economic Interests at such times as shall be determined by the Manager in the Manager's sole discretion.  Cash available for distribution shall be determined by the Manager and shall mean available funds remaining in the Company accounts after all current debts and obligations of the Company have been paid or provided for and a reasonable reserve (as

determined by the Manager) for operating expenses, debt servicing and other contingencies has been set aside.

b.      Within ninety (90) days after the end of any fiscal year, to the extent of cash available for distribution (if any), the Manager shall cause the Company to distribute to each Member with respect to each taxable year of the Company (excluding the taxable year in which the Company is being liquidated) an amount of cash equal to such Member's Tax Liability Amount for such taxable year (a "**Tax Distribution**"). For this purpose, a Member's "**Tax Liability Amount**" for any such taxable year of the Company means an amount equal to the excess of (i) the Assumed Tax Rate multiplied by (ii) the excess of (a) the taxable income (including separately stated items) and gain allocated to such Member for such taxable year of the Company (as shown on the applicable Internal Revenue Service Form 1065 Schedule K-1 filed by the Company) minus (b) the cumulative losses that have been allocated to such Member for each taxable year of the Company to the extent such losses have not previously reduced taxable income and gain pursuant to this provision over the cumulative distributions made to such Member under Section 3.2(a) (excluding Tax Distributions) during such taxable year. The "**Assumed Tax Rate**" shall mean the rate representing the highest federal and California income tax rate in effect for an unmarried individual resident of the State of California, taking into account the character of the income (e.g., long-term or short-term capital gain, ordinary or tax-exempt, or "qualified business income," "qualified REIT dividend" income or "qualified publicly traded partnership income" under Code Section 199A). All Tax Distributions made to a Member pursuant to this Section 3.3(b) shall be treated as an advance distribution to such Member and shall reduce the amount of any distribution (other than Tax Distributions) to which such Member thereafter becomes entitled under this Agreement, whether from proceeds of the liquidation of the Company, under Sections 3.3(a), 9.2, or otherwise. For the avoidance of doubt, Tax Distributions under this Section 3.3(b) to any Member will not take into account any tax items allocated to the Member pursuant to Section 704(c) of the Code. Notwithstanding the foregoing, no Tax Distribution shall be payable in connection with a sale or liquidation of the Company or a Capital Event.

3.3      <u>Tax Allocation Matters</u>. Except as otherwise provided herein, all items of income, gain, loss deduction or credit for federal, state and local income tax purposes will be allocated in strict compliance with Code and the Treasury Regulations, in the same manner as the Company's corresponding "book" items. Each Member's allocable share of the taxable income or loss of the Company, depreciation, depletion, amortization and gain or loss with respect to any contributed property, or with respect to revalued property, shall be determined in the manner provided in the Code and the Treasury Regulations. Allocations pursuant to this Section are solely for federal, state and local tax purposes and except to the extent allocations are reflected in the allocations of the Company's corresponding "book" items. Allocations under this Section will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items or distributions pursuant to any provision of this Agreement.

3.4      <u>Allocations in Respect of Transferred Membership Interests</u>. If any Membership Interest (or portion thereof) is transferred during any fiscal year, each item of income, gain, loss, deduction or credit of the Company for that fiscal year shall be assigned pro rata to each day in the particular period of that fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each item so assigned to any such day shall be allocated to the Member based upon that Member's respective Membership Interest at the close of that day. Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date that sale or other disposition occurs. If any Membership Interest (or portions thereof) are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the

economic attributes of the transferor (e.g., Capital Contributions balance, Adjusted Capital Contributions balance, Capital Account balance) to the extent attributable to the Membership Interest (or portion thereof) so transferred.

3.5     Section 1.83-3(l) Compliance.  Each Class A Member agrees, and agrees to cause the Company, to comply with all of the requirements of the safe harbor set forth in Proposed Treasury Regulations Section 1.83-3(l), and any corresponding future provision of the Code or the Treasury Regulations, whereby each Class A Member hereby agrees that the fair market value of any Profits Interest that is transferred in connection with the performance of services is treated as being equal to the liquidation value of that Profits Interest as of the date of issuance or grant.

## ARTICLE 4
## ACCOUNTING AND RECORDS

4.1     Books of Account.  The Company shall keep complete and accurate business and accounting books and records, which shall be open to inspection at the Company office by any Class A Member or Class A Member's authorized representative at any reasonable time.  Each Class A Member shall have the right to cause a special audit and/or review of Company books and records. All fees and expenses of such special audit or review shall be borne by said Class A Member.

4.2     Accountants.  The Manager may retain at the Manager's sole election, an independent accounting firm to review Company books and records annually, or more frequently if the Manager so decide, or to review other accounting determinations as requested by the Manager.

## ARTICLE 5
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1     Management by Manager.

a.     The Company shall be a single manager, manager-managed limited liability company.  The Manager of the Company ("**Manager**") shall be appointed exclusively by Unrivaled at Unrivaled's sole discretion. The initial Manager of the Company is as set forth in Schedule I.

b.     All decisions, elections and consents to be made in connection with the direction, management and control of the Company shall, except as expressly provided otherwise in this Agreement, be reserved to the Manager.  Subject to Section 5.2, to any provisions hereof permitting Class A Members to make unilateral decisions, and to the mandatory voting provisions of the Act or other applicable law, all actions to be taken by the Members shall be made by the Class A Members, including without limitation the actions described in Section 5.2(b).

c.     The Manager, solely in the Manager's capacity as Manager, (i) shall make no Capital Contribution and (ii) shall have no interest in profits, losses or distributions of the Company.

5.2     Members' Voting Rights.

a.     Except as otherwise expressly provided in this Agreement, on any matter or action that is subject to the approval of the Members, Unrivaled shall have the exclusive right to vote and the Vote of Unrivaled shall be equal to a Vote of one hundred percent (100%) of the Members.  People's shall have no Vote or voting rights on any matter or action.  In the event that People's is required to Vote under

applicable law, People's hereby grants to Unrivaled a proxy to Vote all of People's Membership Interest in any manner as desired by Unrivaled in Unrivaled's sole discretion. People's acknowledges that the proxy granted hereby, is given to secure the performance of a duty, is coupled with an interest and shall be irrevocable until the duty is performed. This Agreement does not grant any other proxies and should not be interpreted as doing so.

        b.     Notwithstanding the foregoing, none of the following actions may be authorized or undertaken by the Company without the prior written consent of People's for so long as People's (i) holds a Membership Interest and (ii) is not in breach of this Agreement (including, without limitation, Section 8.3 hereof): (i) modify or amend this Agreement in a manner that adversely affects the Class B Members, except as otherwise required by applicable laws or regulations; (ii) amend the Company's Articles of Organization in a manner that adversely affects the Class B Members; (iii) modify any material tax election or change the Company's method of accounting for income tax purposes, amend any material tax return, enter into any closing agreement, settle any tax claim or assessment, or consent to any extension or waiver of the limitation period applicable to any tax claim or assessment relating to Company, relating to any period prior to the date hereof, if such election, change, agreement, settlement or consent would have the effect of directly increasing the tax liability of the Company; or (iv) sell, adjust, split, combine or reclassify any of its units or other equity interests, in any manner that adversely affects the Class B Members; (v) enter into any agreement, or otherwise become obligated, to do any action identified in this Section 5.2(b).

        5.3     <u>No Manager Compensation</u>.  Subject to Section 6.5 or unless the Unrivaled otherwise agrees, no Manager shall receive compensation for his, her or its services to the Company as a Manager.

        5.4     <u>Meetings</u>.  Members shall meet from time to time on the call of the Manager or any Member.  Upon reasonable advance notice, Unrivaled shall have the right to have advisors, attorneys and consultants attend Member meetings at the expense of Unrivaled, provided that no meeting shall be delayed due to the unavailability of any such person.  People's shall have the right to have advisors, attorneys and consultants attend Member meetings. Members may participate in a meeting through the use of conference telephone, video conferencing or similar communications equipment or methods as long as all Members participating can hear one another and speak to one another.

        5.5     <u>Action Without Meeting</u>.  Any action that may be taken at a meeting of the Members may be taken without meeting if a consent in writing, setting forth the action so taken is signed by Unrivaled.

ARTICLE 6<br/>MANAGER AND OFFICERS

        6.1     <u>Appointment and Removal of Manager</u>.  Unrivaled may, from time to time, in its sole discretion, remove or appoint a new Manager.

        6.2     <u>Appointment and Removal of Officers</u>.  The Manager may appoint a President, Chief Financial Officer, Secretary and/or other officers of the Company.  Any officer of the Company shall exercise such powers and perform such duties as are typically exercised by similarly titled officers in a corporation or as shall otherwise be determined from time to time by the Manager, but subject in all cases to the supervision and control of the Manager.  Any officer of the Company may be terminated and removed from office at any time by the Manager, with or without cause.  Multiple offices, or all offices, may be held by one person. Officers may, but need not, be Members.

7

6.3 <u>Signing Authority of Manager and Officers</u>.  The Manager or officer (if any) of the Company shall have such authority to sign checks, contracts, instruments and other documents on behalf of the Company as may be delegated to them from time to time by the Manager, provided, however, that:

a. any contract that is approved by the Manager or otherwise in accordance with this Agreement may be signed by any Manager or any officer; and

b. any Manager or officer may enter into, without any additional approval by the Manager or the Members, on behalf of the Company, any contract (written or otherwise): (i) that does not involve or include any mortgaging or pledging of, or otherwise placing a lien or encumbrance on (other than a statutory lien for taxes not yet due and payable) or granting of a security interest in, any of the material assets or securities of the Company; (ii) that, individually or when aggregated with a group of related contracts, does not involve consideration in excess of $100,000.00 in the aggregate; (iii) that does not call for performance over a period of more than one (1) month, unless such contract may be cancelled by the Company upon 30 days' (or less) notice without premium or penalty; (iv) that does not prohibit the Company from freely engaging in business or from freely competing with any person or entity anywhere in the world; (v) that does not impose on the Company the obligation to indemnify, defend or hold harmless any person or entity whereby the Company has or reasonably could be expected to have indemnification obligations in excess of $100,000; (vi) under which no Manager, Member or any affiliate or relative (by blood or marriage) of any Manager or Member has any rights or derives any benefits; (vii) that does not provide for the guaranty by the Company or any of its affiliates of the indebtedness or obligations of, or the performance by, any third party; or (viii) that does not require, directly or indirectly, the approval of the Members under Section 5.2.

6.4 <u>Acts of Manager and Officers as Conclusive Evidence of Authority</u>.  Any note, mortgage, deed of trust, evidence of indebtedness, contract, certificate, statement, conveyance or other instrument or obligation in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other person or entity, when signed by Manager, the President, Chief Financial Officer, the Secretary (if any) or any Vice-President (if any), is not invalidated as to the Company by any lack of authority of the signing Manager or officer(s) in the absence of actual knowledge on the part of the other person or entity that the signing Manager or officer(s) had no authority to execute the same.

6.5 <u>Compensation of Officers</u>.  Each officer of the Company (including, without limitation, the Manager to the extent he or she is separately an officer of the Company) shall serve without compensation.

ARTICLE 7
STANDARD OF CARE; COMPETITION AND
OUTSIDE INTERESTS; CONFIDENTIALITY

7.1 <u>Standard of Care</u>.

a. To the fullest extent permitted by the Act and other applicable law as a manager-managed limited liability company, neither any Member nor the Tax Representative, nor any officer of the Company, shall owe any duty, including, without limitation, any fiduciary duty of loyalty or care, to the Company, any other Member or any other person or entity party to or otherwise bound by this Agreement except to the extent otherwise expressly set forth in this Agreement or in other written agreements to which such Member is a party or by which it is bound. To the extent that such duties cannot be eliminated, such duties shall be limited and modified to the fullest extent permitted by the Act and other

8

applicable law and as specifically set forth in Sections 7.2; provided, however, that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

      b.    To the fullest extent permitted by the Act and other applicable law, the fiduciary duties of the Manager shall be limited to the following, in each case as limited and modified to the fullest extent permitted by the Act and other applicable law and as specifically set forth in Sections 7.2 and 7.3:

      i.    Duty of loyalty, which shall be limited to (A) accounting to the Company and hold as trustee for it any property, profit, or benefit derived by such Manager in the conduct and winding up of the activities of the Company or derived from a use by such Manager of the Company's property, including the appropriation of a Company opportunity (subject to Sections 7.2 and 7.3); (B) refraining from dealing with the Company in the conduct or winding up of the activities of the Company as or on behalf of a person having an interest adverse to the Company; and (C) refraining from competing with the Company in the conduct or winding up of the activities of the Company (subject to Sections 7.2 and 7.3); and

      ii.    Duty of care in the conduct and winding up of the activities of the Company, which shall be limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

The foregoing are duties are further limited and modified as set forth in Sections 7.2 and 7.3, and the Members hereby acknowledge and agree that such limitations and modifications are reasonable in all respects; provided, however, that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

      7.2    <u>Transactions with any Manager or Member</u>.  Subject to Section 5.2(b), any Manager or Member may, and may cause any of his/her/its affiliates to, engage in, notwithstanding that it may constitute a conflict of interest, any transaction (including, without limitation, the purchase, sale, lease or exchange of any property, the lending of money, the rendering of any service or the establishment of any salary, other compensation or other terms of employment) with the Company so long as such transaction (a) is approved in writing by the Manager (if the Manager are not a party to or beneficiary of such transaction), and (b) otherwise is on terms no less favorable to the Company than it reasonably could expect to receive from an unaffiliated third party in an arms' length transaction. Moreover, the approval required to authorize or ratify any acts or transactions that would otherwise violate the duty of loyalty set forth under Section 7.1 shall be the approval of the Unrivaled.

      7.3    <u>Confidentiality</u>.  All books, records, financial statements, tax returns, budgets, business plans and projections of the Company, all other information concerning the business, affairs and properties of the Company and all of the terms and provisions of this Agreement, in each case shall be held in confidence by each Member and his/her/its respective affiliates, subject to any obligation to comply with (a) any applicable law, (b) any rule or regulation of any legal authority or securities exchange, (c) any subpoena or other legal process to make information available to the persons entitled thereto, (d) any accounting or audit request by Unrivaled as part of its financial audits or (e) any investor reporting to Unrivaled's equity or debt investors from time to time.  Such confidentiality shall be maintained to the same degree as such Member maintains his/her/its own confidential information (but in no event to a lesser degree than a reasonable person would maintain his/her/its confidential information) and shall be maintained until such time, if any, as any such confidential information either is, or becomes, published or a matter of public knowledge through no fault, directly or indirectly, of such Member or any of its affiliates, agents or representatives.

ARTICLE 8
TRANSFER RESTRICTIONS

8.1    Generally.

(a)    No Class B Member shall directly or indirectly transfer (which, for the purposes of this Agreement, shall include, without limitation, any transfer, conveyance, sale, gift or other disposition), mortgage, pledge, encumber, hypothecate or alienate all or any portion of his/her/its Membership Interest, whether voluntarily or by operation of law (a "**Transfer**"), except as permitted by this Article 8.

(b)    Notwithstanding Section 8.1(a), a Member may Transfer all or any portion of his/her/its Membership Interest provided that such Member is a Class A Member or, if such Member is a Class B Member, such Class B Member has received the prior written consent of Unrivaled and the Manager to such Transfer.

8.2    Prohibited Transfer Is Void.

(a)    Any purported Transfer of all or any portion of a Class B Member's Membership Interest that is not authorized by this Section 8 or that is in breach of (or results in breach of) Section 8 shall be void and of no effect, except that it also shall constitute a material breach of this Agreement.

(b)    No Transfer of all or any portion of a Class B Member's Membership Interest shall be permitted or recognized if its consummation would cause (or reasonably could be expected to cause) a breach or violation of any agreement to which the Company is a party or by which any of its property is bound, including, without limitation, any loan or security agreement in respect of the Company or any of its property.

(c)    Notwithstanding any provision of this Agreement to the contrary, there shall be no Transfer (including, without limitation, any Permitted Transfer) of any Membership Interest (or portion thereof) if such transfer would: (i) constitute a transaction effected through an "established securities market" within the meaning of Treasury Regulations Section 1.7704-1(b) or otherwise cause the Company to be a "publicly traded partnership" within the meaning of Section 7704 of the Code; or (ii) effect a termination of the Company under Section 708 of the Code (but only if such termination would result in material adverse consequences to the Company or any Member under federal, state or local law, as determined by the Manager).

8.3    Option to Purchase.  Subject to the Terms set forth in this Section 8.3, without limitation of anything contained in any purchase agreement entered into between the Members, during the Option Term, Unrivaled shall have the Option to purchase all of People's' Membership Interest for the Option Exercise Price as more fully described in this Section 8.3.

a.    Option Term.  The Option term shall commence on the date of receipt of all regulatory approvals for Unrivaled to acquire People's' Membership Interest and shall continue for a period of twelve (12) months thereafter (the "**Option Term**").

b.    Call Option.  For the duration of the Option Term, for the Option Exercise Price, People's hereby voluntarily, irrevocably and exclusively grants to Unrivaled an option to purchase all of

People's' Membership Interest, in accordance with the terms and conditions set forth herein (the "**Call Option**").

       c.    <u>Computation of Option Exercise Price</u>. For purposes of this Section 8.3, the "**Option Exercise Price**" shall mean One Dollar.

       d.    <u>Option Notice</u>.  In the event that Unrivaled wishes to exercise the Call Option, Unrivaled shall deliver a written notice to People's notifying People's of Unrivaled's desire to exercise the Call Option (the "**Option Notice**").

       e.    <u>Delivery of Option Exercise Price</u>.  In the event that Unrivaled opts to exercise the Call Option, the Option Exercise Price shall be payable to People's within three (3) days of People's receipt of the Option Notice (the "**Option Closing Date**.") People's and Unrivaled agree that they shall execute a purchase agreement for Unrivaled's purchase of People's' Membership Interest in a form to be mutually agreed upon by the Members in good faith (the "**Remaining Purchase Agreement**"). The date of execution of the Remaining Purchase Agreement shall be referred to as the "**Execution Date**". The Parties acknowledge that the intent is for the Execution Date to also be date of the closing of the Remaining Purchase Agreement (the "**Closing**"). In the event that there are still conditions to the Closing that have not been satisfied on or before the Execution Date, the Closing may be extended, but, in no event shall the Closing occur later than ten (10) days following the Execution Date.

f.    <u>Restriction on Transfer</u>.  From the Effective Date until the later of the conclusion of the Option Term or the Option Closing Date, People's may not offer to Transfer any of People's' Membership Interest to any Person except Unrivaled.

8.4    <u>Intentionally Omitted</u>.

8.5    <u>Drag Along Rights</u>.  In the event that Unrivaled enters into an agreement with any person or persons (the "**Drag-Along Purchaser**") regarding Transfer of all of Unrivaled's Membership Interest, Unrivaled shall be entitled, in Unrivaled's sole and exclusive discretion, to require each Member of Company to include all of its Membership Interest in the Transfer (the "**Drag-Along Right**"), provided that such parties strictly comply with the following provisions:

       a.    Unrivaled shall provide written notice to People's at least thirty (30) business days prior to the communication of the proposed Transfer, which notice shall include the identity of the Drag-Along Purchaser, the offer price, and other material terms and conditions of the proposed Transfer (the "**Drag-Along Notice**").

       b.    Upon receipt of the Drag-Along Notice, People's shall be obligated to Transfer all of its Membership Interest at the same price, proportional to their percentage ownership of the Membership Interest, being subject, to the same representations and warranties (but only to its knowledge with respect to the matters relating to the Company), covenants, indemnities, holdback, escrow and other material provisions of the proposed Transfer.

       c.    All fees and expenses incurred in connection with the Transfer shall be the sole responsibility of Unrivaled.

       d.    Unrivaled shall be entitled to one hundred percent (100%) of the proceeds received from such sale, minus the Option Exercise Price, which shall be paid to People's directly by the Drag-Along Purchaser.

8.6     Permitted Transfers and Permitted Transferees.

(a)     Any permitted transferee covered by Section 8.6(b), any other transferee of all or any portion of a Member's Membership Interest whose transfer is pre-approved by the Unrivaled as contemplated by Section 8.1(b), or any Transferee which is done in compliance with Section 8.5, is, with respect to the associated Permitted Transfer, a "**Permitted Transferee**" for the purposes of this Agreement.  Any transfer permitted by and complying with Section 8.6(b), or for which the transferor Member obtains the prior written approval of the Manager and Unrivaled in accordance with Section 8.1(b), or which is done in compliance with Section 8.5, is a "**Permitted Transfer**" for the purposes of this Agreement.

(b)     If a Permitted Transfer is from People's to a person or entity who, prior to such transfer, was not a Member, then the Permitted Transferee shall become a Class B Member (non-Voting).

8.7     Admission of Substituted Member.  If a Permitted Transfer is to be consummated and if the subject Permitted Transferee is not, prior to such consummation, a Member, then the Permitted Transferee of such Permitted Transfer shall be admitted to the Company as a substituted Member subject to satisfaction of the following conditions: (a) the Permitted Transfer is consummated in compliance with this Agreement and all regulatory approvals required for such Permitted Transfer have been obtained; (b) Unrivaled approves the form and content of the instruments and documents regarding such Permitted Transfer; (c) the Permitted Transferee accepts and adopts in writing all of the terms and conditions of this Agreement, as then in effect; (d) the transferor Member or the Permitted Transferee pays all costs and expenses incurred by the Company in connection with such admission, including, without limitation, legal and accounting fees; and (e) upon admission, the Percentage Interests shall be adjusted and Schedule I shall be amended accordingly, including, without limitation, to reflect such Permitted Transferee's admission to the Company as a Class A Member or Class B Member, as applicable.

8.8     Restrictions on Transferees.  A transferee of all or any part of a Member's Membership Interest who does not become a substituted Member shall have no right to require any information or accounting of the Company's transactions, to inspect the Company's books or to vote on Company matters. In addition, subject to Section 8.2, such transferee shall only be entitled to receive the share of distributions and the allocations of Net Profits and Net Losses and other items of income, gain, loss, deduction and credit to which the transferor would otherwise have been entitled, if any.

ARTICLE 9
DISSOLUTION

9.1     Dissolution of the Company.  The Company shall dissolve: (a) on the date stated in the Certificate (if any); (b) at the election of Unrivaled;; or (c) the occurrence of any other event causing a dissolution of the Company under Section 18-801 of the Act.

9.2     Distribution of Assets Upon Liquidation or Capital Event.  Upon the liquidation or dissolution of the Company, after payment of the Company's debts and liabilities and the provision for adequate reserves (as reasonably determined by the Manager), the assets of the Company shall promptly be distributed solely to Class A Members following, in the event that People's owns any Membership Interest as of such time, payment to People's of the Option Exercise Price.

9.3     <u>Restoration of Negative Capital Accounts</u>.  Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account balance (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), that Member shall not have any obligation to make any contribution to the capital of the Company, and the negative balance of that Member's Capital Account shall not be considered a debt owed by that Member to the Company or to any other person for any purpose whatsoever.

9.4     <u>Distribution of Assets in Kind</u>.  After all debts of the Company have been paid, the Voting Members may determine (which determination shall be binding on all Members) to distribute all or a portion of the assets of the Company in kind.

9.5     <u>Certificate of Dissolution</u>.  Upon completion of the winding up of the Company, the Members shall prepare, execute and deliver to the California Secretary of State a certificate of dissolution in accordance with the Act.

9.6     <u>Recourse to Assets</u>.  Each Member agrees to look solely to the assets of the Company for any distributions or return of such Member's Capital Contributions.

ARTICLE 10
INDEMNIFICATION

10.1     <u>Indemnification Generally</u>.  Subject to any limitations on indemnification mandated by the Act, and except with respect to any breach of purchase agreement for the purchase by Unrivaled of Membership Interests in the Company entered into by the Members by the Class B Members or the other sellers party thereto, or any matters that constitute indemnifiable matters under Section 10.02 of such purchase agreement and any Damages related thereto the Company shall indemnify and hold harmless any person (an "**<u>Indemnified Person</u>**") made, or threatened to be made, a party to an action or proceeding, whether civil, criminal or investigative (a "**<u>Proceeding</u>**"), including an action by or in the right of the Company, by reason of the fact that such Indemnified Person was or is (a) a Manager of the Company, (b) a Member, (c) an officer of the Company, (d) the Tax Representative, (e) an Affiliate of a Manager, the Tax Representative, a Member or an officer of the Company, or (f) an officer, director, shareholder, partner, member, employee, manager or agent of any of the foregoing, or by reason of the fact that such person was or is serving at the request of the Company as a manager, Tax Representative, director, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against Damages incurred as a result of such Proceeding or any appeal thereof; provided, however, that no such person shall be indemnified or held harmless if and to the extent that the Damages for which indemnification is sought results from any of such person's (or such person's agent's or representative's) acts or omissions (i) in bad faith, (ii) for a purpose which the person at issue (A) did not reasonably believe to be in, or not opposed to, the best interests of the Company and (B) with respect to criminal proceedings, additionally had no reasonable cause to believe was unlawful, (iii) that involves fraud, willful misconduct, gross negligence or reckless disregard of duty, (iv) that constitutes a material breach of this Agreement, or (v) from which such person derives an improper personal benefit.  The Company's indemnification obligations hereunder shall survive the termination of the Company.  As used herein, "**<u>Damages</u>**" means any and all judgments, fines, taxes, amounts paid in settlement, and reasonable expenses (including investigation, accounting and attorneys' fees).

13

10.2    Contract Right; Expenses.  The right to indemnification conferred in this Article 10 shall be a contract right and shall include the right to require the Company to advance the expenses incurred by the Indemnified Person in defending any such Proceeding in advance of its final disposition; provided, however, that the payment of such expenses in advance of the final disposition of a Proceeding shall be made only upon receipt by the Company of an undertaking, by or on behalf of the Indemnified Person, to repay all amounts so advanced if it shall be determined that such Indemnified Person is not entitled to be indemnified under this Article 10 or otherwise.

10.3    Indemnification of Employees and Agents.  The Company may, to the extent authorized from time to time by the Manager, grant rights to indemnification and to advancement of expenses to any employee or agent of the Company to the fullest extent of the provisions of this Article 10 with respect to the indemnification and advancement of expenses of a Manager, Tax Representative, Members and officers of the Company.

10.4    Nonexclusive Right.  The right to indemnification and the payment of expenses incurred in defending a Proceeding in advance of its final disposition conferred in this Article 10 shall not be exclusive of any other right which any person may have or hereafter acquire under any statute or agreement, or under any insurance policy obtained for the benefit of the Company or any Manager, tax matters partner, tax representative, Member and/or any officer of the Company.

10.5    Insurance.  The Manager may cause the Company to purchase and maintain insurance on behalf of any person (including, without limitation, the Manager, Tax Representative, Member and/or officer of the Company) who is or was an agent of the Company against any liability asserted against that person and incurred by that person in any such capacity or arising out of that person's status as an agent of the Company, whether or not the Company would have the power to indemnify that person against liability under this Agreement or applicable law.

ARTICLE 11
MISCELLANEOUS

11.1    Entire Agreement.  This Agreement and the Articles of Organization constitute the complete and exclusive statement of agreement among the Manager and the Members with respect to their respective subject matters and supersede all prior written and oral agreements or statements between or among the Manager and/or the Members with respect to such subject matter, and this Agreement amends and restates, and supersedes, in its entirety, any previous operating agreements of the Company existing prior to the date hereof, which shall be of no force or effect.

11.2    Amendments.  Except as otherwise expressly provided herein, all amendments to this Agreement or the Articles of Organization must be made in a writing and signed by all of the Class A Members.  Any such amendment shall be binding on all Members.

11.3    Offset Privilege; No Partition.  Any monetary obligation owing from the Company to any Member may be offset by the Company against any monetary obligation then owing from that Member to the Company.  No Member shall have the right to seek the partition any property belonging to the Company.  Upon any breach of the preceding sentence by any Member, the other Members shall be entitled to a decree or order restraining and enjoining any application, action or petition for partition and shall not be required to post bond in conjunction therewith.

14

11.4    <u>Remedies Cumulative</u>.  Except as otherwise provided herein, the remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

11.5    <u>Notices</u>.  Any notice to be given to the Company, the Manager or any Member in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address, facsimile number or email address specified by the party to receive the notice by courier or other means of personal service, when received if sent by facsimile or email, or three (3) calendar days after deposit of the notice by first class mail, postage prepaid, or certified mail, return receipt requested.  Manager's and Member's initial address, facsimile number and/or email address for such notices is specified on <u>Schedule I</u>.  Any party may, by giving five (5) calendar days' prior written notice to the other parties, designate any other address, facsimile number or email address as the new address, facsimile number or email address to which notice to such first party is to be given.  Any notice to the Company shall be directed to the attention of Manager at such Manager's most-current address, facsimile number or email address under this Notices paragraph.

11.6    <u>Attorneys' Fees</u>.  The prevailing party in any action to enforce this Agreement shall be entitled to its costs and fees (including, without limitation, reasonable attorneys' fees and expert witness fees) incurred in connection with such action.

11.7    <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to any conflicts of laws principles of the State of California or any other jurisdiction that would call for the application of the law of any jurisdiction other than the State of California.  Manager and each Member consents to the exclusive jurisdiction of the state courts sitting in Orange County, California in any action on a claim arising out of, under or in connection with this Agreement or any of the transactions contemplated by this Agreement. The parties hereto acknowledge and agree (a) that cannabis businesses are not permitted under, or may otherwise violate, federal law and (b) that any illegality or violation of federal law applicable to cannabis businesses shall not be a defense to enforceability of this Agreement.

11.8    <u>Interpretation</u>.  Article and Section headings in this Agreement are inserted only for convenience of reference and are not to be considered in the interpretation or construction of any provision of this Agreement.  This Agreement shall not be construed as if it had been prepared by one of the parties, but rather as if all parties had prepared it.

11.9    <u>Severability</u>.  If any provision of this Agreement or the application of that provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of that provision to persons or circumstances other than those to which it is held invalid shall not be affected.

11.10   <u>No Third Party Rights</u>.  No Person other than the Manager, a Member or a person entitled to indemnification pursuant to Article 10 shall have any legal or equitable right, remedy or claim, or be a beneficiary, under or in respect of this Agreement.

11.11   <u>Multiple Counterparts; Signatures</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  This Agreement may be executed and delivered by PDF, facsimile and/or electronic signatures, and any such PDF, facsimile or electronic signature shall be deemed an original for purposes of evidencing execution of this Agreement.

11.12  <u>Definitions</u>.  The undefined capitalized terms set forth in this Agreement shall have the meaning prescribed in Schedule II attached hereto and incorporated herein.

11.13  <u>Successors in Interest</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their personal representatives and, subject to the applicable provisions of this Agreement, their successors and assigns.

IN WITNESS WHEREOF, the Members and the Manager have executed this Agreement, and acknowledge and agree to this Agreement, in each case effective as of the Effective Date.

MANAGER AND CLASS A MEMBER:          CLASS B MEMBER:

Unrivaled Brands, Inc.                People's California, LLC

By: _____          By: _____
Name: Francis Knuettel II            Name: Bernard Steimann
Title: Chief Executive Officer       Title: Manager

[Signature Page to Amended and Restated Operating Agreement of People's First Choice, LLC]

4822-2366-1822

IN WITNESS WHEREOF, the Members and the Manager have executed this Agreement, and acknowledge and agree to this Agreement, in each case effective as of the Effective Date.

<u>MANAGER AND CLASS A MEMBER</u>:          <u>CLASS B MEMBER</u>:

Unrivaled Brands, Inc.                        People's California, LLC

By: _____          By: _____
Name: Francis Knuettel II                    Name: Bernard Steimann
Title: Chief Executive Officer               Title: Manager

# SCHEDULE I

## MANAGER AND MEMBERS
### (as of November 22, 2021)

**MANAGER:**

**Name**: Unrivaled Brands, Inc.          Address: 3242 S. Halladay Street, Santa Ana, CA 92705

**MEMBERS:**

| MEMBERS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Member's Name | Member's Address/Facsimile/Email | Member's Capital Contributions[1] | Member's Capital Account Balance | Class of Membership Interest | Number of Membership Interest Units | Profits Interest Fully Vested or Subject to Vesting? | Member's Percentage Interest | Voting Member or Non-Voting Member? | "Economic Interest" |
| Unrivaled Brands, Inc. ("**Unrivaled**") | | | | Class A | 80 | Fully Vested | 80% | Voting Member | 100% |
| People's California, LLC ("**People's**") | 3843 S. Bristol Street, #601, Santa Ana, CA 92704 | | | Class B | 20 | Fully Vested | 20% | Non-Voting Member | 0% |
| | | **Total**: | **Total**: | | **Total**: 100 | | **Total**: 100% | | **Total**: 100% |

---

[1] To be determined prior to execution by Unrivaled in its reasonable discretion.

4822-2366-1822

## SCHEDULE II

## DEFINITIONS

"**Adjusted Capital Contribution**" of a Member means the excess of (i) that Member's aggregate Capital Contributions to the Company, over (ii) distributions to that Member under Section 9.2 (including pursuant to Section 3.2(b)).

"**Book Value**" means, with respect to any asset of the Company, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)      The initial Book Value of any asset contributed by a Member to the Company shall be such asset's gross fair market value (as determined by the Manager) at the time of such contribution;

(ii)      The Book Value shall be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that the depreciation deduction taken into account each fiscal year for purposes of adjusting the Book Value of an asset shall be the amount of Depreciation with respect to such asset taken into account for purposes of computing Net Profits or Net Losses for the fiscal year;

(iii)      The Book Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-(b)(2)(iv)(m) of the Treasury Regulations and this Agreement; provided, however that Book Values shall not be adjusted pursuant to this subsection (iii) to the extent that the Manager, in the Manager's sole discretion, determine that an adjustment pursuant to subsection (v) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (iii);

(iv)      The Book Value of any asset distributed to a Member by the Company shall be such asset's gross fair market value (as determined by the Manager) at the time of such distribution; and

(v)      The Book Value of all Company assets shall be adjusted to equal their respective gross fair market values (taking Section 7701(g) of the Code into account), as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; (c) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member, and (d) the liquidation of the Company within the meaning of Section 1.704-l(b)(2)(ii)(g) of the Treasury Regulations; provided that an adjustment described in clauses (a), (b) or (c) of this paragraph shall be made only if the Manager determine that such adjustment is necessary to reflect the relative economic interests of the Members in the Company.

"**Capital Contribution**" means, with respect to any Member, the amount of cash and the fair market value of other property (determined by the Manager as of the date of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by each Member to the capital of the Company.

"**Capital Event**" means: (A) the purchase or other acquisition directly from the Members, by a person or entity (or group of persons or entities), in one transaction or a series of related transactions, of at least a majority of all of the then-outstanding Membership Interests; or (B) a merger, consolidation or other reorganization in which (I) the Company is a constituent party, or (II) a subsidiary of the Company is a constituent party (and in the case of (II), the Company issues shares of its capital stock (or analogous equity interests) pursuant to such merger, consolidation or reorganization), except any such merger, consolidation or reorganization involving the Company or such subsidiary in which the voting equity interests of the Company outstanding immediately prior to such merger, consolidation or reorganization continue to represent, or are converted into or exchanged for voting equity interests that represent, immediately following such merger, consolidation or reorganization, at least a majority, by voting power, of the voting equity interests of (1) the surviving or resulting entity; or (2) if the surviving or resulting entity is a wholly owned subsidiary of another entity immediately following such merger, consolidation or reorganization, the parent entity of such surviving or resulting entity.

"**Depreciation**" means an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for the fiscal year or other period for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of the fiscal year or other period, Depreciation will be an amount which bears the same ratio to the beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for the fiscal year or other period bears to the beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for the fiscal year or other period is zero, Depreciation will be determined by reference to the beginning Book Value using any reasonable method selected by the Manager.

"**Membership Interest**" means, for any Member, that Member's total interest as a member of the Company, including that Member's share of the Company's Net Profits, Net Losses, distributions, his/her/its right to inspect the books and records of the Company and his/her/its right, to the extent specifically provided in this Agreement or in the Act and not otherwise restricted herein, to participate in the business, affairs and management of the Company and to vote or grant consent with respect to matters coming before the Company.

"**Net Profits**" and "**Net Losses**" means, for each fiscal period, the net income and net loss, respectively, of the Company for such period as determined in accordance with federal income tax principles (including rules governing depreciation and amortization), subject to the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Losses shall be subtracted from Net Profits or Net Losses;

(c)    Gains or losses resulting from any disposition of a Company asset with respect to which gains or losses are recognized for federal income tax purposes shall be computed with reference to the Book Value of the Company asset disposed of, notwithstanding the fact that the adjusted tax basis of such Company asset differs from its Book Value;

(d)      In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there will be taken into account Depreciation;

(e)      If the Book Value of any Company asset is adjusted upon the events and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), the amount of the adjustment will be taken into account as gain or loss from the disposition of the asset for purposes of computing Net Profits or Net Losses;

(f)      To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses; and

(g)      Any gain, income, deductions or losses specially allocated pursuant to Section 3.2 shall not be taken into account in determining Net Profits or Net Losses.